1   MORGAN, LEWIS & BOCKIUS LLP
    Joseph E. Floren, State Bar No. 168292
2   Elizabeth A. Frohlich, State Bar No. 195454
    One Market, Spear Street Tower
3   San Francisco, CA  94105-1126
    Tel:  415.442.1000
4   Fax:  415.442.1001

5   *Of Counsel*

6   Marc J. Sonnenfeld
    Karen Pieslak Pohlmann
7   1701 Market Street
    Philadelphia, PA 19103-2921
8   Tel: 215.963.5000
    Fax:  215.963.5001

9
    *Attorneys for Defendants CardioNet, Inc., Arie*
10  *Cohen, James M. Sweeney, Martin P. Galvan, Fred*
    *Middleton, Woodrow Myers Jr., M.D., Eric N.*
11  *Prystowsky, M.D., Harry T. Rein, Robert J. Rubin,*
    *M.D., and Randy H. Thurman*
12
    [Additional parties and counsel identified on
13  signature page]

14          **UNITED STATES DISTRICT COURT**

15         **SOUTHERN DISTRICT OF CALIFORNIA**

16  WEST PALM BEACH POLICE PENSION          Civil Action No.: 3:10-cv-00711-L -NLS
    FUND, Individually and on Behalf of All Others
17  Similarly Situated,

18                      Plaintiff,           **MEMORANDUM OF POINTS AND**
                                             **AUTHORITIES IN SUPPORT OF**
19                 vs.                       **DEFENDANTS' JOINT MOTION TO**
                                             **TRANSFER THE ACTION TO THE**
20                                           **EASTERN DISTRICT OF**
    CARDIONET, INC., ARIE COHEN, JAMES M.    **PENNSYLVANIA PURSUANT TO 28**
21  SWEENEY, MARTIN P. GALVAN, FRED          **U.S.C. § 1404(a)**
    MIDDLETON, WOODROW MYERS JR., M.D.,
22  ERIC N. PRYSTOWSKY, M.D., HARRY T.       Date:  June 28, 2010
    REIN, ROBERT J. RUBIN, M.D., RANDY H.    Time: 10:30 a.m.
23  THURMAN, BARCLAY'S CAPITAL, INC.,        Judge: The Hon. M. James Lorenz
    CITIGROUP GLOBAL MARKETS INC.,
24  LEERINK SWANN LLC, THOMAS WEISEL         **ORAL ARGUMENT REQUESTED**
    PARTNERS LLC, BANC OF AMERICA
25  SECURITIES LLC and COWEN AND
    COMPANY,
26
                        Defendants.
27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memo. of Points and Authorities in Support of
Defendants' Joint Motion to Transfer

# TABLE OF CONTENTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................ 3

I.      THE COURT SHOULD DECIDE THIS MOTION FIRST. ............................ 4

II.     THE EASTERN DISTRICT OF PENNSYLVANIA IS A PROPER FORUM. ................ 5

III.    THE CONVENIENCE OF THE PARTIES WEIGHS IN FAVOR OF
        TRANSFER. ............................................................................................ 6

IV.     THE CONVENIENCE OF THE WITNESSES WEIGHS IN FAVOR OF
        TRANSFER. ............................................................................................ 9

V.      TRANSFERRING THIS ACTION TO PENNSYLVANIA WOULD ALSO BE IN
        THE "INTEREST OF JUSTICE." ................................................................ 11

        A.      Pennsylvania Has a Greater Interest in This Litigation Than California. ............. 12

        B.      Judicial Economy Would Be Best Served by Transfer. ....................................... 14

        C.      Plaintiff's Choice of Forum Should Be Disregarded. ......................................... 14

                1.      Plaintiff's Choice of Forum Is Not Entitled to Deference Because
                        Plaintiff Is a Non-Resident. ....................................................... 15

                2.      Plaintiff's Choice of Forum Is Not Entitled to Deference Because
                        This Is a Putative Class Action. ................................................. 15

                3.      Plaintiff's Choice of Forum Is Not Entitled to Deference Because
                        the "Operative Facts" Occurred Primarily in Pennsylvania. ................... 16

        D.      The Availability of Witnesses Subject to Compulsory Process Weighs in
                Favor of Transfer. ................................................................. 18

        E.      The Relative Ease of Access to Sources of Proof Weighs in Favor of
                Transfer. ............................................................................. 18

CONCLUSION ....................................................................................................... 19

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memo. of Points and Authorities in Support of
Defendants' Joint Motion to Transfer

i

1

## <u>**TABLE OF AUTHORITIES**</u>

2

<u>**Cases**</u>

3

<u>Baird v. Cal. Faculty Ass'n</u>, 2000 U.S. Dist. LEXIS
4      6145 (N.D. Cal. Apr. 24, 2000) ................................................................. 14

5 <u>B&B Hardware, Inc. v. Hargis Indus.</u>, No. CV 06-4871,
     2006 U.S. Dist. LEXIS 96381 (C.D. Cal. Nov. 29, 2006)........................... 11, 12, 14
6

7 <u>Bose v. Sunshine Electronics of N.Y., Inc.</u>,
     No. 3:05-CV-252, 2006 U.S. Dist. LEXIS 18669
8      (N.D. Tex. Apr. 12, 2006)....................................................................... 12

9 <u>Broad Data Retrieval Corp. v. Sirius Satellite Radio, Inc.</u>
     No. CV 06-1190, 2006 U.S. Dist. LEXIS 37641
10      (C.D. Cal. June 6, 2006)......................................................................... 11

11
<u>Burse v. Purdue Pharma Co.</u>, No. SC-04-594, C-04-713,
12      2004 U.S. Dist. LEXIS 9769 (N.D. Cal. May 3, 2004) ............................. 4

13 <u>Catch Curve, Inc. v. Venali, Inc.</u>, No. CV 05-04820,
     2006 U.S. Dist. LEXIS 96379 9 (C.D. Cal. Feb. 27, 2006)..................... 15
14

15 <u>In re Connetics Sec. Litig.</u>, No. 06-Civ.-11496, 2007 U.S. Dist. LEXIS
     38480 (S.D.N.Y. May 23, 2007)............................................................. 7, 16
16

17 <u>Doornbos v. Pilot Travel Centers LLC</u>, No. 04-CV-00044, 2005 WL 6167730
     (S.D. Cal. Aug. 15, 2005) ...................................................................... 5
18

19 <u>Fontaine v. Washington Mut. Bank, Inc.</u>, No. CV 08-5659, 2009 U.S. Dist. LEXIS
     41168 (C.D. Cal. Apr. 30, 2009)............................................................ 18

20 <u>Friedman v. Purdue Pharma Co.</u>, No. Civ. 04-0404,
     2004 WL 1376383 (D. Ariz. June 2, 2004) ............................................ 4
21

22 <u>In re Global Cash Access Holdings, Inc. Sec. Litig.</u>, No. 08 Cv. 3516, 2008 U.S.
     Dist. LEXIS 70367 (S.D.N.Y. Sept. 18, 2008)........................................ 9, 16, 18
23

<u>Gould v. National Life Ins. Co.</u>, 990 F. Supp. 1354 (M.D. Ala. 1998) ......................... 4
24

25 <u>In re Hanger Orthopedic Group</u>, 418 F. Supp. 2d 164 (E.D.N.Y. 2006)..................... 7

26 <u>Hatch v. Reliance Ins. Co.</u>, 758 F.2d 409 (9th Cir. 1985) ..................................... <u>passim</u>

27 <u>In re Horseshoe Ent.</u>, 305 F.3d 354 (5th Cir. 2002), <u>opinion superseded by</u>
     337 F.3d 429 (5th Cir. 2003)................................................................. 8
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memo. of Points and Authorities in Support of
Defendants' Joint Motion to Transfer

ii

*Irvine Pharm. Servs., Inc. v. Arnold*, No. SA CV 08-0974,
2008 U.S. Dist. LEXIS 91372 (C.D. Cal. Oct. 28, 2008) ....................................................... 8, 9

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495 (9th Cir. 2000) ........................................ 11, 12, 19

*Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518 (1947) ....................................................... 15

*In re LimitNone, LLC*, 551 F.3d 572 (7th Cir. 2008) ................................................................. 4, 5

*Lou v. Belzberg*, 834 F.2d 730 (9th Cir. 1987) .............................................................. 14, 15, 17

*Madovax, Inc. v. AOL LLC*, No. CV 08-05914 SJO (PJWx),
2009 U.S. Dist. LEXIS 40977 (C.D. Cal. Apr. 14, 2009) ....................................................... 14

*Martin v. Spring Break '83 Prods., LLC*, No. CV 09-6104,
2009 U.S. Dist. LEXIS 119526 (C.D. Cal. Dec. 3, 2009) ....................................................... 18

*In re Nematron Corp.*, 30 F. Supp. 2d 397 (S.D.N.Y. 1998) ................................................. 9, 14

*Pacific Car & Foundry Co. v. Pence*, 403 F.2d 949 (9th Cir. 1968) ....................................... 14

*Pfeifer v. Himax Techs., Inc.*, 530 F. Supp. 2d 1121 (C.D. Cal. 2008) ................................... 15

*Public Employees' Ret. Sys. of Miss. v. Morgan Stanley*,
605 F. Supp. 2d 1073 (C.D. Cal. 2009) ....................................................................................... 4

*SPD Swiss Precision Diagnostics GmbH v. Church & Dwight Co., Inc.*,
No. CV09-0291, 2009 WL 981233 (N.D. Cal. Apr. 13, 2009) ................................................. 8

*Shay v. Sight & Sound Sys.*, 668 F. Supp. 2d 80 (D.D.C. 2009) ............................................. 4

*Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422 (2007) ...................... 4, 5

*Solomon v. Continental Am.*, 472 F.2d 1043 (3d Cir. 1973) ..................................................... 8

*Steelcase, Inc. v. Haworth, Inc.*, No. CV96-1964,
1996 U.S. Dist. LEXIS 20674 (C.D. Cal. May 15, 1996) ....................................................... 18

*In re Stillwater Mining Co. Sec. Litig.*, No. 02-Civ-2806,
2003 U.S. Dist. LEXIS 7983 (S.D.N.Y. May 9, 2003) ................................................. 6, 9, 11

*Szegedy v. Keystone Food Products, Inc.*, No. CV 08-5369,
2009 U.S. Dist. LEXIS 83444 (C.D. Cal. Aug. 26, 2009) ....................................................... 14

*Williams v. Bwman*, 157 F. Supp. 2d 1103 (N.D. Cal. 2001) ................................................. 15

*In re Yahoo! Inc.*, No. CV 07-3125,
2008 U.S. Dist. LEXIS 20605 (C.D. Cal. Mar. 10, 2008) ............................................... passim

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memo. of Points and Authorities in Support of
Defendants' Joint Motion to Transfer

iii

<u>Young v. Wells Fargo & Co.</u>, No. C 08-3735,
  2008 U.S. Dist. LEXIS 103955 (N.D. Cal. Dec. 17, 2008) .............................................. <u>passim</u>

**<u>Statutes</u>**

15 U.S.C. § 77a ...................................................................................................................... 1

15 U.S.C. § 77p(c) .................................................................................................................. 1

15 U.S.C. § 77v ............................................................................................................... 1, 5, 14

15 U.S.C. § 78j(b) ................................................................................................................... 3

15 U.S.C. § 78t(a) ................................................................................................................... 3

15 U.S.C. 78u-4 ...................................................................................................................... 12

28 U.S.C. § 1404(a) ........................................................................................................... <u>passim</u>

**<u>Federal Rules</u>**

Fed. R. Civ. P. 4(k)(1) ............................................................................................................ 3

Fed. R. Civ. P. 45(b)(2) ......................................................................................................... 3

MORGAN, LEWIS &
  BOCKIUS LLP
ATTORNEYS AT LAW
 SAN FRANCISCO

Memo. of Points and Authorities in Support of
Defendants' Joint Motion to Transfer

iv

1    In this action brought by plaintiff West Palm Beach Police Pension Fund (the "Pension

2    Fund" or "Plaintiff"), defendants CardioNet, Inc. ("CardioNet" or the "Company"), Arie Cohen,

3    James M. Sweeney, Martin P. Galvan, Fred Middleton, Woodrow Myers, Jr., M.D., Eric N.

4    Prystowsky, M.D., Harry T. Rein, Robert J. Rubin, M.D., Randy H. Thurman (collectively

5    "CardioNet Defendants"), and Barclays Capital, Inc. (erroneously named as Barclay's Capital,

6    Inc.), Citigroup Global Markets Inc. ("CGM"), Leerink Swann LLC, Thomas Weisel Partners

7    LLC, Banc of America Securities LLC and Cowen and Company (collectively "Underwriter

8    Defendants" and with CardioNet Defendants, "Defendants"), respectfully submit this

9    Memorandum of Points and Authorities in Support of their Joint Motion to Transfer the Action to

10   the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).

11                               **PRELIMINARY STATEMENT**

12       Despite the fact that Plaintiff, the pension fund for police officers in West Palm Beach,

13   Florida, has no discernible ties to California, and only one of sixteen defendants is located in the

14   Southern District of California ("Southern District"), Plaintiff filed this purported federal

15   securities class action complaint alleging violations of the Securities Act of 1933 (the "Securities

16   Act"), 15 U.S.C. § 77a, *et seq.* in San Diego County Superior Court. Defendants timely removed

17   the action to this Court, citing the Securities Litigation Uniform Standards Act of 1998

18   ("SLUSA"), 15 U.S.C. §§ 77p(c), 77v(a), as grounds for removal. Defendants now seek to

19   transfer the action to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). A

20   significant number of Defendants and key witnesses are located in or near Pennsylvania, the

21   principal place of business of CardioNet; most of the relevant events and alleged conduct

22   occurred in Pennsylvania; there is already pending federal securities litigation against CardioNet

23   and two of the individual defendants in this case in the Eastern District of Pennsylvania

24   ("Pennsylvania") that substantially overlaps with this case on numerous issues of fact and law;

25   and there is little meaningful connection between this case and the Southern District.

26       Plaintiff's Amended Complaint purports to assert claims on behalf of a putative class of

27   investors who allegedly "purchased or otherwise acquired the common stock of CardioNet

28   pursuant and/or traceable to the Company's $83 million initial public stock offering on March 25,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memo. of Points and Authorities in Support of
Defendants' Joint Motion to Transfer                    1

2008 (the 'IPO') and or its $152+ million secondary stock offering on August 6, 2008 (the 'Secondary Offering,' collectively with the IPO, the 'Offerings')." Am. Compl. ¶ 1 (A copy of the Amended Complaint is attached hereto as Exhibit 1.) The Amended Complaint alleges that the registration statement and prospectus for the IPO and the Secondary Offering (collectively, the "Offering Documents") contained false and misleading statements and omissions in violation of the Securities Act.

Plaintiff appears to be a citizen of Florida.[1] Defendants include (1) the Company, a leading provider of innovative cardiac monitoring technology and related services that is based in Pennsylvania, (2) several former and current officers and directors of the Company (Cohen, Galvan, and Thurman) who reside in Pennsylvania, (3) former director Myers and current director Prystowsky, who are residents of Indiana, (4) current director Rubin and former director Rein, who are residents of Maryland and Connecticut respectively, (5) former officer and Executive Chairman Sweeney and current director Middleton, who reside in California, and (6) the Underwriter Defendants, most of whom are headquartered in New York City.[2]

This securities litigation is about allegedly misleading or omitted material information in the Offering Documents. The potential witnesses with the most knowledge regarding the preparation of the Offering Documents are current or former employees of CardioNet who work and/or reside in the Pennsylvania area. In addition, most of the Underwriter Defendants involved in preparing the Offering Documents—including the lead underwriter, CGM—are located in New York. Many of the central allegations of the Amended Complaint concern the operations of the Company's Pennsylvania testing center and its dealings with third parties in or near Pennsylvania. Key third parties who are referenced in the Amended Complaint are located in or near Pennsylvania and within the subpoena power of the Pennsylvania court. As detailed further

---

[1] Although the Amended Complaint does not identify Plaintiff's state of citizenship, Defendants' good faith efforts indicate that Plaintiff is a citizen of Florida. See http://www.wpbppf.com/modules /contactUs/ (last visited on April 7, 2010) (noting the Pension Fund's address in West Palm Beach, Florida).

[2] Underwriter Defendants Leerink Swann LLC and Thomas Weisel Partners LLC, both incorporated in Delaware, have principal places of business in Massachusetts and California, respectively.

below, it would be far more convenient, practical, and efficient to try this case in Pennsylvania, which would have jurisdiction over or be able to serve compulsory process on the Defendants and key third parties located in Pennsylvania, New York and elsewhere on the East Coast as they are within 100 miles of Pennsylvania.  See generally Fed. R. Civ. P. 4(k)(1); Fed R. Civ. P. 45(b)(2).

Ordinarily, a plaintiff's choice of forum is entitled to deference.  That is not so here. Transferring this action to Pennsylvania is appropriate because Pennsylvania has a far greater interest than any California court in adjudicating claims related to the activities of a corporation based in Pennsylvania.  In addition, the Company is currently defending a putative federal securities class action that was filed in August 2009 in the Eastern District of Pennsylvania alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) (the "Pennsylvania Action") that names CardioNet, Galvan and Thurman, all of whom are defendants in this case.  (A copy of the Consolidated Complaint in the Pennsylvania Action is attached hereto as Exhibit 2).  The factual allegations in the Pennsylvania Action overlap with many of the allegations asserted here.  The presence of most defendants and key thirty party witnesses in or close to Pennsylvania and subject to compulsory process—whereas Plaintiff here is a citizen of Florida and has no connection to either forum—makes transfer to Pennsylvania appropriate and serves the best interests of the parties.  Moreover, the Pension Fund, a non-resident plaintiff representing a putative class, has little or no basis for asserting that California is an appropriate forum for its claims.

Under these circumstances, settled authority strongly indicates that the Court may and should address this motion first, before any other matters pertaining to jurisdiction, and should transfer this case to the Eastern District of Pennsylvania for all further proceedings.

## ARGUMENT

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  The determination of whether an action should be transferred pursuant to § 1404(a) thus involves a two-step inquiry.  See Hatch v. Reliance Ins. Co., 758 F.2d 409, 414 (9th Cir. 1985).  First, a court must find that the district to which the action would be transferred

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer                                      3

is one where the action "might have been brought."  Id.  Second, assuming the transferee forum is appropriate, the court must weigh the three statutory factors: (1) convenience of the parties; (2) convenience of witnesses; and (3) the "interest of justice."  Id.

## I.       THE COURT SHOULD DECIDE THIS MOTION FIRST.

Defendants expect that Plaintiff will move to remand this case to state court.[3]  However, the Court need not address Plaintiff's anticipated motion regarding the "propriety of removal before ruling on the motion to transfer."  Public Employees' Ret. Sys. of Miss. v. Morgan Stanley, 605 F. Supp. 2d 1073, 1074 (C.D. Cal. 2009).  As the Supreme Court recognized, "[a] district court . . . may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant."  Sinochem Int'l Co. Ltd. v. Malay Int'l Shipping Corp., 549 U.S. 422, 432 (2007).[4]  See also In re LimitNone, LLC, 551 F.3d 572, 576 (7th Cir. 2008) (per curiam) ("[T]he district court was not required to determine its own subject-matter jurisdiction before ordering the case transferred.") (citing cases); Shay v. Sight & Sound Sys., 668 F. Supp. 2d 80, 82 (D.D.C. 2009) ("Because there is no automatic priority for sequencing jurisdictional issues, a court may decide questions of venue before addressing issues of personal or subject matter jurisdiction.") (citation omitted); Gould v. National Life Ins. Co., 990 F. Supp. 1354, 1362 (M.D. Ala. 1998) ("[T]here is no federal law or statute, or judicial decision, that requires this court to decide a motion to remand before it decides a motion to transfer.") (citing cases).  District courts within the Ninth Circuit have not hesitated to rule on a motion to transfer

---

[3]   Plaintiff's anticipated remand action is part of its strategy to avoid having to litigate this action in tandem with the Pennsylvania action, just as was its tactical amendment to the complaint shortly after filing to eliminate the California securities fraud claims that created a separate basis for removal of this action.  Plaintiff hopes to defeat transfer of the case through the remand motion.  Since the Pennsylvania court is best suited to handle this action, all questions including any remand or other jurisdictional motions should be addressed by that court.  At Plaintiff's request, however, Defendants agreed, subject to the Court's approval, to notice the hearing on this motion on June 28 so that Plaintiff could notice its anticipated motion to remand for hearing on the same date, in order that the Court may have both motions before it and decide which motion to entertain first.

[4]   The Supreme Court noted in Sinochem that the doctrine of *forum non conveniens* has been "codified" in 28 U.S.C. § 1404(a) and Congress "has provided for transfer, rather than dismissal, when a sister federal court is the more convenient place for trial of the action."  549 U.S. at 430.  Accordingly, Sinochem's analysis applies to this motion to transfer.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer                                               4

1    before deciding a motion to remand when circumstances so warrant. See, e.g., Morgan Stanley,

2    605 F. Supp. at 1074-75; Burse v. Purdue Pharma Co., Nos. C-04-594, C-04-713, U.S. Dist.

3    LEXIS 9769, at *4 (N.D. Cal. May 3, 2004) ("The Court is free to rule on the competing motions

4    [to remand and to transfer] in any order."); Friedman v. Purdue Pharma. Co., No. Civ. 04-0404,

5    2004 WL 1376383, at *2 (D. Ariz. June 2, 2004) (same).

6         The factors identified by the Supreme Court in Sinochem all weigh in favor of ruling on

7    the motion to transfer before the anticipated motion to remand in this case. In denying a petition

8    for a writ of mandamus challenging a district court's decision to rule on a motion to transfer

9    before ruling on a motion to remand, the Court of Appeals for the Seventh Circuit explained that

10   "[t]he relative ease of determining venue before subject-matter jurisdiction is an issue of judicial

11   economy; the site of the majority of the conduct in question concerns the convenience and

12   fairness of transferring the case." LimitNone, 551 F.3d at 576. As set forth below, the contacts

13   with Pennsylvania support the convenience and fairness of both deciding the motion to transfer

14   first and of transferring the case. Similarly, judicial economy is well served by deciding the

15   motion to transfer both because of the relative ease of the deciding transfer compared to subject

16   matter jurisdiction and because transferring this case to a forum where a related case is pending

17   supports judicial economy. Thus, this court should follow the instructions of the Supreme Court

18   that "where subject-matter or personal jurisdiction is difficult to determine, and *forum non*

19   *conveniens* considerations weigh heavily in favor of dismissal, the court properly takes the less

20   burdensome course." Sinochem, 549 U.S. at 436.

21   **II.      THE EASTERN DISTRICT OF PENNSYLVANIA IS A PROPER FORUM.**

22        Under the first part of the two-step inquiry described in Hatch, there is no question that

23   this action "might have been brought" in Pennsylvania. Federal courts have jurisdiction over

24   suits brought under the Securities Act, and venue would be appropriate in Pennsylvania because

25   CardioNet resides and transacts business in Pennsylvania. See 15 U.S.C. § 77v; see also

26   Doornbos v. Pilot Travel Centers LLC, No. 04cv00044, 2005 WL 6167730, at *2 (S.D. Cal. Aug.

27   16, 2005) (noting that action could have properly been brought in transferee venue of Tennessee

28   because "[p]ersonal jurisdiction over a corporation is proper in the district where the corporation

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

5

is headquartered and from which it conducts substantial business"). Similarly, a number of the individual Defendants reside in or near Pennsylvania. Declaration of Philip G. Leone in Support of Defendants' Joint Motion to Transfer the Action to the Eastern District of Pennsylvania Pursuant to 28 U.S.C. § 1404(a) ¶¶ 6-9 (hereinafter "Leone Decl.").

### III. THE CONVENIENCE OF THE PARTIES WEIGHS IN FAVOR OF TRANSFER.

The three factors that are considered under the second part of the two-step inquiry described in Hatch all strongly weigh in favor of transfer here. In this action, a Florida plaintiff has brought suit in California against Pennsylvania-based CardioNet, Pennsylvania residents Cohen, Galvan, and Thurman, mostly New York-based Underwriter Defendants, and a handful of defendants located in other states near Pennsylvania. Leone Decl. ¶¶ 4, 6-9; Declaration of Joseph E. Floren in Support of Defendants' Joint Motion to Transfer the Action to the Eastern District of Pennsylvania Pursuant to 28 U.S.C. § 1404(a) ¶¶ 2-5, 11 (hereinafter "Floren Decl."). Indeed, Thurman works at CardioNet's headquarters. Leone Decl. ¶ 6. In contrast, of the sixteen named defendants, only three (Middleton, Sweeney and Thomas Weisel Partners LLC) have any connection to California. Leone Decl. ¶¶ 10-11; Floren Decl. ¶ 7. Of these three defendants, only one, defendant Sweeney, has any connection to the Southern District. Leone Decl. ¶ 10. However, Sweeney has had no connection to CardioNet since mid-2008, and Middleton is an outside director, not an officer, of CardioNet. Id. ¶¶ 10-11. Furthermore, the three parties with any connection to California are all asking this Court to transfer the case to Pennsylvania, not to keep it in California, because they believe it is more convenient to litigate in Pennsylvania notwithstanding their locations in California. Thus, the "convenience of the parties," the first factor in the § 1404(a) analysis, weighs heavily in favor of transfer of this action to Pennsylvania.

In analyzing the convenience of the parties, the logical starting point is their residences. In a purported class action securities case such as this, where Defendants' conduct and alleged misstatements and omissions will take center stage, the location and convenience of Defendants assumes even greater importance. See In re Yahoo! Inc., No. CV 07-3125, 2008 U.S. Dist. LEXIS 20605, at *8 (C.D. Cal. Mar. 10, 2008); see also In re Stillwater Mining Co. Sec. Litig., No. 02 Civ. 2806, 2003 U.S. Dist. LEXIS 7983, at *11 (S.D.N.Y. May 9, 2003) (holding when

"the facts giving rise to [the] action lie within the knowledge of the officers and employees of [the defendant] who participated in creating and disseminating the allegedly false and misleading statements," and "plaintiffs do not have personal knowledge about [those] disputed issues," the convenience of the parties weighs in favor of transfer, even if plaintiffs reside in the chosen forum); In re Connetics Sec. Litig., No. 06 Civ. 11496, 2007 U.S. Dist. LEXIS 38480, at *14 (S.D.N.Y. May 23, 2007) (transferring securities class action filed in New York by lead plaintiff Oklahoma Teachers' Retirement System to California, where the "vast majority" of the corporate and individual defendants resided).

By contrast, the residence of the named plaintiff in a purported class action securities case has little bearing on the "convenience of the parties" when that plaintiff has no apparent connection to the forum it has chosen.  See In re Connetics, 2007 U.S. Dist. LEXIS 38480, at * 15 ("[L]ead plaintiff Oklahoma Teachers is a resident of Oklahoma and thus cannot claim that [New York] is the more convenient forum for it.").  For example, in In re Yahoo!, the court transferred a securities class action to the Northern District of California, where defendant Yahoo! was headquartered and the individual defendants resided, because lead plaintiffs, both pension funds, could show no reason why their chosen forum of the Central District of California was convenient for them, or that they would be inconvenienced by the transfer.  See 2008 U.S. Dist. LEXIS 20605, at *7-8.  Like the Pension Fund here, plaintiffs there were not residents of their chosen forum.  Id.  The court found significant the fact that the plaintiffs represented not only themselves, but also a "putative class . . . presumably consist[ing] of persons residing throughout the United States."  Id.; see also Young v. Wells Fargo & Co., No. C 08-3735, 2008 U.S. Dist. LEXIS 103955, at *12 (N.D. Cal. Dec. 17, 2008) (transferring nationwide class action to Southern District of Iowa because, among other things, "class members will be located throughout the country"); In re Hanger Orthopedic Group, 418 F. Supp. 2d 164, 169 (E.D.N.Y. 2006) (transferring securities class action from the Eastern District of New York to the District of Maryland because lead plaintiffs "are simply representatives of a putative class that will likely be geographically dispersed throughout the United States" and "cannot claim that New York is the more convenient forum for them," whereas defendants "are all located in or near the District of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

7

1  Maryland" and thus "have a compelling claim that Maryland is the more convenient forum for

2  them").  Securities class actions are routinely transferred to the district where the defendants are

3  found.  See Hanger, 418 F. Supp. 2d at 168 (citing cases).

4          Here, the vast majority of the sixteen defendants reside in or near the Pennsylvania area,

5  Leone Decl. ¶¶ 4, 6-9; Floren Decl. ¶¶ 2-7, 11, and each of the individual Defendants located in

6  California either has had no connection with CardioNet since mid-2008 or has never been an

7  officer.  Leone Decl. ¶¶ 10-11.  In all events, the few California-based defendants believe that

8  Pennsylvania is a more convenient forum.  Accordingly, it would be far more convenient for each

9  of these Defendants if this action were litigated in Pennsylvania rather than the Southern District.

10  The location of Defendants should be the paramount consideration because this action will focus

11  on their alleged misstatements and omissions.  Am. Compl. ¶¶ 10-30, 64-80.  Moreover, all the

12  Defendants (even those located in California) seek to transfer the case to Pennsylvania.  On the

13  other hand, Plaintiff, a resident of Florida, has no basis for asserting that the Southern District of

14  California is an especially convenient forum or that transfer to Pennsylvania would in any way

15  inconvenience Plaintiff (indeed, Florida is substantially closer to Pennsylvania than to California).

16  See, e.g., Wells Fargo, 2008 U.S. Dist. LEXIS 103955, at *10-11 (where class plaintiffs did not

17  reside in either transferor or transferee district, granting motion to transfer action to Southern

18  District of Iowa, where the majority of defendants were headquartered).

19          Finally, Plaintiff's choice to file suit in the Southern District may be motivated by the fact

20  that Plaintiff's counsel has an office in the Southern District.  However, courts have made clear

21  that "[c]onvenience of [plaintiff's] counsel bears no weight in the analysis of convenience of the

22  witnesses and parties."  SPD Swiss Precision Diagnostics GmbH v. Church & Dwight Co., Inc.,

23  No. CV 09-0291, 2009 WL 981233, at *3 (N.D. Cal. Apr. 13, 2009) (citing In re Horseshoe Ent.,

24  305 F.3d 354, 358 (5th Cir. 2002), opinion superseded by 337 F.3d 429, 434 (5th Cir. 2003)

25  ("[t]he factor of 'location of counsel' is irrelevant and improper for consideration in determining

26  the question of transfer of venue") and Solomon v. Continental Am. Life Ins. Co., 472 F.2d 1043,

27  1047 (3d Cir. 1973) ("The convenience of counsel is not a factor to be considered.")).

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer                                          8

In sum, a non-resident plaintiff has asserted securities claims against a corporate entity headquartered in Pennsylvania and individuals and other corporate entities that largely reside or are based in or near the Pennsylvania area, and even those individuals who reside in California seek transfer. This factor weighs strongly in favor of transferring this action to Pennsylvania.

## IV. THE CONVENIENCE OF THE WITNESSES WEIGHS IN FAVOR OF TRANSFER.

The convenience of the witnesses in this action—the second factor in the second step of the inquiry under Hatch—also weighs in favor of transferring this case to Pennsylvania because that location would be far more convenient to the key witnesses. See In re Yahoo!, 2008 U.S. Dist. LEXIS 20605, at *8; Irvine Pharm. Servs., Inc. v. Arnold, No. SA CV 08-0974, 2008 U.S. Dist. LEXIS 91372, at *6-7 (C.D. Cal. Oct. 28, 2008).

The concentration of a majority of potential witnesses in a single district weighs in favor of transfer to that district. See, e.g., Wells Fargo, 2008 U.S. Dist. LEXIS 103955, at *11 (ordering transfer of action to Southern District of Iowa because "the senior level officers and employees responsible for developing and implementing the policies and procedures at issue are located in Des Moines"); In re Nematron Corp. Sec. Litig., 30 F. Supp. 2d 397, 401 (S.D.N.Y. 1998) (transferring securities class action to the Eastern District of Michigan largely because "all or virtually all of the witnesses that [defendants] anticipate calling . . . reside and/or work in Southeastern Michigan, within the boundaries of the Eastern District of Michigan"). Moreover, the convenience of a few "key" witnesses outweighs "the convenience of numerous less important witnesses." Irvine, 2008 U.S. Dist. LEXIS 91372, at *7-8 (finding that convenience of the witnesses weighed in favor of transferring the action to the District of Wisconsin even though a majority of witnesses resided in California, because defendant's witnesses, who lived closer to Wisconsin, would "directly address the [dispositive] question of whether or not the Defendant violated the Trade Secret Agreement"). In securities cases like this one, where "plaintiff alleges that certain documents contained false or misleading statements, the key witnesses are frequently 'officers and employees of [the defendants] who participated in drafting or distributing [those] statements.'" In re Global Cash Access Holdings, Inc. Sec. Litig., No. 08 Cv. 3516, 2008 U.S.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

9

1  Dist. LEXIS 70367, at *12 (S.D.N.Y. Sept. 18, 2008) (quoting In re Stillwater, 2003 U.S. Dist.

2  LEXIS 7983, at *4).

3       Here, the most important witnesses—the current and former employees of CardioNet who

4  participated in the preparation of the Offering Documents—are almost all located in or near

5  Pennsylvania. Leone Decl. ¶ 14. For example, at the time of the Offerings and at present,

6  CardioNet's head of the regulatory and reimbursement department and the top executives in its

7  finance department, as well as key operations including, inter alia, intake (referral processing),

8  distributions, billings, reimbursement services and commercial and Medicare payor contracts,

9  were and are located in Pennsylvania. Leone Decl. ¶ 12. Moreover, CardioNet's former and

10  current marketing and sales executives who could comment on the sales practices of the

11  Company that form a substantial portion of Plaintiff's allegations, see Am. Compl. ¶¶ 15, 23-24,

12  26, 66-68, 74-76, are and were also all located in Pennsylvania. Leone Decl. ¶ 16. CardioNet's

13  Senior Vice-President of Clinical Operations, who was responsible for CardioNet's Mobile

14  Cardiac Outpatient Telemetry ("MCOT™") clinical trials, and the Company's Medical Director,

15  both of whom would serve as important witnesses with respect to Plaintiff's allegations regarding

16  the results of a clinical trial published in the *Journal of Cardiovascular Electrophysiology*, were

17  and are located in Philadelphia. Leone Decl. ¶¶ 12, 17. The individuals at CardioNet's

18  independent accounting firm, Ernst & Young, who worked with CardioNet at the time the

19  Offering Documents were prepared, also were and are located in Pennsylvania. Leone Decl. ¶ 18.

20       Importantly, third parties whose conduct is referenced in the Amended Complaint are

21  located much closer to Pennsylvania than California. For example, the Amended Complaint

22  highlights a report by a stock analyst from Jefferies & Company, Inc. (the "Jefferies Report").

23  Am. Compl. ¶¶ 7, 58. The three analysts listed on the front page of the Jefferies Report and who

24  provide the analyst certifications for the Jefferies Report on page 13, all have phone numbers in

25  New York City, and Jefferies is headquartered in New York City. Floren Decl. ¶¶ 8-9. The

26  Amended Complaint also focuses on reimbursement decisions by Highmark Medicare Services

27  ("Highmark") for CardioNet's MCOT™ technology as well as CardioNet's relationship with

28  Highmark. See e.g., Am. Compl. ¶¶ 4, 7-8, 12, 25, 58, 61, 69-71, 77-79. Highmark, which is the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer
    10

1   Medicare contractor that prices CardioNet's MCOT™ technology regionally, is located in Camp

2   Hill, Pennsylvania, Leone Decl. ¶ 20, which is within one hundred miles of the courthouse where

3   the Pennsylvania Action is pending and therefore within the subpoena powers of the Pennsylvania

4   court.  In addition, the Amended Complaint makes numerous allegations relating to the Centers

5   for Medicare and Medicaid Services ("CMS") (the government agency responsible for national

6   Medicare reimbursement rates), its relationship with Highmark and its role in reimbursement

7   decisions relating to CardioNet's MCOT™ technology.  See, e.g., Am. Compl. ¶¶ 19, 23, 58, 69-

8   71, 77-79.  CMS is located in Baltimore, Maryland, Leone Decl. ¶ 21, which, like Highmark, is

9   also within the subpoena powers of the Pennsylvania court.  In addition, to the extent any

10  accounting issues arise, CardioNet's independent accounting firm is located within the subpoena

11  power of the Pennsylvania court. Id. ¶ 18.  In sum, these important witnesses are near

12  Pennsylvania and thousands of miles away from Southern California.

13      Given that there is no reason to believe that any of the key witnesses for the Plaintiff are

14  located in the Southern District, it would be far more convenient for the majority of the witnesses

15  if Plaintiff's claims were litigated in Pennsylvania rather than the Southern District.[5]

16  **V.      TRANSFERRING THIS ACTION TO PENNSYLVANIA WOULD ALSO BE IN
17           THE "INTEREST OF JUSTICE."**

18      In deciding the third factor under the second step of the analysis prescribed in Hatch—

19  whether it would be in the "interest of justice" to transfer an action to another district—courts in

20  the Ninth Circuit may consider a multitude of potentially relevant factors.  See Jones v. GNC

21  Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000); B & B Hardware, Inc. v. Hargis Indus.,

22  No. CV 06-4871, 2006 U.S. Dist. LEXIS 96381, at *17-18 (C.D. Cal. Nov. 29, 2006).  Of those

23

24  _____

        [5]   That witnesses located in Pennsylvania or New York could be deposed in those
25  locations instead of California is irrelevant to this transfer motion because "[i]n assessing the
    effect of a transfer on the convenience of witnesses, courts consider the effect of a transfer on the
26  availability of certain witnesses, and their live testimony, at trial."  Broad. Data Retrieval Corp. v.
    Sirius Satellite Radio, Inc., No. CV 06-1190, 2006 U.S. Dist. LEXIS 37641, at *7-8 (C.D. Cal.
27  June 6, 2006) (emphasis added) (internal quotations and citation omitted); see also In re
    Stillwater, 2003 U.S. Dist. LEXIS 7983, at * 12-13 (rejecting plaintiffs' suggestion that "the
28  testimony of defendants' witnesses could be videotaped for trial" because "[d]efendants have a
    right to call live witnesses").

Morgan, Lewis &
Bockius LLP
Attorneys At Law
San Francisco

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer                                            11

factors, five are potentially relevant here: (a) the relative interests of the two forums in the

litigation; (b) which forum would better serve judicial economy; (c) Plaintiff's choice of forum;

(d) the availability of compulsory process to compel attendance of unwilling non-party witnesses;

and (e) ease of access to sources of proof. Each weighs in favor of transfer here.[6]

### A.   Pennsylvania Has a Greater Interest in This Litigation Than California.

When deciding whether transfer would be in the "interest of justice," courts often consider

the "relative interests of the two forum states in the litigation."  B & B Hardware, 2006 U.S. Dist.

LEXIS 96381, at *17-18.  Pennsylvania has a greater interest in adjudicating this action than does

California, and the Amended Complaint reveals as much.  Nearly every corporate entity named as

a Defendant in the Complaint has its principal place of business in Pennsylvania or New York.

See Leone Decl.¶ 4; Floren Decl. ¶¶ 2-5.  More importantly, the corporate entity that allegedly

made the false or misleading statement in its Offering Statements, CardioNet, has its headquarters

in Pennsylvania.  Leone Decl. ¶ 4.  Surely, Pennsylvania has a greater interest than any California

court in resolving disputes involving the activities of corporations located in Pennsylvania.  See,

e.g., Bose Corp. v. Sunshine Electronics of N.Y., Inc., No. 3:05-CV-252-L, 2006 U.S. Dist.

LEXIS 18669, at *23-25 (N.D. Tex. Apr. 12, 2006) (holding that the Eastern District of New

York had a local interest in adjudicating a federal trademark infringement action because the

alleged infringers were headquartered in Brooklyn).

Pennsylvania also has a greater interest in this case because District Judge Stewart Dalzell

of the Eastern District of Pennsylvania is currently presiding over the Pennsylvania Action, a case

alleging violations of the federal securities laws by three of the defendants in this matter,

CardioNet, Galvan, and Thurman, based on many of the same allegations.  Originally, two

separate complaints were filed on behalf of two different plaintiffs, and Judge Dalzell

consolidated the cases.  Pursuant to the Private Securities Litigation Reform Act of 1995, 15

U.S.C. § 78u-4(a)(3), notice of the claim was published and three separate competing lead

---

[6]  In addition to the factors addressed here, courts in the Ninth Circuit have identified several other factors as relevant to the "interest of justice" analysis, including the state that is most familiar with the governing law and the enforceability of the judgment.  Jones, 211 F.3d at 498-99; In re Yahoo!, 2008 U.S. Dist. LEXIS 20605, at *5.  None of these factors is particularly relevant here, and certainly none weighs against transfer.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

12

1    plaintiff motions to appoint lead plaintiff and lead counsel were filed, resulting in separate orders

2    appointing lead plaintiff and subsequently approving the selection of lead counsel.  See Floren

3    Decl. ¶ 10.

4          Pursuant to Judge Dalzell's scheduling order, defendants filed a motion to dismiss the

5    claims in the Pennsylvania Action on March 26, 2010.  The allegations underlying the claims that

6    Judge Dalzell will analyze in ruling on defendants' pending motion to dismiss substantially

7    overlap with the factual allegations here.  For example, the plaintiffs in this action and the

8    Pennsylvania Action both base their claims on CardioNet's MCOT™ technology and the

9    reimbursement for the use of the technology.  Compare Pennsylvania Action Compl. ¶¶ 2-3, 39-

10   42, 48, 53-54 with Am. Compl. ¶¶ 2-4, 6, 17-19, 54 (discussing technology and reimbursement

11   process).  Plaintiffs in both actions allege that the reimbursement of CardioNet's MCOT™

12   technology by Medicare was likely to face a significant rate decrease, as explained in the Jefferies

13   Report.  Compare Pennsylvania Action Compl. ¶¶ 4-5, 68-72, with Am. Compl. ¶¶ 7, 58, 59.

14   Indeed, the Amended Complaint highlights the Jefferies Report under the heading "The Truth

15   Begins to Emerge," and Paragraph 58 describing the Jefferies Report spans five pages.  Am.

16   Compl. ¶ 58.  Both complaints also focus on CardioNet's denial of any advance knowledge about

17   such a reduction and the Company's later announcements that commercial payors and the

18   Medicare contractor decided to reduce its reimbursement rate.  Compare Pennsylvania Action

19   Compl. ¶¶ 74-75, 93-94, 98-99, 102, with Am. Compl. ¶¶ 7-8, 60, 61.  Other overlapping

20   allegations exist, including claims about venture capital investments in CardioNet and references

21   to an article about CardioNet in The Wall Street Journal.  Compare Pennsylvania Action Compl.

22   ¶¶ 7, 13-14, 43-44, 87(d), 91 and Ex. 2, with Am. Compl. ¶¶ 9, 55, 57, 62-63.  Although the

23   Pennsylvania Action does not focus on the IPO and Secondary Offering to the same extent as the

24   Amended Complaint does, the complaint in that action includes allegations about these events

25   and claims that stock sales in these Offerings establish that certain parties anticipated

26   reimbursement rate changes.  Pennsylvania Action Compl. ¶¶ 56, 58, 85(d).  Thus, the overlap in

27   factual allegations is significant.  Moreover, certain legal issues overlap both actions, such as the

28   standards for determining whether alleged misstatements and omissions were material.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer                                          13

1    Given the similarity of the allegations in these cases and the advancement in the

2    Pennsylvania Action as demonstrated by its procedural history, transfer to Pennsylvania is

3    appropriate.

4    **B.**     **Judicial Economy Would Be Best Served by Transfer.**

5    As described above, there is significant overlap between the factual allegations in the

6    Pennsylvania Action and this case.  Judicial economy would be better served by having these two

7    cases proceed before the same Court in the same jurisdiction where one judge can become

8    familiar with the facts and legal issues, ensure consistency of rulings on overlapping issues and,

9    should any claims proceed past a motion to dismiss, coordinate discovery to prevent duplication

10   and inconvenience to witnesses and parties.  See Szegedy v. Keystone Food Products, Inc., No.

11   CV 08-5369, 2009 U.S. Dist. LEXIS 83444, at *11-19 (C.D. Cal. Aug. 26, 2009) (noting that

12   "interests of judicial economy weigh strongly in favor of transfer" to the Eastern District of

13   Pennsylvania because of the existence of a related case and although it involved "different legal

14   theories . . . it involves similar, if not identical, facts and issues" and the Pennsylvania judge "had

15   extensive experience with these factual allegations" and "is therefore in the best position to

16   consider plaintiff's claims here"); see also Baird v. California Faculty Ass'n, No. C-00-0628-

17   VRW, 2000 U.S. Dist. LEXIS 6145, at *2-3 (N.D. Cal. Apr. 24, 2000) ("related litigation pending

18   in the proposed transferee forum is a factor that weighs heavily in favor of transfer") (citation

19   omitted); Modovax, Inc. v. AOL LLC, No. CV 08-05914 SJO (PJWx), 2009 U.S. Dist. LEXIS

20   40977, at *19 (C.D. Cal. Apr. 14, 2009) ("to permit a situation in which two cases involving

21   precisely the same issues are simultaneously pending in different District Courts leads to the

22   wastefulness of time, energy and money that § 1404(a) was designed to prevent") (citation

23   omitted).

24   **C.**     **Plaintiff's Choice of Forum Should Be Disregarded.**

25   Although a plaintiff's forum choice is generally afforded deference, Lou v. Belzberg, 834

26   F.2d 730, 739 (9th Cir. 1987), a "plaintiffs' choice of forum ... 'is not the final word.'" B & B

27   Hardware, 2006 U.S. Dist. LEXIS 96381, at *10 (quoting Pacific Car & Foundry Co. v. Pence,

28   403 F.2d 949, 954 (9th Cir. 1968)).  The fact that this is a securities class action brought pursuant

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to          14
Transfer

1   to the special venue provision of the Securities Act, 15 U.S.C. § 77v, is irrelevant.  See, e.g., In re

2   Nematron, 30 F. Supp. 2d at 406 (holding that § 77v does "not alter the standard employed in

3   deciding whether transfer is appropriate").

4        A plaintiff's choice of forum receives less deference when any one of the following is

5   true: (1) plaintiff is not a resident of its chosen forum; (2) plaintiff purports to represent a class;

6   (3) the operative facts did not occur in the chosen forum; or (4) plaintiff has engaged in forum

7   shopping.  See Lou, 834 F.2d at 739; Catch Curve, Inc. v. Venali, Inc., No. CV 05-04820, 2006

8   U.S. Dist. LEXIS 96379, at *4 (C.D. Cal. Feb. 27, 2006).  Here, as established below, this case

9   presents at least two of these factors and a third—the question of where the operative facts

10  occurred—is debatable at best.  Thus, Plaintiff's choice of forum should be disregarded entirely.

### 1.  Plaintiff's Choice of Forum Is Not Entitled to Deference Because Plaintiff Is a Non-Resident.

13        Plaintiff is not a resident of the Southern District of California.  Therefore, "the usual

14  reasons for deferring to a plaintiff's choice of forum do not apply" in this case.  In re Yahoo!,

15  2008 U.S. Dist. LEXIS 20605, at *15; Pfeifer v. Himax Techs., Inc., 530 F. Supp. 2d 1121, 1124

16  (C.D. Cal. 2008) (giving "only minimal consideration to Plaintiffs' choice of forum" because

17  plaintiffs did not reside in the district they chose); see also Wells Fargo, 2008 U.S. Dist. LEXIS

18  103955, at *9-10 ("Where a plaintiff does not reside in the forum, the Court may afford his choice

19  considerably less weight."); Williams v. Bowman, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001)

20  (stating that deference given to plaintiff's choice of forum is "substantially reduced" when

21  plaintiff is a non-resident) (citation omitted).

### 2.  Plaintiff's Choice of Forum Is Not Entitled to Deference Because This Is a Putative Class Action.

23        This case is a putative class action. Because the Pension Fund is merely the named

24  plaintiff, its choice of forum does not deserve deference.  See Lou, 834 F.2d at 739; In re Yahoo!,

25  2008 U.S. Dist. LEXIS 20605, at *13-14; see also Koster v. Lumbermens Mut. Cas. Co., 330

26  U.S. 518, 524 (1947) (holding, in the context of a derivative action, that "where there are

27  hundreds of potential plaintiffs, . . . all of whom could with equal show of right go into their many

28

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

15

home courts, the claim of any one plaintiff that a forum is appropriate . . . is considerably weakened," even when it is the plaintiff's "home forum").

### 3. Plaintiff's Choice of Forum Is Not Entitled to Deference Because the "Operative Facts" Occurred Primarily in Pennsylvania.

Another reason why Plaintiff's choice of forum does not deserve deference is that the "operative facts" in this case occurred primarily in or near Pennsylvania, not the Southern District. In a securities action, alleged misstatements and omissions are deemed to have occurred in the district where they were transmitted or withheld. In re Yahoo!, 2008 U.S. Dist. LEXIS 20605, at *24; see also In re Global Cash, 2008 U.S. Dist. LEXIS 70367, at *19 (transferring class action brought by a government-sponsored retirement plan which alleged Securities Act violations to the District of Nevada, where the issuer was headquartered, the relevant registration statements had been prepared, and the alleged misstatements were thus deemed to have occurred); In re Connetics, 2007 U.S. Dist. LEXIS 38480, at *19 (holding that because the allegedly misleading documents at the "core" of the litigation were "prepared and issued from [defendant's] headquarters in the Northern District of California, and are therefore deemed to have occurred therein. . . . significant portions of the operative facts occurred in [that district]").

In In re Yahoo!, the lead plaintiff pension funds argued against transfer of the action from the Central District to the Northern District of California, the site of Yahoo!'s headquarters, because the alleged misrepresentations were tied to various failed and/or fraudulent aspects of Yahoo!'s business, "all of which allegedly occurred in the Central District." 2008 U.S. Dist. LEXIS 20605, at *24-25. The court rejecting plaintiff's argument, holding that although "some of the relevant facts appear to have occurred in this forum," id. at *14-15, the "case turns on the allegedly false public statements and the decisions made by Yahoo!'s senior management, which indisputably occurred at Yahoo!'s headquarters." Id. at *25. Thus, because Yahoo!'s headquarters was the "factual center of this case," the court held that "plaintiffs' claims have stronger contacts with the Northern District," and granted Yahoo!'s motion to transfer. Id.; see also Wells Fargo, 2008 U.S. Dist. LEXIS 103955, at *10-11 (holding that action should be transferred from the Northern District of California to the Southern District of Iowa where the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

16

1  defendants were principally based even though some relevant policies and practices were

2  formulated in California).

3      While CardioNet once maintained corporate headquarters in California at the time of the

4  IPO (shortly before completing its relocation to Pennsylvania, the focus of its relevant business)

5  and, as alleged by Plaintiff, "the preparation and dissemination of the materially false and

6  misleading [IPO]" was presumably "disseminated into [California]," Am. Compl. ¶ 32, the

7  Amended Complaint further acknowledges that "CardioNet's physical headquarters were moved

8  to Pennsylvania between the March 2008 IPO and the August 2008 Secondary Offering." Id.

9  The Secondary Offering was the larger of the two, and as the later in time, litigation may focus

10  upon the facts as they existed at that time.  Thus, at the very least, the allegations on the face of

11  the complaint make clear that dissemination of the allegedly false statements relating to the

12  Secondary Offering occurred in Pennsylvania, not the Southern District.  See id.  The undisputed

13  connections between the Secondary Offering and Pennsylvania strongly support transfer.

14      Moreover, the Amended Complaint's assertion that the alleged misstatements in either of

15  the Offerings were prepared in California, id., is not accurate.  In fact, the drafting sessions in

16  which CardioNet participated for the Offering Documents for both Offerings primarily occurred

17  in Pennsylvania.  Leone Decl. ¶ 13.  Most of the CardioNet executives and the top executives in

18  the finance department who participated in preparation and drafting of the Offering Documents

19  for both Offerings were and currently are located in Pennsylvania.  Id. ¶ 14.  At the time of the

20  IPO, the only CardioNet senior executive located in California was James Sweeney, the

21  Company's Executive Chairman, and he flew to Pennsylvania to participate in the drafting

22  sessions for the Offering Documents for the IPO.  Id. ¶ 15.  CardioNet's sales department,

23  marketing department, regulatory and reimbursement department, Senior Vice-President of

24  Clinical Operations and the Company's Medical Director, as well as most of CardioNet's

25  potentially relevant operations (including intake (referral processing), distributions, billings,

26  reimbursement services and commercial and Medicare payor contracts) were all located in

27  Pennsylvania at the time of the Offerings and are still there.  Id. ¶ 12.

28

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

17

1
2
3
4

Given all these facts, this factor simply does not support Plaintiff's choice of venue. Even assuming a handful of events (as alleged in the Amended Complaint) may have occurred in California, this factor alone does not provide Plaintiff with deference regarding its decision to file suit here given that the other factors clearly support transfer. See Lou, 834 F.2d at 739.

5
6

**D.    The Availability of Witnesses Subject to Compulsory Process Weighs in Favor of Transfer.**

7
8
9
10
11
12
13
14
15
16
17
18
19
20

As set forth above, several third parties are likely to be important witnesses in this case. In particular, the face of the Amended Complaint demonstrates that Plaintiff will likely need to seek discovery from Jefferies, Highmark and CMS to support its claims. It is also possible that accounting issues may arise requiring discovery of CardioNet's accountants. All four of these entities are within the subpoena power of the Pennsylvania court, but not the California court, because they are located within 100 miles of the Pennsylvania court. Accordingly, this factor also supports transfer. See Fontaine v. Washington Mut. Bank, Inc., No. CV 08-5659, 2009 U.S. Dist. LEXIS 41168, at *15 (C.D. Cal. Apr. 30, 2009) (noting that "if the action remains in California, there is an increased chance that certain material non-party witnesses may be outside the Court's subpoena power" but "if this action is transferred to the District of Nevada, this problem is significantly minimized"); Martin v. Spring Break '83 Prods., LLC, No. CV 09-6104, 2009 U.S. Dist. LEXIS 119526, at *17 (C.D. Cal. Dec. 3, 2009) (noting that since "transfer would likely bring more material non-party witnesses within a court's subpoena power, this factor favors transfer").

21

**E.    The Relative Ease of Access to Sources of Proof Weighs in Favor of Transfer.**

22
23
24
25
26
27
28

Although the location of pertinent documents is less significant in light of modern technologies, it remains relevant to the § 1404(a) analysis. In re Yahoo!, 2008 U.S. Dist. LEXIS 20605, at *26-27 (holding that "access to sources of proof weigh[ed] in favor of transfer" to the district of defendant's headquarters, where most of the documents relating to the alleged misrepresentations and omissions were maintained); Steelcase Inc. v. Haworth, Inc., No. CV 96-1964, 1996 U.S. Dist. LEXIS 20674, at *10-11 (C.D. Cal. May 15, 1996) (concluding that the "relative ease of access to proof . . . . favors transfer to the Western District of Michigan" because

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

18

1  "[t]he majority of the documentary evidence in this case is located at the parties' corporate

2  headquarters in Michigan"); see also, e.g., In re Global Cash, 2008 U.S. Dist. LEXIS 70367, at

3  *18 (finding fact that "[m]any of the documents pertaining to the defendants' allegedly false or

4  misleading statements were prepared in the District of Nevada and are maintained therein"

5  weighed in favor of transferring class action asserting Securities Act claims to that district).  Here,

6  the ease of access to sources of proof weighs in favor of transfer to Pennsylvania because almost

7  all of the documents in the possession of CardioNet relating to the preparation of the allegedly

8  false and misleading Offering Documents are located in the files of employees located in

9  Pennsylvania.  Leone Decl. ¶ 19.  In addition, the electronic servers accessible from the offices of

10  CardioNet which would have additional relevant documents are also located in Pennsylvania.  Id.[7]

11  ## CONCLUSION

12       For the reasons set forth above, Defendants respectfully request that the Court transfer this

13  action to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a), and that it address

14  this motion before ruling upon Plaintiff's anticipated motion to remand the action.

15

16

17

18

19

20

21

22

23

24

25

26      [7]  The difference in the cost of litigation between the two forums is often treated as an independent factor in the § 1404(a) analysis.  See Jones, 211 F.3d at 498-99.  This factor also weighs in favor of transfer.  While Defendants would incur considerably greater costs litigating

27  this case in California, there is no reason to think it would be any more expensive for Plaintiff to assert its claims in a forum—Pennsylvania—that is actually closer to its base in Florida than the

28  Southern District.

Morgan, Lewis &
Bockius LLP
Attorneys At Law
San Francisco

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer

19

1    Dated:      April 7, 2010

2                                                      Respectfully submitted,

3                                                      MORGAN, LEWIS & BOCKIUS LLP

4                                                      By: _____/s/_____
                                                              Joseph E. Floren
5
                                                      *Attorneys for CardioNet Defendants*
6
                                                      GIBSON DUNN & CRUTCHER LLP
7

8                                                      By: _____/s/_____
                                                              Dean J. Kitchens
9
                                                      Dean J. Kitchens, State Bar No. 82096
10                                                     Theane Evangelis Kapur, State Bar No. 243570
                                                      333 South Grand Avenue
11                                                     Los Angeles, CA 90071-3197
                                                      Tel. 213.229.7726
12                                                     Fax 213.229.6726

13                                                     *Attorneys for Defendants Barclay's Capital, Inc.,*
                                                      *Citigroup Global Markets Inc., Leerink Swann*
14                                                     *LLC, Thomas Weisel Partners LLC, Banc of*
                                                      *America Securities LLC and Cowen and*
15                                                     *Company*

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to
Transfer                                    20

1

## **SIGNATURE CERTIFICATION**

2

3    Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and

4  Procedures Manual, I hereby certify that the content of this document is acceptable to Dean

5  Kitchens, counsel for Barclays Capital, Inc. (erroneously named as Barclay's Capital, Inc.),

6  Citigroup Global Markets Inc., Leerink Swann LLC, Thomas Weisel Partners LLC, Banc of

7  America Securities LLC and Cowen and Company, and that I have obtained Mr. Kitchens'

8  authorization to affix his electronic signature to this document.

9  Dated:      April 7, 2010                     By: _____/s/_____

10                                                            Joseph E. Floren

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points and Authorities in
Support of Defendants' Joint Motion to        21
Transfer

## <u>TABLE OF CONTENTS OF EXHIBITS</u>

| EXHIBIT | PAGE(S) |
|---------|---------|
| 1       | 23-58   |
| 2       | 59-146  |

# Exhibit 1

1  SCOTT+SCOTT LLP
   ARTHUR L. SHINGLER III (181719)
2  MARY K. BLASY (211262)
   600 B Street, Suite 1500
3  San Diego, CA  92101
   Telephone:  619/233-4565
4  619/233-0508 (fax)
   ashingler@scott-scott.com
5    – and –
   DAVID R. SCOTT
6  P.O. Box 192
   156 South Main Street
7  Colchester, CT  06415
   Telephone:  860/537-3818
8  860/537-4432 (fax)
   drscott@scott-scott.com
9
   Counsel for Plaintiff
10
   [Additional Counsel on Signature Page]
11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                        COUNTY OF SAN DIEGO

14
   WEST PALM BEACH POLICE PENSION          Case No. 37-2010-00086836-CU-SL-CTL
15 FUND, Individually and on Behalf of All Others
   Similarly Situated,                     FIRST AMENDED CLASS ACTION
16                                          COMPLAINT FOR VIOLATIONS OF THE
                              Plaintiff,    SECURITIES ACT OF 1933
17
        vs.
18
   CARDIONET, INC., ARIE COHEN, JAMES M.
19 SWEENEY, MARTIN P. GALVAN, FRED          JURY TRIAL DEMANDED
   MIDDLETON, WOODROW MYERS JR., M.D.,
20 ERIC N. PRYSTOWSKY, M.D., HARRY T.
   REIN, ROBERT J. RUBIN, M.D., RANDY H.
21 THURMAN, BARCLAY'S CAPITAL, INC.,
   CITIGROUP GLOBAL MARKETS INC.,
22 LEERINK SWANN LLC, THOMAS WEISEL
   PARTNERS LLC, BANC OF AMERICA
23 SECURITIES LLC and COWEN AND
   COMPANY,
24
                              Defendants.
25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 23

1  Plaintiff West Palm Beach Police Pension Fund ("Plaintiff"), individually and on behalf of all others
2  similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges
3  the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information
4  and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys,
5  which included, among other things, a review of CardioNet, Inc.'s ("CardioNet" or the "Company") press
6  releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other
7  publicly disclosed reports and information about the defendants. Plaintiff believes that substantial
8  evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

9  **NATURE OF THE ACTION**

10  1. This is a securities class action on behalf of Plaintiff and all other persons or entities, except
11  for defendants, who purchased or otherwise acquired the common stock of CardioNet pursuant and/or
12  traceable to the Company's *$83 million* initial public stock offering on March 25, 2008 (the "IPO") and/or
13  its *$152+ million* secondary stock offering on August 6, 2008 (the "Secondary Offering," collectively with
14  the IPO, the "Offerings") seeking to pursue *strict liability* remedies under the Securities Act of 1933 (the
15  "Securities Act").

16  **INTRODUCTION AND BACKGROUND TO THE ACTION**

17  2. CardioNet provides Mobile Cardiac Outpatient Telemetry ("MCOT") using an internally
18  developed proprietary technology platform. MCOT allows continuous cardiac monitoring for up to 30 days,
19  with the capability for real-time review and querying from a monitoring center. According to defendants,
20  the technology purportedly allows for the identification of heart rhythm irregularities that elude the
21  commonly used shorter-term monitoring technologies (*e.g.*, Holter monitoring), and many insurers,
22  including Medicare, purportedly cover MCOT for defined subsets of patients who experience serious, but
23  unpredictable, arrhythmias that have not been adequately evaluated by those other less expensive techniques.

24  3. Diagnostic tests like MCOT are represented by two CPT billing reimbursement codes (or
25  "Current Procedural Terminology" codes). One code identifies the Professional Component of the test – the
26  physician's interpretation of the test result as it relates to the individual patient; the second code identifies
27  the Technical Component of the test – in the case of CardioNet, the resources required to provide and
28  conduct the test and generate a test report (the MCOT equipment, the monitoring center with its technology

- 1 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**Exhibit 1**
**Page 24**

1  and staff, the computerized analysis of data, the generation of a report to the physician, etc.). CardioNet

2  operates a physiological testing laboratory – monitoring patients nationwide from its monitoring base in

3  Pennsylvania and billing insurers for the Technical Component of the test, while the referring physician bills

4  for the Professional Component, which is small compared to the Technical Component.

5      4.    MCOT obtained FDA approval and was approved for commercial use in 2002, and

6  CardioNet, then headquartered in California, set up its Pennsylvania testing center that same year. As a

7  Pennsylvania-based testing facility, the center did all of its Medicare billing to a single regional Medicare

8  Part B carrier, Highmark Medicare Services ("Highmark"), also based in Pennsylvania. At the time of the

9  Company's March 2008 IPO and August 2008 Secondary Offering, the test was provided under a temporary,

10  non-specific, Category III CPT code. According to Highmark's January 13, 2006 press release, using the

11  temporary CPT code, CardioNet was being reimbursed for the Technical Component at an average rate of

12  $1,123, while prescribing physicians were receiving an average Professional Component reimbursement fee

13  of $128:

14  **Real-Time, Outpatient Cardiac Monitoring**

15  Effective 45 days from the date of this notice, the reimbursement allowance(s) for procedure
16  code, 93799 when used with the narrative, "ECG arrhythmia detection and alarm system"
   will change. The new allowance(s) effective for dates of service on or after March 1, 2006
17  will be:

|  |  |  |
|---|---|---|
| 93799 - Technical Component | ECG arrhythmia detection and alarm system; Technical Component | $1123.07 |
| 93799 - 26 | ECG arrhythmia detection and alarm system; Professional Component | $128.27 |

These codes and their corresponding allowances represent a course of treatment that includes
22  up to 21 consecutive days of cardiac monitoring.

23      5.    In March 2008, CardioNet concluded its $82 million IPO, selling 4.5 million shares at $18

24  per share. In August 2008, CardioNet and certain insiders and venture capital financers sold another 5.75

25  million shares for $26.50 per share, taking in over $152 million in proceeds. Selling shareholders included

26  CardioNet's founder and former Chief Executive Officer.

- 2 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**Exhibit 1**
**Page 25**

6. In October of 2008, CardioNet would announce approval of permanent codes for MCOT – CPT 93228 for the Professional Component and CPT 93229 for the Technical Component – effective January 2009, and a carrier-determined reimbursement rate for the Technical Component of $1,123.07.

7. The analyst community that followed and established a market price for CardioNet stock is extremely sensitive to reimbursement issues, particularly for single product companies where one reimbursement decision can be make-or-break the Company. The CardioNet reimbursement story began unraveling on April 24, 2009 when an analyst began speculating about an imminent Highmark payment reduction for the MCOT Technical Component. Though CardioNet immediately issued a rebuke, its common stock fell precipitously, closing down 13% and erasing over $70.5 million in market capitalization. On May 18, 2009, the Company again responded with a further press release that solidified the situation, announcing formal Highmark posting of the $1,123.07 rate originally announced in October 2008.

8. However, on June 30, 2009, CardioNet was forced to issue a press release announcing a significant downward revision of its financial guidance for fiscal 2009 based on lower than expected commercial reimbursement rates. Analyst concern over Medicare reimbursement was heightened by this news, and confirmed in a July 12, 2009 CardioNet announcement of a revised Highmark Technical Component payment rate effective September 1, 2009 – a more than 30% reduction – to $754. On this announcement, the price of CardioNet's stock once again suffered a significant decline, falling 34% in one day on trading volume over seven times its average three-month daily average.

9. As displayed vividly in a November 20, 2009 *Wall Street Journal* exposé, once the investment community learned the truth about CardioNet, the price of the millions of shares of CardioNet stock sold to the unsuspecting public in the Company's IPO and Secondary Offering simply cratered:

- 3 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 26



Fading Heartbeat | CardioNet's public history

10.     Unbeknownst to investors, prior to the IPO, CardioNet had actually made a series of conscious business strategy decisions that imprudently simultaneously increased both reported revenues and its reimbursement jeopardy, significantly increasing the risk associated with the purchase of CardioNet stock in the Offerings.

11.     First, by maintaining all of its testing operations in a single location, CardioNet put its entire Medicare business into the hands of a single local Medicare contractor. Had operations been regionalized, there would have been a different contractor for each region. A single contractor would then have impacted only a portion of the Medicare business, not all of it. There was a trade-off at work: using a single carrier increased reimbursement jeopardy by putting all of the Company's eggs in a single basket; use of multiple carriers would have spread the risk, but required commensurately broadened advocacy communications and reimbursement support to multiple regional Medicare carriers. CardioNet opted for using the single carrier: Highmark, over which, unbeknownst to investors, it wielded significant pricing influence.

12.     If multiple carriers had been handling CardioNet's claims pre-IPO, Medicare would have had an incentive to set reimbursement at a single, nationally determined level, especially if there were regional disparities that could not be supported by differential costs. But a single explicitly national rate established centrally would have been greatly preferable to an effectively national rate set by a single regional carrier. At the national level, there are procedural rules, formal opportunities for comment on proposals, and public notification of the basis upon which a decision is made. As a local carrier, Highmark was not bound by any

- 4 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 27

1  of these requirements. Instead, CardioNet used its influence over Highmark to self-set extremely high

2  reimbursement rates prior to its IPO – rates that unbeknownst to investors were under critical, pointed

3  review at the time of the IPO.

4       13.    Second, CardioNet chose to operate as a physiological testing laboratory rather than selling

5  its technology to independent laboratories. Had it done the latter, the Company would have been free to sell

6  the technology at a price of its own choosing. This would have transferred the primary reimbursement risk

7  to CardioNet's customers, but it would also have provided those customers with unequivocal documentation

8  of an important cost element required for the test – the technology cost. Under the scenario CardioNet

9  chose, there was no such documentation, as there was no arms'-length transaction between the technology

10  supplier and the testing facility. Under these circumstances, Medicare invokes special accounting rules

11  applicable to "related party transactions"; the relevant aspect of those rules is that transfers between related

12  parties occur at the cost of manufacture or acquisition – no margin (markup) is recognized. Thus, to the

13  extent CardioNet provided real cost data, Medicare would calculate the cost of providing the Technical

14  Component without allowing a markup on cost of manufacture.

15       14.    CardioNet made the choice it did in order to capture a larger share of the total Technical

16  Component revenue stream prior to its IPO and Secondary Offering, allowing it to report the receipt of

17  artificially inflated revenues in the IPO and Secondary Offering Registration Statements. But there was an

18  undisclosed trade-off: control of the total revenue stream increased direct exposure to reimbursement risk.

19  And there was a more conservative choice available: sell the technology to testing facilities until

20  reimbursement was clearly established, and then expand into the testing business once reimbursement risk

21  was minimized.

22       15.    The third risk-increasing activity defendants undertook pre-IPO, yet concealed from

23  investors, was implementing aggressive sales practices that included training prescribing physicians to over-

24  prescribe and over-bill for MCOT services, which would ultimately result in critical regulatory scrutiny of

25  reimbursement rates, decreased acceptance rates amongst payors and generally damage the product's sales

26  potentials.

27       16.    Essentially unbeknownst to investors, CardioNet took the Company public before solidifying

28  its business position and before removing reimbursement risk from the equation. Instead, doing the IPO and

- 5 -

1    the Secondary Offering simply allowed early investors to cash out and take profits and management to

2    realize substantial capital gains. This action seeks recovery, including rescission, for innocent purchasers

3    who suffered tens of millions of dollars in losses when the truth about CardioNet emerged and its stock price

4    was pummeled.

5    <u>**SUMMARY AND OVERVIEW OF THE ACTION**</u>

6        17.    Traditional heart rate monitors include Holter and event monitors. Holter monitors

7    continuously record a patient's heartbeats. They are generally worn for a one or two-day period. Older

8    Holter monitors require the patient to physically return the device to the physician for review, while newer

9    Holter monitors allow for the results to be uploaded via the Internet. Event monitors intermittently record a

10   patient's heartbeats during cardiac events. They are generally worn for a 15 to 30-day period. Some types

11   of event monitors are manually activated by the patient when symptoms associated with a cardiac event are

12   experienced, while other types of event monitors have an auto trigger that will automatically record an

13   event. The event monitors have limited storage capacity and the data must be transmitted periodically via

14   telephone in order to avoid the risk of exhausting their storage.

15       18.    CardioNet's MCOT system incorporates a lightweight patient-worn sensor attached to

16   electrodes that capture two-channel ECG data, measuring electrical activity of the heart and communicating

17   wirelessly with a compact, handheld monitor. The monitor analyzes incoming heartbeat-by-heartbeat

18   information from the sensor on a real-time basis by applying algorithms designed to detect arrhythmias.

19   According to CardioNet, the MCOT system continuously monitors a patient's heartbeats and the data is

20   transmitted wirelessly to the Company's control center. When the MCOT monitor detects an arrhythmic

21   event, it automatically transmits the ECG to the CardioNet Monitoring Center, even in the absence of

22   symptoms noticed by the patient and without patient involvement. Conversely, traditional Holter and event

23   monitors required more patient participation, both in recognizing cardiac events, initiating monitoring, and

24   transmitting their cardiac data to be analyzed.

25       19.    MCOT reimbursement fees are paid by commercial payors and from Medicare Part B carriers

26   where the services are performed on behalf of the Centers for Medicare and Medicaid Services (the "CMS").

27   At the time of the IPO in March 2008, the Company received approximately 30% of its revenues as

28   reimbursement from Medicare, and the rest came from private payors. However, most private payors tended

- 6 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 29

1   to incorporate Medicare reimbursement guidelines into their own reimbursement schedules. The

2   reimbursement paid to CardioNet and prescribing physicians alike was either provided by the Medicare

3   Part B carrier for Pennsylvania on behalf of the CMS, or by commercial payors.

4        20.    Historically, commercial payors have refused to enter into contracts to reimburse the fees

5   associated with medical devices or services that payors determined to be "experimental and investigational."

6   Commercial payors typically label medical devices or services as "experimental and investigational" until

7   such devices or services have demonstrated product superiority *evidenced* by a randomized clinical trial.

8   CardioNet claimed to have completed such a clinical trial in March 2007 in which the CardioNet MCOT

9   system provided higher diagnostic yield than traditional event monitoring. Prior to this clinical trial, the

10   CardioNet MCOT system was labeled "experimental and investigational" by 21 targeted commercial payors,

11   representing approximately 95 million covered lives. According to defendants, subsequent to this March

12   2007 trial, three commercial payors, representing over 26 million covered lives, purportedly removed the

13   designation of the CardioNet System as "experimental and investigational."

14        21.    The financial viability of CardioNet's business model is, and always had been, inherently

15   dependent upon physicians' willingness to prescribe CardioNet's MCOT services. A key barrier to MCOT

16   use, even following FDA approval, was the general reluctance by Medicare providers and commercial

17   insurers to pay for the more expensive MCOT monitoring service – both the Technical and Professional

18   Components – without proof the additional medical diagnoses benefit it provided was "medically

19   necessary."

20        22.    But on March 5, 2007, CardioNet's senior executives issued a press release entitled "New

21   Study Finds Commonly Used Heart Monitoring System Often Fails to Detect Serious Cardiac Arrhythmias,

22   a Leading Cause of Stroke and Sudden Cardiac Death - *Journal of Cardiovascular Electrophysiology* Finds

23   That New Methods Are Needed to Help Save Lives Business." The release stated that a "first of its kind

24   study, to be published in the March issue of the *Journal of Cardiovascular Electrophysiology*, compared the

25   effectiveness of two ambulatory electrocardiographic monitoring systems in detecting arrhythmias, a

26   condition in which a person's heartbeat is abnormal," and that the ***results of the study showed that MCOT***

27   ***was almost three times more effective detecting and diagnosing clinically significant arrhythmias***

28   ***compared to the frequently prescribed cardiac loop event recorder."*** The release cited CardioNet founder,

- 7 -

Exhibit 1
Page 30

1    Chairman and Chief Executive Officer ("CEO") James M. Sweeney ("Sweeney"), as stating "he now

2    expect[ed] more insurance companies to reimburse for MCOT as a result of the findings of this study."

3    [Emphasis added.]

4         23.    To help sell its MCOT services to a reluctant purchaser base prior to its IPO, CardioNet also

5    enlisted an aggressive sales force and trained them to coerce physicians into prescribing MCOT. Traditional

6    external cardiac monitoring devices, including Holter and event monitors, have limited memory capacity

7    which requires that patients frequently visit their doctors' offices to have the data uploaded, or that they

8    upload themselves telephonically or via the internet. The advent of telemetry permitted real-time data

9    transmission anywhere cell phone reception was possible that did not require patient assistance to send.

10   *Continuous transmission, CardioNet's sales personnel would emphasize to physicians, could provide*

11   *physicians with lucrative daily monitoring fees*. As one physician was told by a CardioNet sales

12   representative when asked why physicians should use MCOT over traditional cardio-monitoring devices:

13   "because there is more money [in] it. You can bill daily." Receiving daily reimbursement was crucial

14   because doctors received daily reports when using MCOT. But unbeknownst to investors, CMS was quickly

15   catching on – the sleight of hand was slower than the eye – and CMS would drastically reduce the

16   Professional Component and preclude claiming daily reimbursement rates.

17        24.    As part of its extensive pre-IPO effort to increase the number of MCOT prescriptions being

18   written by physicians, CardioNet also provided its equipment to physicians on a cost-free basis, and trained

19   the physicians to bill Medicare and private insurers for use of the equipment as part of the Professional

20   Component fee they were collecting. As was explained to one sales representative in May 2006, "[i]n this

21   model there is no capital investment made from the doctor." *Moreover, physicians were shown that by*

22   *writing Holter prescriptions, but providing MCOT services, they could bill daily for analyzing the MCOT*

23   *results reports*. These billing practices led to higher fees being paid to physicians and increased their

24   willingness to prescribe – and even over-prescribe – MCOT over Holter and event monitoring when

25   patients' symptoms did not necessarily indicate MCOT was appropriate.

26        25.    Additionally, utilizing strong ties CardioNet had engendered with Pennsylvania-based

27   Highmark, the sole intermediary designated by the CMS as the controlling contractor for MCOT services,

28   CardioNet had successfully convinced CMS that MCOT was medically necessary, citing MCOT's purported

- 8 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 31

1    diagnostic advantages over traditional Holter and event monitoring services. Prior to the IPO, the Technical

2    Component of CardioNet's service was being billed by CardioNet under Medicare's non-specific billing, or

3    CPT, code "93799." Having the non-specific code permitted CardioNet to exhibit greater influence over the

4    single reimbursement rate Highmark was setting for the Company – and CardioNet and its reimbursement

5    fee-hungry physician customers were collecting.

6         26.    *CardioNet's pre-IPO sales push was a huge success. CardioNet's annual revenues more*

7    *than doubled from $34 million in FY 2006 to $73 million in FY 2007 (for the fiscal year ending*

8    *December 31, 2007).*

9         27.    The IPO was effected through a Registration Statement on Form S-1 (File No. 333-145547)

10   declared effective by the SEC on March 18, 2008 pursuant to which 3 million shares of common stock were

11   sold on March 25, 2008 by CardioNet and 1.5 million shares were sold by venture capital financier Guidant

12   Investment Corporation/Boston Scientific Corporation ("Guidant") for $18.00 per share, *resulting in*

13   *aggregate gross proceeds of $54 million to CardioNet and $27 million to Guidant.* Thereafter, on April 8,

14   2008, an additional 1,014,286 shares were sold by Guidant upon a partial exercise of the underwriters' over-

15   allotment option, at the $18.00 price, *resulting in $1.8 million in additional proceeds to Guidant*.

16   Underwriters Citigroup Global Markets Inc. ("Citi"), Lehman Brothers, Inc. ("Lehman Bros."), Leerink

17   Swann LLC ("Leerink"), and Thomas Weisel Partners LLC ("Thomas Weisel") shared an estimated $3.8

18   million in underwriting fees in connection with the IPO. Net of underwriting fees and other expenses,

19   CardioNet received approximately $46.7 million in proceeds from the IPO. The Company's stock also

20   began trading on the Nasdaq Global Market under the symbol "BEAT" following the IPO.

21        28.    The Secondary Offering was effected through a Registration Statement on Form S-1 (No.

22   333-151829) declared effective by the SEC on July 31, 2008 pursuant to which 5.75 million shares of

23   common stock were sold on August 6, 2008 for $26.50 per share, *resulting in aggregate gross proceeds to*

24   *the selling stockholders of $152.375 million. Selling stockholders in the Secondary Offering included*

25   *CardioNet Directors Fred Middleton and Harry T. Rein, and CardioNet Founder and CEO Sweeny, who*

26   *sold 1,369,724 shares, 638,272 shares and 593,876 shares, respectively, receiving $36.3 million, $16.9*

27   *million and $15.4 million in gross proceeds.* Underwriters Citi, Banc of America Securities LLC ("Banc of

28

- 9 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 32

1    America"), Leerink, Thomas Weisel and Cowen and Company ("Cowen") also shared an additional

2    estimated $144.4 million in underwriting fees in connection with the Secondary Offering.

3        29.    Defendants in this action include CardioNet, the CardioNet executives and directors who

4    signed the registration statements used to conduct the Offerings and the underwriters to those offerings

5    (including Barclay's Capital Inc. ("Barclay's") as successor-in-interest for now defunct Lehman Bros.)

6    (collectively, "Defendants"). In violation of the Securities Act, Defendants were negligent by issuing false

7    and misleading statements to the investing public relating to the Offerings and the Registration Statements

8    and Prospectuses (collectively referred to as the "Registration Statements") the Company filed with the SEC

9    in support of the Offerings. Defendants negligently allowed the Registration Statements to paint a rosy

10   picture of the Company's business and financial fundamentals and to inaccurately communicate that

11   CardioNet's revenue stream was both viable and reliable.

12       30.    Specifically, under the applicable SEC rules and regulations governing the preparation of the

13   Registration Statements, Defendants were negligent in failing to disclose or indicate, at the time of the IPO

14   and the Secondary Offering, the following material facts: (1) the Registration Statements (and the financial

15   statements and related SEC filings incorporated therein by reference) reported tens of millions of dollars in

16   improperly obtained revenues; (2) the Registration Statements materially understated the potential for payers

17   to reduce their reimbursement rates for the Company's MCOT services going forward by actively

18   concealing defects in the March 2007 study and the improper daily billing methods CardioNet's aggressive

19   sales force were training physicians to undertake; (3) the Registration Statements concealed the extent of

20   influence CardioNet had and had exercised over Highmark in setting the higher rates; (4) the Registration

21   Statements misstated that, as a result of the above, the Company's financial results following the Offerings

22   would in no way be analogous to the financial statements provided in its Registration Statements and the

23   revenue and gross margin increases being promised were not possible; (5) the Registration Statements

24   misstated that the Company lacked adequate internal and financial controls; and (8) as a result of the

25   foregoing, the Company's Registration Statements were false and misleading at all relevant times.

26   **JURISDICTION AND VENUE**

27       31.    This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to

28   the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial

- 10 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 33

1    courts.  This action is not removable.  The claims alleged herein arise under §§11, 12(a)(2) and 15 of the

2    1933 Act.  *See* 15 U.S.C. §§77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by §22 of the Securities Act

3    and venue is proper pursuant to §22 of the Securities Act.  Section 22 of the Securities Act explicitly states

4    that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of

5    competent jurisdiction shall be removed to any court in the United States."  Section 16(c) refers to "covered

6    class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50

7    persons asserting claims under state or common law.  This is an action asserting federal law claims.  Thus, it

8    does not fall within the definition of "covered class action" under §16(b)-(c) and therefore is not removable to

9    federal court.

10          32.     This Court has personal jurisdiction over each of the Defendants named herein because they

11   conducted business in, resided in and/or were citizens of California at the time of the IPO and Secondary

12   Offering (including CardioNet, which maintained its principal place of business in this state at the time of

13   the IPO, and individual defendants James Sweeney, Fred Middleton and Woodrow Myers).  The violations

14   of law complained of herein also occurred in San Diego County, California, including the preparation and

15   dissemination of the materially false and misleading Registration Statements complained of herein, which

16   statements were disseminated into this County.  Cooley Godward Kronish LLP, San Diego, California,

17   served as counsel to CardioNet in both Offerings.  CardioNet, the Underwriter Defendants and all of the

18   Individual Defendants conducted extensive business in this County.  Multiple suppliers provided the

19   components used in the CardioNet System, but its facilities in San Diego, California were registered and

20   approved by the United States Food and Drug Administration, or "FDA", as the ultimate manufacturer of the

21   CardioNet System.  CardioNet manufactured the monitors and sensors for the CardioNet System in San

22   Diego, California.  CardioNet was originally incorporated in California in 1994.  At the time of the IPO and

23   Secondary Offering, CardioNet had been a California-licensed medical device manufacturer since March

24   2002.  At the time of the IPO, CardioNet's executive headquarters were located at 1010 Second Avenue, San

25   Diego, California and it leased approximately 20,000 square feet of space for its headquarters in San Diego

26   both at the time of the IPO and the Secondary Offering (though the Company's physical headquarters were

27   moved to Pennsylvania between the March 2008 IPO and the August 2008 Secondary Offering).

28

- 11 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 34

33. Venue is proper in this Court because Defendants' wrongful acts arose in and emanated from this County.

**PARTIES**

34. Plaintiff West Palm Beach Police Pension Fund purchased CardioNet common stock pursuant and/or traceable to both the IPO and the Secondary Offering, and was damaged thereby.

35. Defendant CardioNet was originally incorporated in the State of California in March 1994. The Company reincorporated in the State of Delaware on February 22, 2008. At the time of the March 2008 IPO, CardioNet's principal executive offices were located at 1010 Second Avenue, San Diego, California 92101. CardioNet's principal executive offices are now located at 227 Washington Street, #300, Conshohocken, Pennsylvania 19428.

36. Defendant James M. Sweeney ("Sweeney"), the Company's founder, served as a CardioNet Director from April 2004 until July 9, 2008, as its CEO from April 2004 until November 2007, and as its Chairman of Board from April 2004 until July 8, 2008. By the time of the IPO, Sweeney had been succeeded as President and CEO by defendant Arie Cohen, but would remain as the Executive Chairman of the Board of Directors until his departure in July 2008. Defendant Sweeney signed the false and misleading Registration Statements. Sweeney sold 593,876 shares in the Secondary Offering, receiving $15.4 million in proceeds.

37. Defendant Arie Cohen ("Cohen") served as the Company's President and CEO from November 2007 until he resigned January 22, 2009 and as a Director from December 2007 until he resigned effective January 22, 2009. Defendant Cohen signed the false and misleading Registration Statements.

38. Defendant Martin P. Galvan ("Galvan") has served as CardioNet's Chief Financial Officer since September 2007 and as the Chief Operating Officer of PDSHeart since October 2007. Defendant Galvan signed the false and misleading Registration Statements.

39. Defendant Fred Middleton ("Middleton") is, and at all relevant times was, a Director of CardioNet, having joined the Board in April 2000. Since 1987, Middleton has also been a general partner/managing director of Sanderling Ventures, a firm specializing in biomedical venture capital. Middleton has played active management roles in many biomedical companies, including as chairman, CEO or director of a number of Sanderling portfolio companies. Sanderling is one of CardioNet's pre-IPO

- 12 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 35

1  venture capital financiers who participated in the Secondary Offering. Defendant Middleton signed the false

2  and misleading Registration Statements. Middleton also sold 1,369,724 shares in the Secondary Offering,

3  receiving $36.3 million in proceeds.

4      40.    Defendant Woodrow A. Myers Jr., M.D. ("Myers") served as a Director of CardioNet from

5  August 2007 until May 8, 2009. Defendant Myers signed the false and misleading Registration Statements.

6      41.    Defendant Eric N. Prystowsky, M.D. ("Prystowsky") is, and at all relevant times was, a

7  Director of CardioNet, having joined the Board in March 2001. Since January 2004, Prystowsky has served

8  as editor-in-chief of the *Journal of Cardiovascular Electrophysiology*. Defendant Prystowsky signed the

9  false and misleading Registration Statements.

10      42.    Defendant Harry T. Rein ("Rein") served as a Director of CardioNet from January 2006 until

11  he resigned effective August 4, 2008. Rein had also served as a general partner with Foundation Medical

12  Partners, a venture capital firm, since March 2003. Foundation Medical Partners was one of CardioNet's

13  pre-IPO venture capital financiers and participated in the Secondary Offering. Defendant Rein signed the

14  false and misleading Registration Statements. Rein also sold 638,272 shares in the Secondary Offering,

15  receiving $16.9 million in proceeds.

16      43.    Defendant Robert J. Rubin, M.D. ("Rubin") is, and at all relevant times was, a Director of

17  CardioNet, having joined the Board in July 2007. Defendant Rubin signed the false and misleading

18  Registration Statements.

19      44.    Defendant Randy H. Thurman ("Thurman") joined CardioNet in July 2008 as Executive

20  Chairman and a director. Defendant Thurman signed the false and misleading Secondary Offering

21  Registration Statement.

22      45.    Defendants Sweeney, Cohen, Galvan, Middleton, Myers, Prystowsky, Rein, Rubin and

23  Thurman are collectively referred to hereinafter as the "Individual Defendants."

24      46.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's

25  Offerings, and served as a financial advisor and assisted in the preparation and dissemination of CardioNet's

26  false and misleading Registration Statements.

27      47.    Defendant Barclay's Capital, Inc. ("Barclay's") is a successor-in-liability to Lehman Brothers

28  Inc. ("Lehman Brothers"), an underwriter of the Company's March 2008 IPO. Lehman Brothers served as a

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**Exhibit 1**
**Page 36**

1  financial advisor and assisted in the preparation and dissemination of CardioNet's false and misleading IPO

2  Registration Statement. On September 15, 2008, Lehman Brothers Holdings Inc., the corporate parent of

3  Lehman Brothers, filed a petition in the United States Bankruptcy Court for the Southern District of New

4  York seeking relief under Chapter 11 of the United States Bankruptcy Code. Subsequently, 18 additional

5  affiliates of Lehman Brothers Holdings Inc. filed petitions in the United States Bankruptcy Court for the

6  Southern District of New York seeking relief under Chapter 11 of the United States Bankruptcy Code. On

7  September 22, 2008, Barclays PLC announced that Lehman Brothers had begun to re-open for business

8  under the ownership of Barclay's Capital, Inc. These actions followed the Bankruptcy Court for the

9  Southern District of New York's approval on September 20, 2008 of Barclay's agreement to acquire

10  Lehman Brothers' fixed income and equity sales, trading and research; prime services; investment banking;

11  principal investing; and private investment management businesses in North America at a discounted price.

12  According to Barclay's September 22, 2008 release, "[m]ore than 10,000 Lehman Brothers employees

13  [were] offered jobs in the new entity," the "combined firm [would] use the Barclays Capital name," and

14  Lehman president and chief operating officer Bart McDade was quoted as stating "[a]ll of Lehman Brothers'

15  partners are excited to join with Barclays Capital."

16      48. Defendant Leerink Swann LLC ("Leerink Swann") was an underwriter of the Company's

17  Offerings, and served as a financial advisor and assisted in the preparation and dissemination of CardioNet's

18  false and misleading Registration Statements.

19      49. Defendant Thomas Weisel Partners LLC ("Thomas Weisel") was an underwriter of the

20  Company's Offerings, and served as a financial advisor and assisted in the preparation and dissemination of

21  CardioNet's false and misleading Registration Statements.

22      50. Defendant Banc of America Securities LLC ("Banc of America") was an underwriter of the

23  Company's Secondary Offering, and served as a financial advisor and assisted in the preparation and

24  dissemination of CardioNet's Secondary Offering Registration Statement.

25      51. Defendant Cowen and Company ("Cowen") was an underwriter of the Company's Secondary

26  Offering, and served as a financial advisor and assisted in the preparation and dissemination of CardioNet's

27  Secondary Offering Registration Statement.

28

- 14 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 37

52.     Defendants Citigroup, Barclay's (as successor-in-liability to Lehman Brothers Inc.), Banc of America, Leerink Swann, Thomas Weisel and Cowen are collectively referred to hereinafter as the "Underwriter Defendants." CardioNet, the Individual Defendants and the Underwriter Defendants are collectively referred to as "Defendants."

53.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the IPO and Secondary Offering Registration Statements and Prospectuses. These Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

(a)     The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and the Secondary Offering and received more than $148 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO and Secondary Offering proceeds, they were willing to merchandize CardioNet stock in the Offerings. The Underwriter Defendants arranged a multi-city road show prior to the Offerings during which they, and certain of the Individual Defendants, met with potential investors and presented highly favorable information about the Company, its financial prospects and its sales and reimbursement practices.

(b)     The Underwriter Defendants also demanded and obtained an agreement from CardioNet that CardioNet would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that CardioNet had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted CardioNet and the Individual Defendants in planning the Offerings, and purportedly conducted an adequate and reasonable investigation into the business and operations of CardioNet, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning CardioNet's business sales model, financial condition, internal control and its future business plans and prospects.

- 15 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 38

1        (d)     In addition to availing themselves of virtually unbridled access to internal corporate

2   documents, agents of the Underwriter Defendants, including their counsel at Dewey & LeBoeuf, New York,

3   New York, met with CardioNet's lawyers, management and top executives in San Diego, California and

4   engaged in "drafting sessions" between at least August 2007 and March 2008 and again between at least

5   June 2008 and August 2008. During these sessions, understandings were reached as to: (i) the strategy to

6   best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which CardioNet stock

7   would be sold; (iii) the language to be used in the Registration Statements; (iv) what disclosures about

8   CardioNet would be made in the Registration Statements; and (v) what responses would be made to the SEC

9   in connection with its review of the Registration Statements. As a result of those constant contacts and

10   communications between the Underwriter Defendants' representatives and CardioNet management and top

11   executives, the Underwriter Defendants knew, or should have known, of CardioNet's existing problems as

12   detailed herein.

13        (e)     The Underwriter Defendants caused the Registration Statements to be filed with the

14   SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

### Background

54.    The Company's flagship offering is MCOT, which, according to the Company's website "enables heartbeat-by-heartbeat, ECG monitoring, analysis and response, at home or away, 24/7/365." Patients wear three chest leads attached to a small portable sensor that continuously detects every heartbeat and transmits the ECG data in real-time to a pocket-sized monitor. If the algorithms in the monitor detect an abnormal heartbeat, the monitor automatically transmits the patient's ECG data to the CardioNet Monitoring Center using wireless communications. In February 2002, the Company received FDA approval for MCOT and opened the first CardioNet Service Center in Pennsylvania.

55.    In May 2006, CardioNet raised venture capital financing through Guidant, issuing it a warrant to purchase 200,136 shares of CardioNet's Series D-1 preferred stock. Again in August 2007, CardioNet issued a warrant to purchase 214,285 shares of its Series D-1 preferred stock to Guidant. The exercise price of the warrants issued to Guidant was $3.50 per share. These warrants were automatically net exercised

- 16 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 39

1  immediately prior to the completion of the IPO in accordance with their terms and Guidant would be the

2  sole selling stockholder in the company's IPO, reaping over $28 million in proceeds.

3        56.    In preparation for the Company's IPO, on March 5, 2007, CardioNet's senior executives

4  issued a release entitled "New Study Finds Commonly Used Heart Monitoring System Often Fails to Detect

5  Serious Cardiac Arrhythmias, a Leading Cause of Stroke and Sudden Cardiac Death - *Journal of*

6  *Cardiovascular Electrophysiology* Finds That New Methods Are Needed to Help Save Lives." Defendant

7  Prystowsky, a long-time CardioNet Director, is the editor-in-chief of the *Journal of Cardiovascular*

8  *Electrophysiology.* The Company's release, which prominently featured CardioNet's MCOT technology,

9  stated in relevant part that:

> A recently completed multi-center, peer-reviewed study has found that cardiac arrhythmias, one of the most common yet potentially dangerous heart conditions affecting more than four million Americans often go undetected despite medical monitoring, resulting in more than 780,000 hospitalizations and contributing to approximately 500,000 deaths each year.

> The first of its kind study, to be published in the March issue of the *Journal of Cardiovascular Electrophysiology*, compared the effectiveness of two ambulatory electrocardiographic monitoring systems in detecting arrhythmias, a condition in which a person's heartbeat is abnormal. Three hundred patients presenting with symptoms suggestive of a cardiac arrhythmia and with previous negative or inconclusive 24-hour Holter monitoring or 24-hours of telemetry, were enrolled in the study by 17 cardiology practices. Patients were randomized to either a new technology called Mobile Cardiac Outpatient Telemetry (MCOT) or to a cardiac loop event recorder. *The results of the study showed that MCOT was almost three times more effective detecting and diagnosing clinically significant arrhythmias compared to the frequently prescribed cardiac loop event recorder.*

> MCOT detected clinically significant arrhythmias in 41 percent of patients, compared to the cardiac loop event recorder, which detected arrhythmias in just 15 percent of patients ($p < 0.001$). Furthermore, MCOT detected clinically significant atrial fibrillation in 23 percent of patients, compared to 8 percent by cardiac loop event recorders ($p < 0.001$). In patients that experienced no symptoms (asymptomatic patients) during the study, the cardiac loop event recorders detected no (0%) clinically significant atrial fibrillation, compared to MCOT, which detected clinically significant atrial fibrillation in 17 percent of patients ($p < 0.001$).

> Other notable findings of the study:

> • In patients with syncope (fainting, passing out) or presyncope (dizziness), MCOT detected clinically significant arrhythmias in 52 percent of patients, compared to 16 percent of cardiac loop event patients ($p < 0.001$).

> • In patients with syncope or presyncope, MCOT detected clinically significant atrial fibrillation in 24 percent of patients compared to 2 percent of cardiac loop event patients ($p$ less than 0.001). In the same group of patients, MCOT detected asymptomatic atrial fibrillation in 19 percent of patients compared to no (0%) cardiac loop event patients ($p < 0.001$).

Exhibit 1
Page 40

- In a sub-group of sites using the auto-detect/auto-trigger cardiac loop event recorders, an arrhythmia was confirmed or excluded as the cause of symptoms in 88 percent of MCOT patients, compared to only 46 percent of cardiac loop event patients (p=0.002).

"These are very compelling findings that for the first time clinically validate the importance and superiority of MCOT--particularly when you consider that a meaningful percentage of patients may not experience easily detectable symptoms," said Steven A. Rothman, M.D., Mainline Arrhythmia and Cardiology Consultants, Wynnewood, PA, the principal investigator of the study. *"Clearly, physicians need to more carefully consider the value of prescribing MCOT as the first-line diagnostic tool when monitoring patients for clinically significant arrhythmias."*

"In the diagnosis of patients with symptoms of a cardiac arrhythmia, MCOT provides a significantly higher yield than standard cardiac loop event recorders," continued Dr. Rothman. "This result was more pronounced in patients presenting with symptoms of syncope or presyncope. MCOT was superior to cardiac loop event recorders for the detection of clinically significant arrhythmias, with a shorter time to diagnosis. The technology reduces patient error, enhances diagnostic accuracy, decreases time to diagnosis, and improves patient care."

About Cardiac Arrhythmia Monitoring

A cardiac arrhythmia is categorized as a temporary or sustained abnormal heart rhythm that is caused by a disturbance in the electrical signals in the chambers of the heart. Proper administration of electrical signals to the heart is necessary to ensure effective heart function. There are two main categories of arrhythmias: tachycardia, meaning a rapid heartbeat, and bradycardia, meaning a slow heartbeat.

The ability to diagnose or rule out a cardiac arrhythmia as the cause of a symptom or cardiac condition is important both to treat those patients with serious arrhythmias, as well as to identify those patients that may not require further medical attention. The problem is that the most commonly prescribed diagnostic method, the Holter monitor (first developed in the late 1940s and generally worn by a patient for 24-48 hours), rarely finds infrequent but nonetheless serious arrhythmias in many patients. Circulation, a publication of the American Heart Association, reported as early as 2003 that the "principal limitation of Holter recordings is that the sampling period is usually too short to allow capture of an infrequent arrhythmia." Similarly, a 2004 Frost & Sullivan study reported that Holter monitors have been found to be effective in diagnosing cardiac arrhythmias only 10 percent of the time.

When Holter monitoring fails to detect an arrhythmia, physicians often place the patient on a portable cardiac loop event recorder, which patients wear for 30 days, but the recorder only stores a limited amount of data, typically about 10 minutes. Additionally, in most cases, cardiac loop event recorders require that the patient activate the device when they feel symptoms, an inherent limitation as patients may or may not experience symptoms.

The most recent advancement in ambulatory arrhythmia monitoring is CardioNet MCOT, whereby patients wear three chest leads attached to a small portable sensor that continuously detects every heartbeat and transmits the ECG data in real-time to a pocket-sized monitor. If the algorithms in the monitor detect an abnormal heartbeat, the monitor automatically transmits the patient's ECG data to the CardioNet Monitoring Center using wireless communications. CardioNet MCOT offers several advantages to physicians, payors, and patients, including: real-time, continuous ECG data detection; 96 hours of memory; increased compliance through technology and reduced patient interaction; reflection of real-life cardiac activity; symptom correlation; detection of arrhythmias where symptoms are not experienced; minimization of data artifacts or "noise"; two-way wireless capabilities for

- 18 -

**Exhibit 1**
**Page 41**

transmission, remote programming and data retrieval; and the ability to tailor the system to physicians' needs.

CardioNet MCOT is available today in 25 states and growing rapidly. In some other states where reimbursement has been lagging, payors have been waiting for clinical data to prove the efficacy of the new service. Jim Sweeney, Chairman and CEO of CardioNet, said that he now expects more insurance companies to reimburse for MCOT as a result of the findings of this study. "It is far better to cover the cost of an effective monitoring technology than to incur the cost of ongoing testing and treatment of patients who are left undiagnosed, and who may ultimately be hospitalized because of stroke or other serious heart conditions."

[Emphasis added; footnotes omitted.]

57.     Later that month in March 2007, CardioNet announced that it had closed on another approximately $115 million private financing round, making it one of the largest private placements of equity bridge financing in the medical technology sector since January 2000, according to Sweeney. "That's even more than most initial public offerings," said Sweeney, speaking at the 56th annual scientific session of the American College of Cardiology in New Orleans. Underwriter Defendant CitiGroup also served as the lead placement agent for this round of venture capital financing. In connection with the financing, CardioNet issued and sold to investors an aggregate of 114,839 shares of mandatorily redeemable convertible preferred stock at a purchase price of $1,000 per share, for aggregate consideration of $114.8 million. Upon the closing of the Company's March 2008 IPO, these shares would convert into 7,680,902 shares of common stock, many of which would be sold in the Company's August 2008 Secondary Offering, including shares sold by venture capital funds Sanderling and Foundation, where defendants Middleton and Rein, respectively, serve as general partners.

### The Truth Begins to Emerge

58.     Beginning with the release of a highly critical Jefferies & Company, Inc. ("Jefferies") analyst report on April 24, 2009, the market learned the true basis of CardioNet's purported success and how fallible its business model was. Analyst Brian Kennedy of Jefferies issued a detailed 16-page report initiating coverage of CardioNet, rating CardioNet as "Underperform," and suggesting that a significant reimbursement rate cut by Highmark was imminent. Among other things, the Jefferies report disclosed for the first time that:

(a)     While over the previous "several years," the Professional Component had been reimbursed at upwards of $300 (depending on the carrier), and the Technical Component, which was

- 19 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 42

1   reimbursed by "only one Medicare carrier, Pennsylvania's Highmark," had been reimbursed at "an average

2   rate of $1,123.07," both reimbursement fees would be dramatically reduced beginning in 2009. Specifically,

3   the professional fee paid to physicians would be reduced to "approximately $25." While the Technical

4   Component would still be determined at "contractor rate," *i.e.*, by Highmark, it was clear to Jefferies that

5   CMS had determined Highmark had been "over-valuing" the service in the past and Highmark would likely

6   reduce the Technical Component CardioNet received in proportion to the reduction in the Professional

7   Component, resulting in a range of $700 - $1,000 payable for the technical fee.

8           (b)      By adding a "modifier [of] -26 and specify[ing] 'mobile cardiac outpatient telemetry'

9   (or close variation) on the CMS claim form," physicians - *as instructed by CardioNet's aggressive sales*

10  *staff* – had been improperly manipulating the rate of reimbursement for MCOT services: "While CMS

11  guidelines stated that the service should be paid only one time in any 30-day period regardless of the number

12  of data transmissions involved (a policy most private insurers [also] follow[ed]), the use of an unlisted code

13  made payment inconsistencies from carrier to carrier fairly common."

14          (c)      "In an October 2006 letter to CMS, [CardioNet had] discusse[d] this issue, saying

15  'payment for physicians varies widely through the country and there is no single methodology used by

16  carriers to determine payment,'" and that "[t]o illustrate its point, [CardioNet] enclosed a table listing the

17  payments made by several Medicare carriers for" the "-26"-modified billing code with the table showing a

18  range of "payments of $30 [to] $299," assuming a monitoring period of up to thirteen days. As a result,

19  Jefferies warned that the *"new payment of roughly $25 for a 30 day period under the recently created*

20  *MCOT-specific code . . . represents a step back – and in some instances a significant step back - in*

21  *physician reimbursement for MCOT."*

22          (d)      Jefferies also explained that the "the new fee is comparable to those for older-line

23  devices, Holter and event monitors, *which removes the profit incentive that once favored MCOT relative to*

24  *these other technologies.*" The Jefferies report carefully added that "*[t]hough we're not suggesting that a*

25  *profit motive alone drives MCOT adoption* - the technology has clear diagnostic benefits - *we think the*

26  *added profitability of MCOT encouraged many physicians to at least trial the technology*" and that

27  Jefferies was "*cautious that this willingness to trial MCOT may decline now that the professional*

28  *reimbursement is on par with that for more routinely used Holters and event monitors.*"

- 20 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 43

1          (e)    Jefferies explained that "Cardiologists and electrophysiologists are generally more

2    experienced with Holters and event monitors and some have the technology, particularly Holters, in their

3    offices, *allowing them to bill for the technical fee too* and generate more revenue."

4          (f)    Jefferies also cautioned that its "checks with physicians who've already adopted

5    MCOT reveal[ed] frustration over the new rate given the greater number of MCOT reports relative to the

6    other technologies, as well as the additional time needed to work through issues *such as explaining to the*

7    *patient that MCOT is associated with a higher co-pay*," with Jefferies concluding that "[w]hile many

8    doctors indicate that they'll continue using MCOT even if they're generating a loss on their efforts, we're

9    inclined to think that demand from existing users could decline *as physicians become more selective in*

10   *choosing patients who'll benefit from the technology*" and that "many private insurers [would] gravitate

11   toward the new CMS professional fee over time, further pressuring demand from both new and existing

12   users of MCOT."

13         (g)    Hypothecating that the "new lower professional fee clearly establishes where the

14   technical fee is headed," Jefferies stated that "[b]roadly stated, *we believe CMS assigns a lower cost/benefit*

15   *value to MCOT than some of the local Medicare carriers, particularly Highmark*."

16         (h)    Jefferies also cautioned that having MCOT costs viewed as "indirect costs, not direct

17   costs," would "increase[] the likelihood of a lower national technical fee." Jefferies also stated that

18   "[c]omments made by [CardioNet] in letters sent to CMS last year indicate[d] that" CardioNet knew "many

19   MCOT costs [were being viewed] as indirect costs rather than direct costs," including the "the software and

20   hardware used in the MCOT monitoring center." Being characterized as indirect costs rendered MCOT

21   costs "akin to overhead, because these items are used to process multiple patients in parallel rather than on a

22   serial basis." Jefferies continued that "[a]lthough [Cardiobeat] cites several technologies it believes offer

23   precedent for the type of reimbursement [it was] requesting, *[Jefferies was] cautious that [regulators] ha[d]*

24   *already considered and rejected this line of thinking*."

25         (i)    Jefferies warned that the "spread between Medicare reimbursement rates for event

26   monitors and MCOT [was] large and should prove unsustainable over time," noting "that *MCOT*

27   *reimbursement [was] approximately five times greater than reimbursement for event monitors*, which

28   typically [fell] between $200 and $250 per case" and that "*Holter reimbursement [was] an even greater*

- 21 -

**Exhibit 1**
**Page 44**

1  *step down*, at approximately $100 per case." Jefferies reported that "[s]everal people [it had] spoken with

2  suggest[ed] that *MCOT ha[d] managed to maintain its substantial reimbursement premium because only*

3  *[CardioNet] had been actively pursuing the opportunity before 2007*, and the company's scale was much

4  smaller than it" was in then in April 2008, stating "[t]hese observers believe that BEAT's aggressive growth

5  strategy, paired with LifeWatch's emergence as an MCOT competitor, [would] attract reimbursement

6  scrutiny and make cuts inevitable."

7         (j)    Jefferies also observed that "Highmark was the first supporter of MCOT, and first

8  supporters tend to be generous with reimbursement," noting CardioNet has "gotten far less traction with

9  CMS than it has with Highmark." According to Jefferies, *in a "2006 letter to CMS, [CardioNet]*

10  *acknowledge[d] its dependence on Highmark bluntly, even limiting its influence to a single person,*

11  *Highmark medical director Dr. Andrew Bloschichak*: 'Our payment is based on the willingness of Dr.

12  Bloschichak to learn about MCOT, carefully research issues and provide for payment that reflects the cost of

13  the service.'" Jefferies emphatically stated "[w]e don't expect CMS to give MCOT the open-minded

14  consideration that Dr. Bloschichak has (due to CMS's priorities elsewhere), and we think an upcoming

15  reimbursement reduction by Highmark will mark the end of MCOT's most favorable Medicare

16  reimbursement terms."

17         (k)    Jefferies also questioned the scientific worth of the March 2007 study CardioNet had

18  designed, paid for and extensively touted, referencing its "non-ideal control group" and stating that while

19  "[f]rom a pure technology standpoint, [CardioNet's] MCOT system performed admirably in the trial," "the

20  results [were] somewhat unremarkable to those familiar with cardiac monitoring, since using better

21  technology capable of capturing asymptomatic events and extending the observation time window should

22  obviously improve one's diagnostic yield." According to Jefferies, however, citing a December 2007

23  technology assessment of remote cardiac monitoring devices, while increased diagnoses yields might

24  improve patient management, further evidence of actual improved "patient-oriented outcomes" was needed

25  to determine efficacy. Specifically, the Jefferies report concluded that:

26        At present, several private insurers won't reimburse for MCOT even though the [CardioNet]
system has achieved statistically significant results in a large-scale randomized clinical trial.

27        Some of these private payers have indicated that they don't think the study's data are
sufficient, an opinion that may stem from a primary focus on outcomes rather than simply

28        diagnosis. *We believe until more outcomes data are generated, restrictions on the*

- 22 -

**Exhibit 1**
**Page 45**

*reimbursable uses of the service are likely to increase as coverage moves toward a Medicare national payment decision. Our checks indicate that Highmark and some private insurers are now fairly lenient in requiring documentation to support the medical necessity of MCOT compared to other less expensive forms of monitoring. We expect CMS to impose more restrictions on usage.* We note that once the technical fee moves out of Highmark's control and into CMS's, the MCOT providers should have the ability to open independent diagnostic testing facilities in any state, not just Pennsylvania. *We believe CMS will take pains to prevent MCOT euphoria from building on the national level. We view CMS's decision to remove the financial incentive favoring MCOT by lowering the professional fee to $25 as an early tell that the agency plans to rein in MCOT costs and limit the technology's use to only those patients who truly need it.*

(l)      In conclusion, the Jefferies report, which was a culmination of extensive research about CardioNet's and the lucrative historical reimbursement rates it had obtained for the MCOT device, hypothesized that, as a result of Highmark's review of CardioNet's historical MCOT billing practices – *practices CardioNet's sales staff had taught doctors to follow to increase their reimbursement rates to increase MCOT prescriptions* – Highmark would cut the Professional Component of the reimbursement fee CardioNet was receiving by at least $200 per service in 2009. [Emphasis added.]

59.      Based on its analysis, Jefferies established a price target for CardioNet's stock of $17 per share, compared to the Company's then-current market price of $22.91 per share. Jefferies' target price was more than 22% lower than the $18 per share Defendants had garnered in the IPO and more than 35% lower than the $26.50 per share they had garnered in the Secondary Offering. Issuance of the Jefferies report caused the price of CardioNet's common stock to fall by $2.97 per share to close at $19.94 on April 24, 2009, a one-day decline of 13%, erasing over $70.5 million in market capitalization.

60.      Though CardioNet adamantly denied and attempted to discredit the findings in the Jefferies report, on June 30, 2009 CardioNet suddenly issued a press release announcing that it was lowering its full year 2009 guidance and withdrawing its 2010 and 2011 guidance based on "lower than anticipated commercial reimbursement rates" for its MCOT device. On this news, CardioNet's shares again plunged $6.75 per share from $16.32 per share on June 30, 2009 to $9.57 per share on July 1, 2009, a one-day decline of 41% per share on volume of 23.4 million shares, over 24 times the preceding three-month's daily average.

61.      Finally, on July 12, 2009, CardioNet announced that it had received a letter from Highmark stating that the reimbursement rate for the technical portion of the MCOT device would be lowered by

- 23 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 46

1 approximately 33%, from $1,123 to $754 per service, and that as a result, the Company was withdrawing its

2 full year 2009 guidance entirely. On this announcement, the price of CardioNet's stock once again suffered

3 a significant decline, falling $2.96 per share to close at $5.87 per share on July 13, 2009 – a one-day decline

4 of 34% on volume of 11.8 million shares, over seven times the average three-month daily average.

5      62.    As detailed in a November 20, 2009 *Wall Street Journal* exposé, the price of the millions of

6 shares of CardioNet stock sold to the unsuspecting public in the Company's IPO and Secondary Offering

7 had cratered:



**Fading Heartbeat** | CardioNet's public history

17      63.    The November 20, 2009 *Wall Street Journal* article, which also detailed CardioNet's

18 concerted – and disingenuous – efforts to discredit the Jefferies report for over a year, including writing the

19 SEC, the Nasdaq Stock Market and the Financial Industry Regulatory Authority accusing Jefferies of stock

20 manipulation, quoted CardioNet's then-current CEO conceding that that "the rate cut means CardioNet 'will

21 not be able to sustain operations as a stand-alone company'" anymore. Indeed, by mid-December 2009,

22 CardioNet's CEO would be forced to disclose that (a) the Company planned to cut $15 million in operating

23 costs (in addition to the $8 million in expense cuts that had been made during the period from mid-July to

24 mid-December 2009) to remain afloat, and that (b) the Company had retained Lazard Frères & Co. to

25 evaluate its options, including what some analysts believe could be a sale of the Company. Even today, with

26 talk of a possible sale of the Company in the market, CardioNet stock continues to trade in the range of

27 $5.50 to $6.50 per share, after falling as low as $4.36 per share on December 8, 2009.

28

- 24 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 47

## THE FALSE AND MISLEADING IPO REGISTRATION STATEMENT

64. On or about August 17, 2007, CardioNet filed with the SEC a Form S-1 Registration Statement for the IPO that went through several rounds of amendments before being declared effective by the SEC on March 18, 2008. On or about March 25, 2008, the Company conducted its IPO valued at more than $82 million, including shares sold by Guidant. The IPO Registration Statement and Prospectus (collectively the "IPO Registration Statement) contained material false and misleading statements, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

65. Purporting to describe the "advantages" CardioNet "believe[d] that the CardioNet System offer[ed]…to physicians, payors and patients," the IPO Registration Statement listed a "***Potential reduction in health care costs,***" stating "[w]e have demonstrated increased diagnostic yield as compared to event monitoring, which we believe may reduce 'time to diagnosis' *and reduce health care costs* resulting from repeated emergency room and physician visits, additional diagnostic testing, prolonged hospitalization for the sole purpose of arrhythmia monitoring and unnecessary hospitalizations for drug initiation and titration, as well as expenditures resulting from stroke and other serious cardiovascular complications." [Emphasis added.]

66. These statements in the IPO Registration Statement concerning "reduction[s] in health care costs" were materially inaccurate. First, the statements, which were made in conjunction with the IPO, concealed/misstated that CardioNet lacked any scientific basis for stating that MCOT's increased diagnostic yields actually led to reduced healthcare costs. CardioNet's March 2007 study was defective and scientifically non-conclusive. While MCOT increased diagnoses yields, the Company lacked a scientific basis to say that increased diagnoses yields reduced actual patient care costs. Second, because CardioNet's sales representatives were employing improper – if not illegal – sales tactics, including instructing doctors to prescribe MCOT to patients whose severity of symptoms did not warrant it, encouraging doctors to bill the professional fee on a daily basis for reviewing medically unnecessary daily reports and charging Medicare and private payors for using the MCOT technology CardioNet provided to them for free, the costs associated with the use of MCOT were actually materially higher than viable alternatives. And third, because MCOT was significantly more expensive that other diagnoses methods and payors would not deem MCOT

- 25 -

Exhibit 1
Page 48

1  "medically necessary" based on the Company's flawed study, CardioNet had no basis to state it could

2  expand MCOT's acceptance rate amongst physicians, and thus, its own market share and sales revenues.

3       67.    As to CardioNet's "Business Strategy," the IPO Registration Statement cited "[l]everag[ing]

4  [e]xpanded [s]ales [f]ootprint to [e]nhance [m]arket [p]enetration" as a goal, specifically stating that:

5      With the acquisition of PDSHeart, *we now provide services to patients in 48 states*. Our
    sales force increased from 27 account executives at December 31, 2006 to 76 account

6      executives as of December 31, 2007, largely as a result of the PSDHeart acquisition, and we
    intend to continue to add sales capacity. The acquisition accelerated our market expansion

7      strategy *by providing us with immediate access to a sales force with existing physician
    relationships capable of marketing our CardioNet System in areas of the country where it

8      had previously not been marketed or sold.*

9  [Emphasis added.]

10       68.    These statements in the IPO Registration Statement concerning the Company's ability to

11  expand CardioNet's sales footprint into "areas of the country where [CardioNet MCOT] had previously not

12  been marketed or sold" were false and misleading as expanding the Company's sales footprint exposed

13  CardioNet's exorbitant reimbursement rates to being reduced. Once those rates were reduced, CardioNet's

14  higher cost *vis-à-vis* Holter and event monitors would reduce physician prescriptions by rendering use of

15  CardioNet MCOT financially unviable to patients and physicians alike.

16       69.    The IPO Registration Statement stated that CardioNet "receive[d] reimbursement for [its]

17  services from commercial payors and from Medicare Part B carriers *where the services [were] performed*

18  *on behalf of the Centers for Medicare and Medicaid Services, or CMS*," and that its "prescribing

19  physicians receive[d] reimbursement for professional interpretation of the information provided by [its]

20  products and services *from commercial payors or Medicare carriers within the state where they practice.*"

21  These statements were false and misleading as they concealed that *all* pricing was set by Highmark in

22  Pennsylvania, *over which CardioNet's executives wielded significant influence*. [Emphasis added.]

23       70.    The IPO Registration Statement stated that defendants "believe[d] the CardioNet System

24  monitoring system revenues [would] increase as a percentage of revenues going forward as [they]

25  emphasize[d] this service, continue[d] [CardioNet's] geographic expansion and achieve[d] greater market

26  penetration in existing markets." These statements were false and misleading as the 2007 study was flawed,

27  which would result in a reduction rather than an expansion of payor acceptance, reducing revenues.

28  Moreover, because CardioNet's national reimbursement fees were being set by Highmark alone, *over which*

- 26 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 49

1    *CardioNet exhibited significant influence,* unbeknownst to investors, the Company's reimbursement rates

2    would be slashed when CMS realized how much Highmark had been over-valuing CardioNet's MCOT

3    services. When CMS reduced reimbursement rates, CardioNet's revenues would be significantly diminished

4    and its "geographic expansion" and "market penetration" would contract, rather than expand. Specifically,

5    at the time of the IPO, Defendants knew CMS was critically reviewing reimbursement rates for CardioNet

6    MCOT.

7            71.     The IPO Prospectus stated that "[f]or the year ended December 31, 2007, [CardioNet's] gross

8    profit margin was 65%," and that "[i]n general, [defendants] expect[ed] gross profit margins on the

9    CardioNet System services to remain flat or increase, assuming no changes in reimbursement rates."

10   Conversely, defendants stated that "[f]or [CardioNet's] event and Holter monitoring services, [the

11   Company] expect[ed] gross profit margins to decrease *as reimbursement rates decline[d] as [then]*

12   *currently proposed by CMS.*" These statements concerning Defendants' "gross profit" projections for

13   MCOT were false and misleading as Defendants then knew that more likely than not CMS would force a

14   significant reduction in CardioNet's reimbursement rates once multiple providers of MCOT necessitated

15   CMS establishing a national reimbursement rate and CardioNet could no longer dictate reimbursement rates

16   through its influence over Highmark.

17                        **THE FALSE AND MISLEADING SECONDARY**
                          **OFFERING REGISTRATION STATEMENT**
18
            72.     On or about June 23, 2008, CardioNet filed with the SEC a Form S-1 Registration Statement
19
     for the Secondary Offering, that went through several rounds of amendments before being declared effective
20
     by the SEC on July 31, 2008. On or about August 6, 2008, the Company conducted its IPO valued at more
21
     than $152 million. The Secondary Offering Registration Statement and Prospectus (collectively the
22
     "Secondary Offering Registration Statement) contained material false and misleading statements, omitted to
23
     state other facts necessary to make the statements made not misleading and were not prepared in accordance
24
     with the rules and regulations governing their preparation.
25
            73.     Purporting to describe the "advantages" CardioNet "believe[d] that the CardioNet System
26
     offer[ed]…to physicians, payors and patients," the Secondary Offering Registration Statement listed a
27
     *"Potential reduction in health care costs,"* stating "[w]e have demonstrated increased diagnostic yield as
28

- 27 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 50

1   compared to event monitoring, which we believe may reduce 'time to diagnosis' *and reduce health care*

2   *costs* resulting from repeated emergency room and physician visits, additional diagnostic testing, prolonged

3   hospitalization for the sole purpose of arrhythmia monitoring and unnecessary hospitalizations for drug

4   initiation and titration, as well as expenditures resulting from stroke and other serious cardiovascular

5   complications."

6       74.    These statements in the Secondary Offering Registration Statement concerning "reduction[s]

7   in health care costs" were materially inaccurate. First, the statement, which was made in conjunction with

8   the Secondary Offering, concealed/misstated that CardioNet lacked any scientific basis for stating that

9   MCOT's increased diagnostic yields actually led to reduced healthcare costs. CardioNet's March 2007

10  study was defective and scientifically non-conclusive. While MCOT increased diagnoses yield, the

11  Company lacked a scientific basis to say that increased diagnoses yields reduced actual patient care costs.

12  Second, because CardioNet's sales representatives were employing improper – if not illegal – sales tactics,

13  including instructing doctors to prescribe MCOT to patients whose severity of symptoms did not warrant it,

14  encouraging doctors to bill the professional fee on a daily basis for reviewing medically unnecessary daily

15  reports and charging Medicare and private payors for using the MCOT technology CardioNet provided to

16  them for free, the costs associated with the use of MCOT were actually materially higher than viable

17  alternatives. And third, because MCOT was significantly more expensive than other diagnoses methods and

18  payors would not deem MCOT "medically necessary" based on the Company's flawed study, CardioNet had

19  no basis to state it could expand MCOT's acceptance rate among physicians, and thus, its own market share

20  and sales revenues.

21      75.    As to CardioNet's "Business Strategy," the Secondary Offering Registration Statement cited

22  "[l]everag[ing] [e]xpanded [s]ales [f]ootprint to [e]nhance [m]arket [p]enetration" as a goal, specifically

23  stating that:

24      With the acquisition of PDSHeart, *we now provide services to patients in 48 states*. Our
    sales force increased from 27 account executives at December 31, 2006 to 76 account
25      executives as of December 31, 2007, largely as a result of the PSDHeart acquisition, and we
    intend to continue to add sales capacity. The acquisition accelerated our market expansion
26      strategy *by providing us with immediate access to a sales force with existing physician
    relationships capable of marketing our CardioNet System in areas of the country where it*
27      *had previously not been marketed or sold.*

28  [Emphasis added.]

- 28 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**Exhibit 1**
**Page 51**

76. These statements in the Secondary Offering Registration Statement concerning the Company's ability to expand CardioNet's sales footprint into "areas of the country where [CardioNet MCOT] had previously not been marketed or sold" were false and misleading as expanding the Company's sales footprint exposed CardioNet's exorbitant reimbursement rates to being reduced. Once those rates were reduced, CardioNet's higher cost *vis-à-vis* Holter and event monitors would reduce physician prescriptions rendering use of CardioNet MCOT financially unviable to patients and physicians alike.

77. The Secondary Offering Registration Statement stated that CardioNet "receive[d] reimbursement for [its] services from commercial payors and from Medicare Part B carriers *where the services [were] performed on behalf of the Centers for Medicare and Medicaid Services, or CMS*," and that its "prescribing physicians receive[d] reimbursement for professional interpretation of the information provided by [its] products and services *from commercial payors or Medicare carriers within the state where they practice.*" These statements were false and misleading as they concealed that *all* pricing was set by Highmark in Pennsylvania, *over which CardioNet's executives wielded significant influence*. [Emphasis added.]

78. The Secondary Offering Registration Statement stated that Defendants "believe[d] the CardioNet System monitoring system revenues [would] increase as a percentage of revenues going forward as [they] emphasize[d] this service, continue[d] [CardioNet's] geographic expansion and achieve[d] greater market penetration in existing markets." These statements were false and misleading as the 2007 study was flawed, which would result in a reduction, rather than an expansion, of payor acceptance, reducing revenues. Moreover, because CardioNet's national reimbursement fees were being set by Highmark alone, *over which CardioNet exhibited significant influence*, unbeknownst to investors, the Company's reimbursement rates would be slashed when CMS realized how much Highmark had been over-valuing CardioNet's MCOT services. When CMS reduced reimbursement rates, CardioNet's revenues would be significantly diminished and its "geographic expansion" and "market penetration" would contract, rather than expand. Specifically, at the time of the secondary offering, Defendants knew CMS was critically reviewing reimbursement rates for CardioNet MCOT.

79. The Secondary Offering Prospectus stated that "[f]or the quarter ended March 31, 2008, [CardioNet's] gross profit margin was 62.6%," and that "[i]n general, [Defendants] expect[ed] gross profit

- 29 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 52

1 margins on the CardioNet System services to *remain flat or increase*, assuming no changes in

2 reimbursement rates." Conversely, Defendants stated that "[f]or [CardioNet's] event and Holter monitoring

3 services, [the Company] expect[ed] gross profit margins to decrease *as reimbursement rates decline[d] as*

4 *[then] currently proposed by CMS*." These statements concerning Defendants' "gross profit" projections

5 for MCOT were false and misleading as Defendants then knew that more likely than not CMS would force a

6 significant reduction in CardioNet's reimbursement rates once multiple providers of MCOT necessitated

7 CMS establishing a national reimbursement rate and CardioNet could no longer dictate reimbursement rates

8 through its influence over Highmark.

9        80.     In general, the statements made in both the Company's IPO and Secondary Offering

10 Registration Statements were materially false and misleading when made because the Company failed to the

11 disclose the following material facts concerning CardioNet's business operations, financial results,

12 operations and internal controls: (1) the Registration Statements (and the financial statements and related

13 SEC filings incorporated therein by reference) reported millions of dollars in improperly obtained revenues;

14 (2) the Registration Statements materially understated the potential for payors to reduce their reimbursement

15 rates for the Company's MCOT services going forward by actively concealing defects in the March 2007

16 study and the improper billing methods CardioNet's aggressive sales force was training physicians to

17 undertake; (3) the Registration Statements concealed the extent of influence CardioNet had and had

18 exercised over Highmark in establishing CardioNet's national MCOT reimbursement fees; (4) the

19 Registration Statements misstated that, as a result of the above, the Company's financial results following

20 the Offerings would in no way be analogous to the financial statements provided in its Registration

21 Statements; (5) the Registration Statements misstated that the Company lacked adequate internal and

22 financial controls; and (8) as a result of the foregoing, the Company's Registration Statements were false

23 and misleading at all relevant times.

24                  **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

25        81.     Plaintiff brings this action as a class action on behalf of a Class, consisting of all those who

26 purchased CardioNet's common stock pursuant or traceable to the Company's IPO and Secondary Offering

27 Registration Statements and who were damaged thereby (the "Class"). Excluded from the Class are

28 Defendants, the officers and directors of the Company, at all relevant times, members of their immediate

- 30 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 53

1  families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have

2  or had a controlling interest.

3        82.    The members of the Class are so numerous that joinder of all members is impracticable.

4  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

5  through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

6  The proposed Class may be identified from records maintained by CardioNet or its transfer agent and may

7  be notified of the pendency of this action by mail, using the form of notice similar to that customarily used

8  in securities class actions.

9        83.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the

10  Class are similarly affected by Defendants' wrongful conduct.

11        84.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has

12  retained counsel competent and experienced in class and securities litigation.

13        85.    Common questions of law and fact exist as to all members of the Class and predominate over

14  any questions solely affecting individual members of the Class. Among the questions of law and fact

15  common to the Class are:

16             a.    whether the federal securities laws were violated by Defendants' acts as alleged

17                    herein;

18             b.    whether the IPO and Secondary Registration Statements contained false and

19                    misleading statements; and

20             c.    to what extent Plaintiff and members of the Class have sustained damages and the

21                    proper measure of damages.

22        86.    A class action is superior to all other available methods for the fair and efficient adjudication

23  of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by

24  individual Class members may be relatively small, the expense and burden of individual litigation make it

25  impossible for members of the Class to individually redress the wrongs done to them. There will be no

26  difficulty in the management of this action as a class action.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 54

**FIRST CLAIM**
Violation of Section 11 of
**The Securities Act Against All Defendants**

87. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88. This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against each of the Defendants.

89. The IPO and Secondary Offering Registration Statements were inaccurate and misleading, contained untrue statements of material facts, and omitted facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein.

90. Defendant CardioNet is the issuer of the securities purchased by Plaintiff and the Class. As such, CardioNet is strictly liable for the materially inaccurate statements contained in the Registration Statements and the failure of the Registration Statements to be complete and accurate.

91. The Individual Defendants each signed the Registration Statements either personally or through an attorney-in-fact and/or caused their issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statements. They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statements misleading and that the document contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statements and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, the Individual Defendants are liable to Plaintiff and the Class.

92. The Underwriter Defendants each served as underwriters in connection with Offerings. These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statements. They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statements misleading and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statements and also should have known of the omissions of

- 32 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**Exhibit 1**
**Page 55**

1   material facts necessary to make the statements made therein not misleading. As such, the Underwriter

2   Defendants are liable to Plaintiff and the Class.

3         93.     By reasons of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

4         94.     Plaintiff acquired CardioNet common units in reliance on the Registration Statements and

5   without knowledge of the untruths and/or omissions alleged herein. Plaintiff sustained damages and the

6   price of CardioNet shares declined substantially due to material misstatements in the Registration

7   Statements.

8         95.     This action was brought within one year after the discovery of the untrue statements and

9   omissions and within three years of the date of the IPO and the Secondary Offering.

10        96.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to

11   damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of

12   them, jointly and severally.

13                    **SECOND CLAIM**
               **Violation of Section 12(a)(2) of**

14            **The Securities Act Against All Defendants**

15        97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

16   herein.

17        98.     Defendants were sellers and offerors and/or solicitors of purchasers of the CardioNet

18   securities offered pursuant to the IPO and Secondary Offering. Defendants issued, caused to be issued, and

19   signed the Registration Statements in connection with the Offerings. The Registration Statements were used

20   to induce investors, such as Plaintiff and the other members of the Class, to purchase CardioNet securities.

21        99.     The Registration Statements contained untrue statements of material facts, omitted to state

22   other facts necessary to make the statements made not misleading, and omitted material facts required to be

23   stated therein. Defendants' actions of solicitation included participating in the preparation of the false and

24   misleading Registration Statements.

25       100.     As set forth more specifically above, the Registration Statements contained untrue statements

26   of material fact and omitted to state material facts necessary in order to make the statements, in light of

27   circumstances in which they were made, not misleading.

28

- 33 -

**Exhibit 1**
**Page 56**

1    101.    Plaintiff and the other Class members did not know, nor could they have known, of the

2  untruths or omissions contained in the Registration Statements.

3    102.    The Defendants were obligated to make a reasonable and diligent investigation of the

4  statements contained in the Registration Statements to ensure that such statements were true and that there

5  was no omission of material fact required to be stated in order to make the statements contained therein not

6  misleading. None of the Defendants made a reasonable investigation or possessed reasonable grounds for

7  the belief that the statements contained in the Registration Statements were accurate and complete in all

8  material respects. Had they done so, these Defendants could have known of the material misstatements and

9  omissions alleged herein.

10    103.    This claim was brought within one year after discovery of the untrue statements and

11  omissions in the Registration Statements and within three years after CardioNet securities were sold to the

12  Class in connection with the Offerings.

13                          **THIRD CLAIM**
                 **For Violation of Section 15 of the Securities Act**
14                  **Against the Individual Defendants**

15    104.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

16  herein.

17    105.    The Individual Defendants acted as controlling persons of CardioNet within the meaning of

18  §15 of the Securities Act. By reason of their ownership, senior management positions and/or directorships

19  at the Company, as alleged above, these Defendants, individually and acting pursuant to a common plan, had

20  the power to influence and exercised the same to cause CardioNet to engage in the conduct complained of

21  herein. By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities

22  Act.

23    106.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of

24  the Securities Act. As a direct and proximate result of the wrongful conduct, Class members suffered

25  damages in connection with their purchases of the Company's securities.

26                          **REQUEST FOR RELIEF**

27    WHEREFORE, Plaintiff prays for judgment as follows:

28

- 34 -

**Exhibit 1**
**Page 57**

1    A.    Declaring this action to be a proper class action pursuant and certifying Plaintiff as a

2  Class representative;

3    B.    Awarding Plaintiff and other members of the Class compensatory damages;

4    C.    Awarding Plaintiff and other members of the Class rescission on their Section 12(a)(2)

5  claims;

6    D.    Awarding Plaintiff and other members of the Class pre-judgment and post-judgment

7  interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

8  and

9    E.    Awarding Plaintiff and other members of the Class any other relief as the Court may

10  deem just and proper.

11                                       **JURY TRIAL DEMANDED**

12    Plaintiff hereby demands a trial by jury.

13  DATED:  March 10, 2010                    SCOTT+SCOTT LLP
14                                           ARTHUR L. SHINGLER III
                                             MARY K. BLASY
15

16                                           /s/ Mary K. Blasy
17                                           MARY K. BLASY
                                             600 B Street, Suite 1500
18                                           San Diego, CA  92101
                                             Telephone:  619/233-4565
19                                           619/233-0508 (fax)

20                                           SCOTT+SCOTT LLP
                                             DAVID R. SCOTT
21                                           156 South Main Street
                                             P.O. Box 192
22                                           Colchester, CT  06415
                                             Telephone:  860/537-3818
23                                           860/537-4432 (fax)

24                                           Amber L. Eck
                                             ZELDES & HAEGGQUIST, LLP
25                                           625 Broadway, Suite 906
                                             San Diego, CA 92101
26                                           Telephone: 619/434-0024
                                             619/342-7878 (fax)
27
                                             *Counsel for Plaintiff*
28

                                         - 35 -
FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Exhibit 1
Page 58

# Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIANNE SOLOMON-SHRAWDER,
Individually and on Behalf of All Others
Similarly Situated,

              Plaintiff,

    v.

CARDIONET INC., RANDY H. THURMAN
and MARTIN P. GALVAN,

              Defendants.

CIVIL ACTION No. 2:09-cv-3894-SD

CLASS ACTION

## CONSOLIDATED CLASS ACTION COMPLAINT OF LEAD PLAINTIFF
## CENTRAL LABORERS' PENSION, WELFARE AND ANNUITY FUNDS

Jeffrey W. Golan
M. Richard Komins
Jeffrey A. Barrack
Beth T. Seltzer
**BARRACK, RODOS & BACINE**
Two Commerce Square, Suite 3300
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

J. Gerard Stranch, IV
Michael Stewart
Joe P. Leniski
Michael J. Wall
**BRANSTETTER, STRANCH &**
  **JENNINGS, PLLC**
227 Second Avenue North, Fourth Floor
Nashville, Tennessee 37201-1631
Telephone: (615) 254-8801
Facsimile: (615) 250-3970

*Co-Lead Counsel for the Lead Plaintiff and Putative Class*

**Exhibit 2**
**Page 59**

**TABLE OF CONTENTS**

Pages

OVERVIEW OF THE CASE ........................................................................................................... 1

JURISDICTION AND VENUE .................................................................................................... 8

THE PARTIES................................................................................................................................ 9

CLASS ACTION ALLEGATIONS ............................................................................................ 11

BACKGROUND .......................................................................................................................... 12

    A.       Company History and History of the MCOT™ device ......................................... 12

    B.       Reimbursement for Use of the MCOT™ Device .................................................. 16

EVENTS LEADING UP TO DEFENDANTS' FALSE AND MISLEADING
STATEMENTS............................................................................................................................. 20

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................................... 27

    A.       The April 28, 2009 Press Release ......................................................................... 27

    B.       The April 30, 2009 Press Release and Conference Call ....................................... 30

    C.       The May 12, 2009 Bank of America Health Care Conference.............................. 38

    D.       The May 18, 2009 Press Release .......................................................................... 42

THE Company FINALLY Discloses the truth about THE
REIMBURSEMENT PROCESS AND RATES............................................................................ 44

ADDITIONAL FACTS RELEVANT TO SCIENTER................................................................ 49

LOSS CAUSATION/ECONOMIC LOSS ................................................................................... 53

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
DOCTRINE .................................................................................................................................. 54

NO SAFE HARBOR .................................................................................................................... 55

COUNT I ...................................................................................................................................... 55

COUNT II ..................................................................................................................................... 57

Exhibit 2
Page 60

PRAYER FOR RELIEF .............................................................................................................. 58

JURY DEMAND ......................................................................................................................... 59

ii

Exhibit 2
Page 61

Lead Plaintiff Central Laborers' Pension Welfare and Annuity Funds ("Lead Plaintiff" or "Central Laborers"), on behalf of the other named plaintiff on this Complaint and the Class (defined in ¶ 29 below), by its undersigned attorneys, alleges the following upon personal knowledge as to Lead Plaintiff, and upon information and belief as to all other matters, based upon the investigation of counsel. The investigation of counsel is predicated upon, among other things, a review of public filings by CardioNet, Inc. ("CardioNet" or the "Company") with the United States Securities and Exchange Commission ("SEC"), including, among other things, its Forms 10-K and 10-Q, proxy and registration statements, and press releases, as well as a review of media reports about the Company, publicly available data relating to the prices and trading volumes of CardioNet securities, reports issued by securities analysts who followed CardioNet, and interviews with former employees, analysts and others with first-hand information. Lead Plaintiff believes that substantial, additional evidentiary support for the allegations set forth herein will be obtained after a reasonable opportunity for discovery.

## OVERVIEW OF THE CASE

1. This is a securities class action against CardioNet and two of its senior officers for violations of the Securities Exchange Act of 1934 ("1934 Act"), brought on behalf of all persons, other than defendants and their affiliates, who purchased or otherwise acquired the common stock of CardioNet from April 28, 2009 to and including July 10, 2009 (the "Class Period").

2. CardioNet, a company that was formed in 1997 and went public in March 2008, provides continuous, real-time ambulatory outpatient management solutions for monitoring relevant and timely clinical information regarding an individual's health. Its initial efforts are focused on the diagnosis and monitoring of cardiac arrhythmias, or heart rhythm disorders, through its core Mobile Cardiac Outpatient Telemetry ("MCOT$^{TM}$") device and Holter services. CardioNet claims that its MCOT$^{TM}$ device enables heartbeat-by-heartbeat, ECG monitoring,

**Exhibit 2**
**Page 62**

analysis and response, at home or away, twenty-four hours a day, seven days a week, three hundred and sixty-five days a year.

    3.    Much of CardioNet's success as an enterprise revolves around the reimbursement rates set for its MCOT™ device. On October 31, 2008, Highmark Medicare Services ("Highmark"), an intermediary designated by the Centers for Medicare and Medicaid Services ("CMS") as the controlling contractor for services pertaining to the MCOT™ device, set a Category I CPT Code reimbursement rate of $1,123 per service, effective January 1, 2009. Subsequently, on February 17, 2009, CardioNet announced its fourth quarter and year end 2008 results, and further issued bullish revenue and earnings guidance to the market for the years 2009 through 2011.

    4.    However, on April 24, 2009, Brian Kennedy, an analyst at Jefferies & Company, Inc. ("Jefferies"), issued a report (hereafter, the "April 24 Report" or "Report"), a copy of which is attached to this Complaint as Exhibit 1, initiating coverage of CardioNet, rating CardioNet as "underperform," and suggesting that based on an extensive investigation that Mr. Kennedy and Jefferies had conducted a significant reimbursement rate cut by Highmark was imminent. The April 24 Report, which referred to CardioNet by its name and by its stock symbol (BEAT), stated "[t]he Street has assumed that Highmark will keep the technical fee at $1,123 for 2009, even though neither BEAT nor LifeWatch has explicitly stated that the fee won't change. We think the Street's assumption is wrong. Our checks indicate that Highmark is currently reviewing the technical fee." The Report further indicated that a rate reduction of at least $200 was imminent.

    5.    On the day the Report was issued, the price of CardioNet's common stock fell by $2.97 per share to close at $19.94 on April 24, 2009, a one-day decline of 13%.

2

**Exhibit 2**
**Page 63**

6.      Following issuance of the April 24 Report, CardioNet and its senior officers embarked on a concerted campaign to discredit Mr. Kennedy, Jefferies and the information in the Report. First, within hours of the April 24 Report, Leerink Swann LLC ("Leerink"), one of the underwriters for the Company's March 2008 initial public offering ("IPO") and a co-lead manager for the Company's August 2008 secondary stock offering, reiterated its "Outperform" rating on CardioNet, and stated "[t]his morning, we checked in with BEAT management who emphasized to us that they are confident no decision regarding a potential change to reimbursement is imminent based on their conversations today with Highmark senior medical personnel who are unaware of any final decisions."

7.      Second, on April 26, 2009, an analyst at Citigroup, Inc. ("Citigroup"), the lead underwriter for the Company's IPO in March 2008 and the sole book-running manager for its secondary stock offering in August 2008, issued a report entitled "Not Worthy of the BEAT-down," which maintained Citigroup's "Buy" rating for CardioNet stock and explicitly questioned the legitimacy of Jefferies' April 24 Report. The Citigroup report stated that CardioNet management had been in contact with Highmark and saw "no signal of pending reimbursement changes." However, as later reported in *The Wall Street Journal* on November 20, 2009, in an article by David Armstrong, entitled "A Tough 'Sell' for Jefferies Analyst" (hereafter, the "*Wall Street Journal* article"), a copy of which is attached to this Complaint as Exhibit 2, Citigroup's analyst, Amit Bhalla, never even tried to contact Highmark before issuing his April 26 report on CardioNet.

8.      Third, on April 28, 2009 – the first day of the Class Period – CardioNet issued a press release specifically responding to the April 24 Report. The press release stated that after frequent communications with its two main reimbursement entities, CardioNet had not been

3

Exhibit 2
Page 64

notified of any proposed adjustment downward of its reimbursement rates. CardioNet further stated that it believed the Jefferies analyst's reference to such an imminent decrease in the reimbursement rate was "not based on any indication or suggestions provided by Highmark Medicare Services or CMS." The press release went on to say, among other things, that any changes in reimbursement rates would normally occur only "after a substantial amount of interaction and dialogue with our organization."

9.      Fourth, after the April 24 Report, CardioNet refused to speak with any analyst from Jefferies and did not allow any Jefferies analysts to participate in the Company's conference calls with analysts and investors. Specifically, according to Confidential Witness ("CW") 1, a person in the Medical Device & Diagnostics Industries Group within Jefferies, CardioNet refused to return phone calls from Jefferies and blocked Jefferies entirely from the Company's April 30, 2009 analyst conference call. Nobody from CardioNet ever asked Jefferies analysts about the basis for or any information underlying the Report. Indeed, although Jefferies was eventually allowed to listen to the most recent CardioNet conference calls, defendants continued to refuse to take any questions from Jefferies' analysts.

10.     In sharp contrast, defendants clearly communicated with other analysts after Jefferies' April 24 Report. Both the Leerink analyst and the Citigroup analyst specifically cited to communications with CardioNet management in their reports of April 24 an April 26, 2009, and both of them were among the analysts who were allowed to ask questions of CardioNet management during a conference call with analysts on April 30, 2009, following the issuance of the Company's first quarter 2009 results. CW1 explained that other analysts "definitely all talked to Randy [referring to defendant Randy Thurman, the Chairman of the Board, President and Chief Executive Officer of CardioNet] and those guys during the April time frame."

4

Exhibit 2
Page 65

CardioNet's exclusion of Jefferies from conference calls was part of the defendants' scheme to prevent the disclosure of accurate information, prevent pointed questioning about CardioNet's relationship with Highmark, and/or conceal the reality of the status of Highmark's reimbursement process and decision.

11. Fifth, defendants made direct statements during investor and analyst calls in seeking to discredit Mr. Kennedy, Jefferies and the information contained in the April 24 Report. During the first quarter 2009 earnings call, CardioNet's senior officers expressly and specifically repeated the revenue and earnings guidance provided to the market by CardioNet on February 17, 2009, for the years 2009 through 2011. In reiterating this guidance, defendant Thurman stated that while the Company had assumed "some reduction in reimbursement that's factored into the earnings projections we put out there," the Company was working "hand in glove with Highmark and with CMS on an ongoing basis **and …, candidly the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction**." He went on at great length, during the question and answer period, about the April 24 Report, questioning the bases upon which it was written. Defendant Thurman made similar and even more egregious comments at a May 12, 2009 Bank of America Healthcare Conference, during which he expressly questioned the "due diligence" of Mr. Kennedy and Jefferies prior to their issuance of the April 24 Report and further questioned Jefferies' motives in issuing the Report – stating that it was likely issued to assist short sellers who would gain from a rapid decline in the Company's stock price.

12. Sixth, according to CW1, despite the fact that CardioNet refused to communicate with Jefferies, CardioNet was telling others on the Street that Jefferies had never spoken with Highmark. CW1 explained that "[t]he story kept changing on Jefferies about what we did and

5

Exhibit 2
Page 66

didn't do. CardioNet initially went out and told people that we made it up, like literally made it up." Subsequently, after CardioNet could not longer pretend that Mr. Kennedy had not spoken with anyone at Highmark in connection with the April 24 Report, according to CW1, defendants took a new position that Jefferies had misrepresented themselves to Highmark.

13.     In truth, however, the April 24 Report was based on credible information and reflected a thorough investigation that Mr. Kennedy and Jefferies had undertaken. During the course of that investigation, Mr. Kennedy spoke not only with a reliable source at Highmark, but also with reimbursement experts, insurers and physicians. As later reported in the *Wall Street Journal* article, Mr. Kennedy had detailed information stemming from his investigation that was not even included in the April 24 Report. The article further reported that Jefferies' head of research backed and encouraged Mr. Kennedy to issue the Report. Indeed, according to CW2, a person with knowledge of the investigation, Mr. Kennedy received information from Highmark's Vice President for Clinical Affairs, Dr. Andrew Bloschichak ("Bloschichak"), who is directly responsible for oversight of the reimbursement rate process at Highmark.

14.     Seventh, according to the *Wall Street Journal* article, in order to further discredit the April 24 Report, in early June 2009, **defendant Thurman sent letters to the SEC, Nasdaq and the Financial Industry Regulatory Authority ("FINRA") suggesting that the Jefferies report "may have been part of a plot to enrich CardioNet short sellers betting on a share-price decline."** The article further reports that the letters (which Lead Plaintiff's investigator sought to obtain through an FOIA request addressed to the SEC) stated "this strikes me as blatant and inappropriate manipulation of our company's stock" and that the Jefferies report was suspect "given its apparent inaccuracies." And, without any basis whatsoever, Thurman's letters to the

6

Exhibit 2
Page 67

SEC and other regulatory agencies questioned "whether it was written with the intent of driving down our stock price."

15.     CardioNet's campaign to discredit Mr. Kennedy, Jefferies and the April 24 Report came crashing down around CardioNet first on June 30, 2009 and then on July 12, 2009, when the information contained in the Report – which had been vigorously denied and belittled by CardioNet and its senior officers – was shown to be true.

16.     On June 30, 2009, CardioNet issued a press release announcing that it was **lowering its full year 2009 guidance and withdrawing its 2010 and 2011 guidance based on "lower than anticipated commercial reimbursement rates" for its MCOT$^{TM}$ device**.  On this news, CardioNet's shares plunged $6.75 per share from $16.32 per share on June 30, 2009 to $9.57 per share on July 1, 2009, a one-day decline of 41% per share on volume of 23.4 million shares, over 24 times the preceding three-month's daily average.

17.     Then, on July 12, 2009, CardioNet announced that it had received a letter from Highmark stating that **the reimbursement rate for the MCOT$^{TM}$ device would be lowered by approximately 33%, from $1,123 to $754 per service, and that as a result, the Company was withdrawing its full year 2009 guidance entirely**.  With this announcement, the price of CardioNet's stock once again suffered a significant decline, falling $2.96 per share to close at $5.87 per share on July 13, 2009 – a one-day decline of 34% on volume of 11.8 million shares, over seven times the average three-month daily average.

18.     In all, with the announcements made by CardioNet on June 30 and July 12, 2009, the truth about the Company's reimbursement rates and business prospects was finally disclosed, causing the Company's stock price to fall from $16.32 per share on June 30, 2009 to $5.87 per share on July 13, 2009 – **an overall decline of $10.45 per share, or 64%** – causing persons who

7

Exhibit 2
Page 68

purchased CardioNet during the Class Period to suffer enormous losses on their stock purchases. Indeed, as reported in the *Wall Street Journal* article, defendant Thurman, in a later interview, stated that the rate cut means CardioNet "will not be able to sustain operations as a stand-alone company." Further, in mid-December 2009, defendant Thurman disclosed that (a) the Company planned to cut $15 million in operating costs (in addition to the $8 million in expense cuts that had been made during the period from mid-July to mid-December 2009) to remain afloat, and (b) the Company had retained Lazard Frères & Co. to evaluate its options, including what some analysts believe could be a sale of the Company. Yet, even today, with talk of a possible sale of the Company in the market, CardioNet stock continues to trade in the range of $5.00 to $6.00 per share, after falling as low as $4.36 per share on December 8, 2009.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

20.     This Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15, U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the false and misleading statements giving rise to the violations of law complained of herein were made in or issued from this District. In addition, defendant CardioNet maintains its principal executive offices in this District, at 227 Washington Street, Conshohocken, PA 19428, where the day-to-day operations of the Company are directed and managed.

22.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

8

Exhibit 2
Page 69

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

23. Lead Plaintiff, Central Laborers, consists of three funds: Central Laborers' Pension Fund (the "Pension Fund"); Central Laborers' Annuity Fund; and Central Laborers Welfare Fund. The Pension Fund, a Taft-Hartley Trust Fund established in 1965 to help provide financial security to laborers during retirement currently has more than 6,400 pensioners and beneficiaries receiving over $73 million each year in pension benefits. During the Class Period, the Pension Fund purchased 18,184 shares of CardioNet stock, as more fully set forth in the attached Schedule A, at artificially inflated prices and has been damaged thereby.

24. Plaintiff Dianne Solomon-Shrawder is an individual who purchased 1,000 shares of CardioNet stock during the Class Period, as more fully set forth in the attached Schedule A, at artificially inflated prices and has been damaged thereby.

25. Defendant CardioNet, based in Conshohocken, Pennsylvania, is a leading wireless medical technology company which provides continuous, real-time ambulatory outpatient management solutions for monitoring relevant and timely clinical information regarding an individual's health.

26. Defendant Randy H. Thurman ("Thurman") is the Chairman of the Board, President and Chief Executive Officer ("CEO") of CardioNet, having served in those positions since February 2009. Thurman joined CardioNet in July 2008 and served as the Executive Chairman of the Board from July 2008 through February 2009. Prior to his tenure at CardioNet, Thurman was a consultant to Cardinal Health, Inc. ("Cardinal Health"), from July 2007 through June 2008; served as CEO of Viasys Healthcare Inc. ("Viasys"), a healthcare technology company, from April 2001 until its acquisition by Cardinal Health in July 2007; served as

9

**Exhibit 2**
**Page 70**

Chairman and Chief Executive Officer of Strategic Reserves LLC, a privately held company

providing funding and strategic direction to healthcare technology companies, from 1996 to

April 2001; served as Chairman and CEO of Corning Life Sciences, Inc., from 1993 to 1996;

served as Chairman of the Board of Directors of Enzon Pharmaceuticals, Inc., from 1994 to

2001; and held various positions at Rhone-Poulenc Rorer Pharmaceuticals, Inc. ("Rhone-Poulenc

Rorer"), a global pharmaceutical company, from 1984 to 1993, ultimately serving as its

President.

27.      Defendant Martin P. Galvan ("Galvan") was Chief Financial Officer ("CFO") of

CardioNet from September 2007 until January 15, 2010. From June 2001 to July 2007, Galvan

held several positions with Viasys until it was acquired by Cardinal Health, most recently as

Executive Vice President, Chief Financial Officer and Director of Investor Relations. Prior to

that, Galvan served as Chief Financial Officer of Rodel, Inc., a precision surface technologies

company, from 1999 to 2001, and held various positions with Rhone-Poulenc Rorer from 1979

to 1998, including as Vice President, Finance Worldwide. On January 15, 2010, CardioNet

announced that Galvan had left the Company to pursue other career opportunities.

28.      Thurman and Galvan are hereafter referred to as the "Individual Defendants."

The Individual Defendants, because of their positions with the Company, possessed the power

and authority to control the contents of CardioNet's annual and quarterly reports, SEC filings,

press releases and presentations to securities analysts, money and portfolio managers and

institutional investors, i.e., the market. Each of the Individual Defendants was provided with

copies of the Company's reports and press releases alleged herein to be false and misleading

prior to or shortly after their issuance and had the ability and opportunity to prevent their

issuance or cause them to be corrected. Each also directly made public statements that are

10

Exhibit 2
Page 71

alleged herein to be false and misleading. Because of their positions and access to material non-public information, these Defendants knew or were reckless in failing to know that adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were made were materially false and misleading.

## CLASS ACTION ALLEGATIONS

29.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons, including the Pension Fund and plaintiff Solomon-Shrawder, who purchased or otherwise acquired CardioNet's publicly traded securities, during the period from April 28, 2009 through and including July 10, 2009 (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are defendants, their officers, directors and partners, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. The Company's initial public offering of 4,500,000 shares of CardioNet common stock was completed on March 25, 2008. On August 6, 2008, the Company completed a secondary offering of another 5,000,000 shares. According to the Company's 2009 Proxy Statement, as of March 16, 2009, there were 23,731,126 shares outstanding. The disposition of the claims asserted herein in a class action will provide substantial benefits to the parties and the Court.

31.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

            (a)     Whether defendants' conduct violated the federal securities laws;

11

Exhibit 2
Page 72

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants act with scienter;

(d)    Whether defendants engaged in perpetrating a manipulative and deceptive device and/or scheme, and/or otherwise engaged in a fraudulent course of conduct;

(e)    Whether the market prices of CardioNet's common stock were artificially inflated; and

(f)    The extent of damages sustained by Class members and the appropriate measure of damages.

32.    The claims of Lead Plaintiff and plaintiff Solomon-Shrawder are typical of those of the Class.

33.    Lead Plaintiff and plaintiff Solomon-Shrawder will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

34.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

## A.    Company History and History of the MCOT™ device

35.    CardioNet is a wireless medical technology company that provides continuous, real-time ambulatory outpatient management solutions for monitoring relevant and timely clinical information regarding an individual's health.

36.    The Company was founded in 1997 by James M. Sweeney, who at the time he founded CardioNet had been involved in buying, selling or taking public about 20 healthcare product and service companies over a 30 year period. The largest was Caremark, which Sweeney had sold to Baxter in 1987 for approximately $600 million. According to a fact sheet

12

**Exhibit 2**
**Page 73**

about Sweeney during the time he was serving as CEO and Chairman of CardioNet, he had started eight health care product and service companies, taken two companies public, led an LBO [leveraged buy-out], raised over $1 billion in financing for his various companies, and sold two companies for over $1 billion. CardioNet was described as his "eighth startup."

37.     According to a press release of April 18, 2000 announcing that CardioNet had closed a $5 million round of venture capital financing, the Company was founded in 1997 "to develop a wireless, real-time, ambulatory, ECG monitoring service linked to the Internet to allow physicians to more effectively monitor the status of cardiovascular patients outside the hospital." The press release further stated that the Company expected to begin field evaluations of the CardioNet system in the fourth quarter of 2000.

38.     The Company obtained approval from the U.S. Food and Drug Administration ("FDA") for its MCOT$^{TM}$ heart monitor device in 2002. As noted in an EP Lab Digest story of June 1, 2002, in February 2002 the Company received FDA approval for its "core monitoring technology, the CardioNet Ambulatory ECG Monitor with Arrhythmia Detection," and opened its first CardioNet Service Center in Philadelphia, Pennsylvania. CEO, Chairman and founder Sweeney was quoted in the article as stating that initially the Company would be serving patients in the Philadelphia area, and intended to expand to other parts of Pennsylvania and the surrounding states. Eventually, the Company would market the MCOT$^{TM}$ device throughout the United States.

39.     CardioNet developed an integrated patient monitoring platform that incorporates a wireless data transmission network, internally developed software, the FDA-cleared algorithms and medical devices, and an around-the-clock digital monitoring service center. Its initial efforts were focused on the diagnosis and monitoring of cardiac arrhythmias, or heart rhythm disorders,

13

Exhibit 2
Page 74

through its core MCOT™ System. Specifically, CardioNet's MCOT™ system incorporates a lightweight patient-worn sensor attached to electrodes that capture two-channel EKG data, measuring electrical activity of the heart and communicating wirelessly with a compact, handheld monitor. The monitor analyzes incoming heartbeat-by-heartbeat information from the sensor on a real-time basis by applying algorithms designed to detect arrhythmias. When the monitor detects an arrhythmic event, it automatically transmits the ECG to the CardioNet Monitoring Center, even in the absence of symptoms noticed by the patient and without patient involvement.

40.    A cardiac arrhythmia is a disorder of the heart rate or rhythm (*i.e.*, a person's heart beats too quickly, too slowly or with an irregular pattern). The most common form of arrhythmia is atrial fibrillation, which is categorized by a rapid, irregular heartbeat in the upper chambers of the heart. An arrhythmia may be diagnosed either in a physician's office or remotely by monitoring a patient's heart rhythm. If it is done remotely, a physician will prescribe an ambulatory cardiac monitoring device that a patient must wear externally for a period of time. The monitoring device will record the patient's heart rate either intermittently or continuously.

41.    Traditional heart rate monitors include Holter and event monitors. Holter monitors continuously record a patient's heartbeats. They are generally worn for a one-day or two-day period. Older Holter monitors require the patient to physically return the device to the physician for review, while newer Holter monitors allow for the results to be uploaded via the Internet. Event monitors intermittently record a patient's heartbeats during cardiac events. They are generally worn for a 15-day to a 30-day period. Some types of event monitors are manually activated by the patient when he or she experiences symptoms associated with a cardiac event,

14

Exhibit 2
Page 75

while other types of event monitors have an auto trigger that will automatically record an event.
The event monitors have limited storage capacity and the data must be transmitted periodically
via telephone in order to avoid the risk of exhausting their storage.

42.    In contrast, the MCOT™ system continuously monitors a patient's heartbeats and
the data is transmitted wirelessly to the Company's control center. The device is typically worn
by the patient for up to 21 days.

43.    Following approval of the MCOT™ system by the FDA in 2002, CardioNet
continued to raise private capital. In January 2003, Guidant Corporation announced that it had
increased its equity investment in CardioNet to a total of $13.4 million, bringing Guidant's
equity ownership in the Company to nearly 20%. Sweeney, the CEO and Chairman of
CardioNet, noted that Guidant's investment would "help us expand CardioNet's services to new
markets."

44.    In March 2007, while still a privately-owned company, CardioNet completed two
important events in the life of the Company. First, on March 13, 2007, CardioNet announced the
completion of its acquisition of a company called PDSHeart, Inc. ("PDS"), a leading cardiac
monitoring company that provided three product lines in 48 states: event, Holter and pacemaker
monitoring services. The acquisition of PDS added these three additional product lines to
complement the Company's MCOT™ device. According to the Company's prospectus for the
IPO, dated March 18, 2008, the acquisition also supplied the Company with existing sales
channels and relationships in geographic areas that had not been penetrated by the Company.
Second, the Company completed $110 million in private financing, bringing the total that
CardioNet had raised from 1999 to 2007 to nearly $200 million in private debt and equity.

15

Exhibit 2
Page 76

According to a Company press release of March 26, 2007, Citigroup served as the lead placement agent for this financing.

45. According to CW3, a former PDS employee who continued to work for CardioNet as an account executive following the PDS acquisition, physicians who use or prescribe the event monitor receive compensation of $75 for an in-house nurse who hooks up the monitor to the patient and three EKG reads. In addition to the $75, the physician receives $25 in compensation for reading the monitor. By contrast, with the MCOT™ system, because there is no device in the physician's office, CW3 explained that there was no need for the nurse to hook up the MCOT™ and therefore no compensation. Rather, the patient does this himself after receiving the device, which is shipped directly from CardioNet.

46. Additionally, the amount of work for a physician prescribing the MCOT™ is greater than if the physician were using the event monitor. According to CW3, because the event monitor is limited to three EKG reads and the MCOT™ has continuous monitoring capabilities, physicians who prescribe the MCOT™ are also reading vastly greater numbers of EKGs per patient and thus have more work to do.

47. Notwithstanding these potential concerns, revenues from the MCOT™ system represented 88% of the Company's revenue in the first quarter 2009, compared to 86% in the fourth quarter 2008 and 79% in the first quarter 2008. According to the Company, offsetting the growth in the use of the MCOT™ system were declines in the event and Holter revenue, as the Company converted physicians to the newer technology. Consistent with the results during 2008, the Company's payor mix in the first quarter 2009 was 34% from Medicare and 66% from commercial payors.

**B. Reimbursement for Use of the MCOT™ Device**

16

Exhibit 2
Page 77

48.     MCOT$^{TM}$ has two distinct parts: a professional component, collected by the physician for interpreting the reports generated by the MCOT$^{TM}$ service; and a technical component, collected by the MCOT$^{TM}$ provider for offering the service itself. Prior to January 1, 2009, both components were billed by the physician under Current Procedural Terminology ("CPT") code CPT 93799, a nonspecific code used for unlisted cardiovascular services. Physicians would add the modifier -26 and specify "mobile cardiac outpatient elementary" (or a close variation) on the Centers for Medicare and Medicaid Services ("CMS") claim form. While CMS guidelines stated that the service should be paid only one time in any 30-day period regardless of the number of data transmission involved, the use of an unlisted code made payment inconsistencies from carrier to carrier fairly common.

49.     The American Medical Association ("AMA") establishes CPT codes. On October 31, 2008, CardioNet announced that the AMA had established Category I CPT codes that covered CardioNet's system, which became effective on January 1, 2009. The AMA established separate CPT codes for the professional and technical component of the MCOT$^{TM}$ system. CMS elected to price the professional component at approximately \$25 for 2009 and to "contractor price" the technical component, which meant that Highmark would again set the technical fee. The new rate of approximately \$25 was much lower than the prior professional fee, which ranged anywhere from \$30 to \$300. The rate set by Highmark for the technical component remained at \$1,123.

50.     After the establishment of CPT codes applicable to the MCOT$^{TM}$ system, Highmark issued various Highmark Medical Policy Bulletin revisions for real-time cardiac surveillance monitoring systems, including the MCOT$^{TM}$ system The Bulletin revision issued on January 5, 2009 for such M-60 systems stated, among other things, that a cardiac surveillance

17

Exhibit 2
Page 78

service "is not indicated in all patients with arrhythmias" and should be used "only in circumstances where traditional Holter monitoring or cardiac event recording is not expected to provide adequate information or has been unrevealing." A Bulletin revision issued January 26, 2009 similarly listed a series of conditions for which a home-based, real-time cardiac surveillance system is not indicated for use.

51.     On April 13, 2009, Highmark issued a Medical Policy Bulletin, effective that day, that stated that coverage for this service is limited "to a very select patient population who have demonstrated a need for cardiac monitoring and for whom all of the following pertain:

> (1)     There is a low likelihood of a malignant cardiac event.
>
> (2)     Other testing and/or monitoring has been unrevealing or is inappropriate for the patient.
>
> (3)     It is anticipated that the results of this service would provide diagnostic and treatment information."

52.     The Bulletin issued April 13, 2009 further made clear (with emphasis in the original) that systems such as the MCOT$^{TM}$ system are NOT for patients with mild to moderate symptoms of "palpitations" or "weakness," NOT indicated for use as a screening tool, and expected to not be reported more than once in a 30 day period or more than twice in a twelve month period. It reiterated that the system is not indicated for all patients with arrhythmias and should be used "only in circumstances where traditional Holder or cardiac event record is not expected to provide adequate information or has been unrevealing." The April 13, 2009 revision was a strong statement with respect to the limitations of when the MCOT$^{TM}$ system should and should not be utilized.

18

Exhibit 2
Page 79

53.     Commercial payors (*i.e.*, private insurers for the most part) also establish reimbursement rates once they accept a device for payment. This represents a critical market for almost all device manufacturers. Although each payor has its own process, in most cases a committee is charged with the responsibility for coverage policy, and it is each payor's committee that is typically the first step in the process of obtaining coverage. Commercial payors require, at a minimum, that devices have FDA approval, and they further look to clinical literature that documents the safety and efficacy of the product. Many use an external assessment company and may supplement the information with their own literature review and/or use outside clinical consultants to review the data. According to generally available sources, physician advocacy can also be an important component of the coverage decision-making process.

54.     In the commercial payor market, once coverage issues have been resolved, the payor will set a reimbursement rate or rates for use of devices. These may be pegged in some fashion to a rate set for Medicare, and may be determined either with manufacturer input or as a result of discussions and negotiations between medical service providers and commercial payors.

55.     CW4, a former CardioNet employee who served as a Regional Sales Manager for CardioNet and reported to Chris Stasinski, a former Vice President of Sales, explained that reimbursement rates were handled through CardioNet's Reimbursement Services division, which dealt with reimbursement rates and interacted with Medicare and Medicaid payors. The division was headed by Philip G. Leone ("Leone"). According to CW5, a former PDS officer who was employed by CardioNet from the time of the PDS acquisition until early 2008, CardioNet had a rate reimbursement committee which consisted solely of Leone and Anna McNamara,

19

Exhibit 2
Page 80

CardioNet's Senior Vice President, Clinical Operations, who joined CardioNet in September 2002.

## EVENTS LEADING UP TO DEFENDANTS'
## FALSE AND MISLEADING STATEMENTS

56. CardioNet went public on March 25, 2008, selling 3 million shares of the Company's stock and 1.5 million shares of CardioNet stock owned by Guidant Investment Corp., one of its early investors. By the time of the IPO, Sweeney had been succeeded as President and CEO by Arie Cohen, but had remained as the Executive Chairman of the Board of Directors.

57. On July 9, 2008, the Company announced that its board had appointed defendant Thurman as Executive Chairman, and that Sweeney, who had been the Executive Chairman, had accepted a position at the University of California, San Diego. In the announcement, then-CEO Cohen stated: "Our CFO Marty Galvan and I have had the privilege of working with Randy [Thurman] at VIASYS, so we have great confidence that this will be a seamless transition. His deep experience in building strong healthcare enterprises is well documented and his insight to the investment community is unrivaled. We look forward to Randy's contribution and his active role as a counselor to management on a wide range of topics, including operations and strategic direction, as well as assisting in CardioNet's investor relations." The announcement further disclosed that Sweeney, who had founded the Company and served as its CEO until November 2007, expected to "transition from the board" by the end of 2008.

58. Later that same month, on July 22, 2008, the Company announced a secondary offering of approximately 5 million shares of CardioNet stock to be sold by certain of the Company's existing stockholders. Thereafter, on August 1, 2008, it priced the secondary offering at $26.50 per share – $8.50 more than the price in the IPO – and sold 5 million shares, plus a 750,000 over-allotment. In the secondary offering, Sweeney sold 516,414 of the

20

Exhibit 2
Page 81

1,279,845 CardioNet shares he held (going from a 5.5% holder to a 3.3% holder). Other early investors also sold significant portions of their holdings. These included: (a) Sanderling Funds sold 869,565 of their 2,576,195 CardioNet shares (going from an 11.1% holder to a 7.4% holder); (b) Hambrecht & Quist funds sold 503,240 of their 1,446,814 CardioNet shares (going from a 6.3% holder to a 4.1% holder); (c) Basso Funds sold 290,800 of their 334,420 shares; (d) BioFrontier Partners sold 873,892 of its 1,004,975 shares; and (e) Guidant sold 239,956 of its remaining 689,873 shares (going from a 3.0% holder to a 1.9% holder).

59.     Later in 2008, Sweeney left the Board, Arie Cohen left his management positions, and Thurman took over as Interim President and CEO, while retaining his position as Executive Chairman of the Board.

60.     On February 17, 2009, CardioNet issued a press release reporting on its fourth quarter and full year 2008 financial results. The Company reported fourth quarter revenue of $34.4 million, a 43.8% increase over the prior fourth quarter, and full year revenue of $120.5 million, a 65.0% increase over its revenue during the year 2007. The Company noted that it had successfully completed an $82.8 million IPO in March 2008 and a $152.4 million secondary offering in August 2008. It further reported adjusted fourth quarter 2008 earnings per diluted share excluding net operating losses (NOLs) of $0.16, a 33.3% increase over its fourth quarter 2007 results, and full year 2008 earnings per diluted share (on the same basis) of $0.39 compared to a loss of $0.12 per diluted share for the full year 2007.

61.     Defendant Thurman, who was then the Interim President and CEO, was quoted in the press release as follows:

In 2008 we achieved a number of significant accomplishments throughout the organization that positioned us for accelerated growth in 2009. We secured Category I CPT codes and reimbursement rates for the CardioNet System in October, a major milestone in facilitating broader adoption. We also secured

21

Exhibit 2
Page 82

contracts with over 30 new payors during the year, including two major national payors, accounting for an additional 32.1 million covered lives. We strengthened the management team with several key hires and successfully completed the integration of the PDSHeart acquisition and the consolidation of our corporate functions to Pennsylvania. We continued growing and developing our sales and marketing organization, expanding our geographic footprint and elevating our profile within the medical community. We also remained committed to our research and development efforts, as demonstrated by the recent launch of our enhanced atrial fibrillation reporting package. Finally, we continued to benefit from the growing body of peer-reviewed research highlighting the benefits of the CardioNet System. We look forward to the future publication of additional studies, supported by our ongoing clinical programs.

Looking forward, CardioNet is uniquely positioned within the healthcare industry and perhaps most industries today. We are leading what we believe is a revolution in healthcare - wireless medicine. The demand for our cardiac outpatient services is growing at greater than 40% per year. Our services provide significant and meaningful benefits to patients and prescribing physicians while delivering improved cost/benefit outcomes to the payors. **Every indication is that CardioNet is positioned for years of exceptional growth**.

     62.    In addition to reporting its fourth quarter and full year 2008 results, CardioNet

also provided detailed revenue and earnings guidance to the market. Defendant Thurman was

quoted in the press release in this regard as follows:

> ..., **we are establishing revenue guidance for 2009 of $170.0 to $175.0 million, somewhat higher than expectations, and over 40% growth compared to 2008**. Based on the incremental investments I have just outlined, which represent approximately $0.08 to $0.10 per diluted share, **we are providing earnings guidance for 2009 of $0.69 to $0.73 per diluted share, excluding any impact of NOLs, other tax related items and any nonrecurring charges. This represents over 75% earnings growth year over year**. In addition, we currently anticipate a one-time benefit in 2009 related to NOLs and other tax related items which could favorably impact earnings by approximately $1.00 to $1.30 per diluted share. We do not anticipate any earnings per diluted share benefit from NOLs and other tax related items in 2010 or 2011. We believe the investment in 2009 is the foundation that will drive higher revenues and earnings in 2010 and beyond. **Our outlook for 2010 is for revenue to increase at least 50% and earnings to increase 100%, compared to the Company's 2009 guidance excluding NOLs and other tax related items. In 2011, we believe that earnings per diluted share could reach $2.00**. We expect that the increased investment in 2009 and the rapid revenue growth that we are targeting will result in increased shareholder value over the long term.

22

**Exhibit 2**
**Page 83**

63.     The February 17, 2009 press release thus provided the market not only with the

Company's results for the prior year, but also guidance for 2009 and the following two years.

The Company explicitly established the following guidance for 2009 through 2011:

- ▪ Revenue of $170 to $175 million for 2009, representing 40% growth over 2008;

- ▪ Earnings of $0.69 to $0.73 per diluted share for 2009, representing 76% to 87% growth over 2008;

- ▪ Revenue growth of at least 50% for 2010 (at least $255 to $262.5 million);

- ▪ Earnings growth of 100% for 2010 ($1.38 to $1.46 per diluted share); and

- ▪ Earnings that could reach $2.00 per diluted share by 2011.

64.     In a conference call with analysts that started at 5:00 p.m. the same day,

defendants Thurman and Galvan presented the Company's 2008 results and reiterated its

guidance for 2009 through 2011. Defendant Thurman began the conference call by stating: "In

addition to providing detail on '08 and '09, our objective today is to outline for you the

opportunity that we believe CardioNet has to gain significant share in the $2 billion cardiac

monitoring market, and how we plan to leverage that opportunity for the benefit of all of our

stakeholders." Defendant Thurman stated, with respect to reimbursement, that the

reimbursement codes and reimbursement rates for the professional and technical components of

the CardioNet System "provide strong validation of our technology, remove major obstacles for

commercial payors, and establish a simplified and stable reimbursement environment." He

stated the Company had secured payor contracts with two major commercial payors, Aetna and

Humana, and more than 30 smaller providers, and was focused on securing contracts with the

remaining major payors to further improve the Company's coverage. He also announced that the

Company had learned that day of a new payor joining CardioNet, which would add coverage for

over 3 million new lives.

23

Exhibit 2
Page 84

65.     During the question and answer period, defendant Thurman stated that the

Company's guidance did not assume any new acquisitions to help achieve the figures provided

for 2009 through 2011. Defendant Galvan stated the Company ended 2008 with a sales force of

88 individuals, and would grow that number to 148 by the end of 2009. And, when a question

was asked concerning physician reaction to the new reimbursement code, defendant Thurman

introduced Philip Leone, CardioNet's Vice President of Managed Care, who stated the new code

was helping physicians "tremendously" when seeking payments for the Medicare population,

and that on the commercial side, while movement was expected towards the latter part of the first

quarter and into the second quarter, "early indications are it's gone well, the code's gone well."

66.     In reaction to CardioNet's statements on February 17, 2009, CardioNet's stock

price rose from a $22.22 per share close on February 17, 2009, to a closing price of $25.00 on

February 18, 2009. As indicated on the call and thereafter, CardioNet's immediate and long-

term guidance surprised but impressed analysts. As later reported in an article entitled "Portable

Heart Monitor Lets Patients Go About Their Daily Lives," in the *Investor's Business Daily* on

April 20, 2009:

> CardioNet has given guidance for the next three years. That's rare.
>
> "While most companies are pulling their guidance," [Matt] Dolan [an analyst at
> Roth Capital Partners] said, "CardioNet is looking over the horizon."
>
> That long-range forecast is one reason for the recent run-up in share price, says
> CEO Thurman. "Our strategy is to provide better earnings than when the
> company went public," he said.

67.     Following the reports of its 2008 results and guidance for the years 2009 through

2011, CardioNet continued to issue a series of very positive reports. The Company announced

defendant Thurman's appointment as Chairman, President and CEO on February 25, 2009,

reported on its restructured and expanded medical advisory board on March 30, 2009, and

24

Exhibit 2
Page 85

announced expanded product offerings and new clinical research services on April 2, 2009.

Defendants Thurman and Galvan further made a presentation on March 17, 2009, at the Cowen

and Company 29th Annual Health Care Conference, where, among other things, they reiterated

the guidance provided to the market on February 17, 2009, and defendant Thurman noted the

guidance had assumed "about a 5% decline in reimbursement every year."

68.     However, on April 24, 2009, an analyst at Jefferies & Co. issued a research report

that raised significant questions about the health of CardioNet and its business model going

forward. Analyst Brian Kennedy of Jefferies issued a detailed 16-page report initiating coverage

of CardioNet, rating CardioNet as "Underperform," and suggesting that a significant

reimbursement rate cut by Highmark was imminent. The Investment Summary in the Report

stated:

> Although BEAT is the hands-down leader in mobile cardiac outpatient telemetry
> (MCOT), we think soon-to-be-implemented reimbursement reductions for the
> service will prevent the company from achieving the aggressive growth targets set
> by management and the Street.

69.     The Report, which was a culmination of extensive research about CardioNet and

then-current reimbursement rates for the MCOT$^{TM}$ device, indicated that Highmark was

currently reviewing the reimbursement rate for the MCOT$^{TM}$ device and, as a result of the

review, Kennedy expected the technical reimbursement fee by Highmark to be cut in 2009 by at

least $200 per service. The Report noted that CardioNet had guided the market to believe that its

earnings would improve to $0.69 to $0.73 per share in 2009 and to as much as $2.00 per share in

2011, based on the assumption that the Medicare technical fee for the MCOT$^{TM}$ system would

essentially remain on par with the current $1,123 rate paid by Pennsylvania Medicare carrier

Highmark. Stating Jefferies' disagreement, the Report continued:

25

Exhibit 2
Page 86

**But we expect Highmark to cut the technical fee in 2009.** Our checks indicate that the technical fee is now under review at Highmark, which is contrary to the Street assumption. We believe that Highmark plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear. Though several things likely swayed Highmark to revisit the technical fee, we highlight CMS's recent decision to price the MCOT professional fee (which doctors collect) at roughly $25 versus Highmark's prior rate of $128. We think this sent a clear signal to Highmark that it's been overvaluing the service.

**We believe CMS will establish a lower technical fee regardless of Highmark's actions.** Though the prospect of a 2009 cut by Highmark concerns us most, there's evidence CMS won't maintain the $1,123 technical rate regardless. …
[Emphasis in original.]

The Report also stated that "[m]ost physicians and industry experts we speak with suggest the

national technical fee will initially fall **in the $700 to $1,000 range.**"

70.     The April 24 Report set forth numerous reasons why Jefferies believed Highmark

would be lowering the reimbursement rate. In discussing the decision by CMS to price the

MCOT™ professional fee at $25 compared to Highmark's previous fee of $128, which Jefferies

saw as an indicator that Highmark was likely to reduce its rate, the Report stated "[w]e think the

new lower professional fee clearly establishes where the technical fee is heading. The decline

seen in the professional fee with the transition to an MCOT-specific code bodes poorly for the

technical fee under the new CPT code." According to the Report, other factors, including that

MCOT™ costs are considered indirect costs (which increased the likelihood of a lower national

technical fee), and the 2009 Outpatient Prospective Payment System ("OPPS") payment rate

assigned to the technical component was $369 lower than the then-current Highmark rate, also

supported that a rate cut was imminent.

71.     The Report further noted that while five of the six analysts who covered

CardioNet rated its stock as Outperform or Buy, with an average 12-month price target of $33

per share, Jefferies' "bearish stance on BEAT stems from our concerns about reimbursement for

26

**Exhibit 2**
**Page 87**

MCOT, specifically Medicare reimbursement, **which we believe is at risk of being cut in a matter of weeks.**" As the Report further stated:

> The Street has assumed that Highmark will keep the technical fee at $1,123 for 2009, even though neither BEAT nor LifeWatch has explicitly stated that the fee won't change. We think the Street's assumption is wrong. **Our checks indicate that Highmark is currently reviewing the technical fee. We believe the carrier plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear.** This decline – likely made in response to CMS's move to reduce the 2009 professional fee – should mark the end of the favorable Medicare reimbursement terms MCOT has enjoyed for years thanks to Highmark's support of the technology.

72.     Based on its analysis, Jefferies established a price target for CardioNet's stock of $17.00 per share, compared to its then-current price of $22.91 per share. After issuance of the Report, the price of CardioNet's common stock fell by $2.97 per share to close at $19.94 on April 24, 2009, a one-day decline of 13%.

73.     Thereafter, as noted in ¶¶ 6-7, above, on April 24 and April 26, 2009, analysts from Leerink and Citigroup, both of which had served as underwriters and managers for CardioNet's IPO and secondary stock offering in March 2008 and August 2008, issued reports that reiterated their Outperform and Buy recommendations. Both reports stated that the analysts had spoken with the Company's management, and that based on those discussions, there was no basis to believe that Highmark was contemplating a reduction in the MCOT[TM] technical fee reimbursement rate.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

A.      **The April 28, 2009 Press Release**

74.     On April 28, 2009, the first day of the Class Period, CardioNet issued a press release that specifically addressed Jefferies' April 24 Report. The press release, entitled "CardioNet Addresses Analyst Report on Reimbursement Speculation," stated:

27

**Exhibit 2
Page 88**

The analyst [Brian Kennedy] purported to have information indicating that Highmark Medicare Services plans to reduce reimbursement for CardioNet technology and that an announcement to such effect could be made shortly. Following the issuance of this report, CardioNet has been in frequent communication, both written and verbal, with officials of Highmark Medicare Services and the Centers for Medicare and Medicaid Services (CMS) regarding the content of the analyst report. CardioNet has not been notified of any proposed adjustment and believes that the reference in the analyst's report to a pending reimbursement reduction is not based on any indication or suggestion provided by Highmark Medicare Services or CMS.

CardioNet's CEO, Randy Thurman, issued the following statement: "While it is not our practice to respond publicly to analyst reports, we felt that it was important to address some of the assertions contained in the April 24 report. Since the release of this analyst report, CardioNet has received information from senior officials at both CMS and Highmark Medicare Services. These officials have stated to us that the analyst's suggestion of an imminent adjustment was not based on guidance from Highmark Medicare Services or CMS and that 'neither organization provided the analyst with any confidential information or any information specifically about CardioNet.'"

Mr. Thurman went on to say: "CardioNet and Highmark Medicare Services have regularly discussed reimbursement for mobile cardiac telemetry since we began providing that service in 2002. It has been our experience that any significant adjustment by a Medicare contractor of this nature would ordinarily occur after a substantial amount of interaction and dialogue with our organization. To date, Highmark Medicare Services has neither proposed or discussed any payment reductions with us. Furthermore, we have a longstanding and professional relationship with both CMS and Highmark Medicare Services and have no reason to believe either organization would ever disclose confidential information that could have a material effect on CardioNet or any other company."

75. The statements made in the April 28, 2009 press release were materially false and misleading in at least the following respects:

(a) Defendants' statement that "we have a longstanding and professional relationship with both CMS and Highmark Medicare Services and have no reason to believe either organization would ever disclose confidential information that could have a material effect on CardioNet or any other company," was materially false and misleading because, among other reasons, CardioNet purposefully failed to contact anyone from Jefferies concerning the sources

28

Exhibit 2
Page 89

of the information contained in the Report, and even went so far as to ban Jefferies from attending subsequent conference calls with investors. Thus, the statement that we "have no reason to believe" that anyone from Highmark provided any information to Jefferies, and similar statements in the press release, were made without a reasonable basis, and evidenced defendants' willful and/or reckless misconduct in making the statements.

      (b)    Defendants' statements concerning the professional relationships between CardioNet and Highmark and CardioNet and CMS were materially false and misleading. Had the Company had the type of positive relationship with Highmark that defendant Thurman represented it had, defendants would have learned that (a) Mr. Kennedy had received information from Dr. Andrew Bloschichak ("Dr. Bloschichak"), Vice President for Clinical Affairs at Highmark Medicare Services, who has oversight of the reimbursement rate process at Highmark, and (b) Highmark had indicated to Jefferies that a reimbursement rate cut for the CPT code under which the MCOT$^{TM}$ device is billed was imminent. As CW1 confirmed, CardioNet management "overstated their relationship with Highmark" and defendants' representation to the public that CardioNet was in constant communication with Highmark "was clearly an inaccurate statement."

      (c)    Defendants' April 28, 2009 statement that Highmark and CMS "officials have stated to us that the analyst's suggestion of an imminent adjustment was not based on guidance from Highmark Medicare Services or CMS and that 'neither organization provided the analyst with any confidential information or any information specifically about CardioNet'" was also materially false and misleading because it gave the investing public the impression that Jefferies did not receive any information from Highmark regarding an impending rate cut and that the Report was false. While Highmark may or may not have provided information to the

29

Exhibit 2
Page 90

Jefferies analysts specifically about CardioNet, it did provide information regarding an impending rate cut for the CPT code under which the MCOT™ device is billed, which was in essence information specific to CardioNet. On this point, CW1 explained that this statement made by CardioNet in its April 28 press release was nothing more than a "word game." CW1 and CW2 explained that information was provided to Jefferies by Dr. Bloschichak of Highmark, and CW1 further explained that Highmark did, in fact, give Jefferies information concerning the impending rate cut for the CPT code under which the MCOT™ device is billed, which is tantamount to providing information specific to CardioNet and, perhaps, one or two of its closest competitors.

(d)    Defendants had no basis to and were reckless in disparaging the Jefferies April 24 Report when, in fact, the information contained in the Report was provided by Highmark and other industry insiders. Rather than investigate the facts set forth in the April 24 Report, as set forth above, defendants thwarted communication with Jefferies, made a conscious decision not to call any of Jefferies analysts, and instead attacked the Report in an effort to discredit Mr. Kennedy, Jefferies and the information contained in the Report.

**B.    The April 30, 2009 Press Release and Conference Call**

76.    On April 30, 2009, CardioNet issued a press release with its first quarter 2009 financial results. The Company announced that revenues for the first quarter of 2009 increased to $35.7 million compared to $25.5 million in the first quarter of 2008, a 40.3% increase, and that gross profit increased to $23.9 million in the first quarter of 2009, or 66.9% of revenues, compared to $15.9 million in the first quarter of 2008, or 62.6% of revenues. Commenting on the Company's financial results, defendant Galvan stated that "[g]ross margins continued to benefit

30

**Exhibit 2**
**Page 91**

from the positive shift in sales mix towards MCOT™ along with ongoing improvements in our

efficiency and productivity."

77.     In the same press release, defendant Thurman is quoted as stating:

We are pleased to announce another quarter of strong results, demonstrating our
ability to deliver earnings while also investing in strategic initiatives to increase
market share and deliver world class service to our prescribing physicians and
patients. During the quarter we made substantial progress in the expansion of our
sales force and the development of our corporate infrastructure, including
enhancements to our customer service unit. Overall, our financial and operating
performance in the quarter reflects the continued strong adoption of the MCOT™
system in the healthcare community and our commitment to excellence in all
areas of our business.

We continue to view 2009 as an inflection point in our business and believe that
we can achieve accelerated growth and profitability in 2010 and beyond through
strategic investments in our sales organization and corporate infrastructure.

*       *       *

The future looks very promising for CardioNet. We have made concrete progress
in expanding our leadership position in wireless cardiac monitoring and
establishing our first adjacent market business in clinical services through our
pending merger with Biotel Inc. Looking forward, we expect to be well
positioned to leverage our technical expertise, customer service and monitoring
infrastructure to be the clear leader in wireless medicine.

78.     With regard to the Company's financial outlook, defendant Thurman stated:

Based on our first quarter results, along with the continued strong outlook for our
core business, **we are reaffirming our 2009 financial guidance of revenue of
$170.0 to $175.0 million and earnings of $0.69 to $0.73 per diluted share
excluding any impact of net operating losses, other tax related items, and any
nonrecurring charges**. This also excludes the $0.01 per share dilutive impact
that we are anticipating as a result of the Biotel Inc. acquisition, which we expect
to close mid-year. **Beyond 2009, we are comfortable with our previous
guidance of revenue growth of at least 50% combined with earnings growth
of 100% in 2010, with earnings per diluted share that could reach $2.00 in
2011.**

79.     After the release of its first quarter 2009 financial results, CardioNet hosted a

conference call for analysts, media representatives and investors. According to CW1, CardioNet

31

**Exhibit 2**
**Page 92**

blocked Jefferies analysts from this call following the issuance of the April 24 Report, and the

conference call transcript confirms that no analyst from Jefferies participated in the call, even

though it had initiated coverage of CardioNet on April 24, 2009.

80. During the call, defendant Thurman stated:

During the first quarter, we made excellent progress in the execution of our 2009 plan. We continue to leverage the clinically proven superiority of the MCOT™ system and our world-class customer service and monitoring organizations to effectively expand on the $2 billion cardiac monitoring market.

81. Defendant Galvan discussed the revenues derived from the MCOT™ system:

Revenue from the MCOT system continues to grow as a percent of revenue, representing 88% of revenue in the first quarter, compared to 86% in the fourth quarter of 2008 and 79% of revenue in the first quarter of last year. Offsetting this growth are declines in event in [sic] Holter revenue as we continue to convert physicians to the new technology.

82. With respect to the guidance provided to the market, defendant Galvan stated:

Looking forward and turning to our guidance, I would like to provide some additional detail around our outlook for 2009. As we indicated in our earnings release, **we are reaffirming our 2009 outlook of $0.69 to $0.73 per diluted share**, excluding the impact of net operating losses, which does not take into consideration a potential, $0.01 per share dilution that may occur due to the pending merger with Biotel.

With respect to the quarters in 2009, we expect sequential quarterly revenue growth to be consistently in the low to mid teens. As for the pace of earnings across the year, we continue to anticipate that our quarterly EPS flow in the first half of 2009 will be very similar to that which we experienced in 2008 and that the growth in EPS in 2009 compared to 2008 incurs entirely in the second half of 2009.

This earnings phasing is primarily driven by increased expense due to the new account executives coming onboard in the first half of this year, with limited productivity expected until the latter part of the year.

83. During the conference call defendants Thurman and Galvan further addressed the

issue raised in Jefferies' April 24 Report of an imminent reimbursement rate cut by Highmark.

Defendant Thurman stated:

32

Exhibit 2
Page 93

Now, let me comment on the reimbursement front, another area where CardioNet has taken on the leadership role in the industry. QI 2009 was the first quarter that included Category 1 CPT codes and reimbursement rates for the professional and technical components of our MCOT™ system, setting the stage for a more simplified and stable reimbursement environment going forward.

In addition, the validation provided by having dedicated CPT codes has been positive reinforcement in our efforts to establish coverage with the remaining commercial payors. Year-to-date, we have added 11 new payors, representing over 4 million new covered lives. As such, CardioNet now has contracts covering nearly 200 million lives. Coupled with the fact that CardioNet will soon have been used on a 0.25 million patients, nearly seven times that of any MCOT competitor, it is clear that we've moved well beyond the experimental or investigational stage.

We have established the MCOT™ as the most cost beneficial means of providing wireless cardiac monitoring. Everyone benefits greatly, the payors, the physicians and, most importantly, the patients.

84.     Defendants continued to deny that a rate cut was imminent when specifically

asked by analysts:

Amit Bhalla [of Citigroup]: … And maybe, just kind of talk to us about what your assumptions for reimbursement going forward and I'll jump back. Thanks.

Defendant Thurman: **In our three-year -- in our earnings projections that we put out through 2011, we have assumed some reduction in reimbursement that's factored into the earnings projections we put out there.** As a matter of process, we really work hand in glove with Highmark and with CMS on an ongoing basis. And as Phil [referring to Philip G. Leone, Senior Vice President, Reimbursement Services, Regulatory and Compliance] **went through the detail, candidly the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction.** So that's the way the process works. **We know of no reason today to expect any significant change in the reimbursement levels.**

                    *       *       *

Bob Hopkins [of Bank of America-Merrill Lynch]: … Okay, Thanks. And then just wanted to ask you couple on reimbursement. First, the back and forth with Highmark over the course of the last week, did you, ask them specifically about your reimbursement rate and whether or not it was under review at the current time?

Defendant Galvan: No. **We really have an outstanding relationship with Highmark and a dialogue with that is weekly if not more frequently and this always happens.** And Phil went through the kind of the detailed explanation of how

33

Exhibit 2
Page 94

reimbursement is determined and **we have no question that whether if there was any meaningful or anticipated change in the reimbursement rates, that we would be well aware of that. That's the professional relationship that exists with Highmark. And so at this point in time, we see nothing that would significantly change our current way to reimbursement**.

Bob Hopkins: So you did ask them specifically about whether or not reimbursement rate was under review at the current time and they said no?

Galvan: They just said, we know nothing based on our relationship with Highmark that would anticipate any change in reimbursement whatsoever.

\*      \*      \*

Bob Hopkins: Okay. And then just one other thing on Highmark, just to clarify, in the past, has there been sort of an annual review process or was there just been semi-annual or has there have been any consistency to the process in the past?

Defendant Thurman: Yeah, the consistency to the process has been what I stated before and that there is an ongoing relationship between Highmark and ourselves and frankly with CMS. **But there is not a scheduled event**, we are – you have to remember that CardioNet is really the pioneer in this whole area of wireless medicine. And I think **there has been this absolutely professional and collaborative relationship between the payors and us on justifying and understanding the cost benefit of what we do**. So, it's really – just I can't –

Bob Hopkins: Okay.

Defendant Thurman: **Say it one more time, that it's just an ongoing and a very collaborative effort between the parties that are involved**.

85.     Defendants April 30, 2009 statements contained in ¶¶ 76-84 were materially false and misleading in at least the following respects:

(a)     Defendants' statements denying that a rate reimbursement review was underway (*e.g.*, "there is not a scheduled event"), promoting the notion that CardioNet had a positive, professional relationship with Highmark and other payors (*e.g.*, "there has been this absolutely professional and collaborative relationship between the payors and us on justifying and understanding the cost benefit of what we do," "[w]e really have an outstanding relationship with Highmark," we work "hand in glove" with Highmark and CMS, and "we have no question

34

**Exhibit 2
Page 95**

that whether if there was any meaningful or anticipated change in the reimbursement rates, that we would be well aware of that. That's the professional relationship that exists with Highmark."), and denying an imminent reimbursement rate cut (*e.g.*, "at this point in time, we see nothing that would significantly change our current way to reimbursement" and "[w]e know of no reason today to expect any significant change in the reimbursement levels") were materially false and misleading, and made recklessly because, among other reasons, CardioNet purposefully failed to contact anyone from Jefferies concerning the sources of the information contained in the Report, and even went so far as to ban Jefferies from attending subsequent conference calls with investors. Thus, the statements were made without a reasonable basis, and evidenced defendants' willful and/or reckless misconduct in making the statements.

(b)     Defendants' statements concerning the professional relationships between CardioNet and Highmark and CardioNet and other payors were further materially false and misleading because had the Company had the type of positive relationship with Highmark that defendants represented it had, defendants would have learned that (a) Mr. Kennedy had received information from Dr. Bloschichak, and (b) Highmark had indicated to Jefferies that a reimbursement rate cut for the CPT Code under which the MCOT$^{TM}$ device was billed was imminent. As CW1 confirmed, CardioNet management "overstated their relationship with Highmark."

(c)     Defendants' statements reiterating the guidance they had provided to the market on February 17, 2009 were also materially false and misleading, and made without a reasonable basis, because, among other reasons, the guidance factored in only a relatively small long-term reimbursement rate decline but, had defendants spoken with Mr. Kennedy or others at Jefferies concerning the April 24 Report, they would have learned that a significant

35

Exhibit 2
Page 96

reimbursement rate cut was imminent, and that this key assumption underlying their market guidance was materially in error. Defendants' statements in this regard were further materially false and misleading because, through the reiteration of the Company's guidance, defendants gave the investing public the impression that Jefferies did not receive any information from Highmark regarding an impending rate cut and that the Report was false. While Highmark may or may not have provided information to the Jefferies analysts specifically about CardioNet, it did provide information regarding an impending rate cut for the CPT code under which the MCOT™ device is billed, which was in essence information specific to CardioNet. CW1 and CW2 explained that information was provided to Jefferies by Dr. Bloschichak of Highmark, and CW1 further explained that Highmark did, in fact, give Jefferies information concerning the impending rate cut for the CPT code under which the MCOT™ device is billed, which is tantamount to providing information specific to CardioNet and, perhaps, one or two of its closest competitors.

(d)     Defendants' statements that "we really work hand in glove with Highmark and with CMS on an ongoing basis" and that "candidly the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction" were also materially false and misleading because, in addition to the reasons stated above, defendants had no basis to lead the market to believe that a reimbursement rate increase was just as likely as a reimbursement rate decrease. Indeed, the large sales of stock by Sweeney, Guidant and other early investors in the IPO and secondary offering, which occurred just a few months after the IPO, suggest that the Company's founder and its early investors anticipated that the reimbursement rates set by commercial payors, Highmark and eventually the CMS would

36

Exhibit 2
Page 97

decline significantly as the MCOT™ device gained further acceptance and penetration in the market.

(e)     Defendants' statements that the Company had assumed only "some reduction in reimbursement" in setting its revenue and earnings projections through 2011, "the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction," "at this point in time, we see nothing that would significantly change our current way to reimbursement," and "[w]e know of no reason today to expect any significant change in the reimbursement levels," were further materially false and misleading because CardioNet had failed to adequately apprise itself of likely reimbursement rate cuts by its commercial payors, who collectively paid approximately 66% of the Company's revenues on a quarter-to-quarter basis by April 2009. Thus, while much of the question and answer portion of the April 30, 2009 conference call was devoted to questions concerning Highmark and the reimbursement rate for the MCOT™ system under Medicare, defendants' statements were also materially false and misleading with respect to reimbursement rates being set or re-set by commercial payors.

(f)     Defendants' statements concerning the increasing level and percentage of the Company's revenues that were derived from its MCOT™ system, and offsetting declines from its Holter and event devices, were materially misleading because, as more Medicare claims were made based on usage of the MCOT™ system – including claims that may have been outside the strict limitations of coverage under the Highmark Medical Policy Bulletin revisions issued in January and April 2009, referred to in ¶¶ 50-52 above – such increasing and potentially abusive claims would increasingly push Highmark to review and cut the reimbursement rate applicable to the MCOT™ system, hurting the Company's future revenues and earnings. The statements were further materially misleading because to the extent CardioNet pushed the usage

37

Exhibit 2
Page 98

of the MCOT™ system, with its higher reimbursement rate, as opposed to usage of Holter and

event devices, which had lower reimbursement rates, in contradiction of Highmark's limitations

on usage of the MCOT™ system, that would only temporarily make the Company's reported

revenues and earnings appear better, and it would factor into Highmark's and/or CMS's decision

to significantly reduce the reimbursement rates applicable to the MCOT™ system.

### C.  The May 12, 2009 Bank of America Health Care Conference

86.     On May 12, 2009, CardioNet participated in the Bank of America Health Care

Conference.  Among other statements made during the conference, during the question and

answer portion of the presentation, defendant Thurman again denied that a rate cut from

Highmark was imminent, and he point-blank accused Jefferies of failing to do proper "due

diligence."  In response to a questions about how the Company would provide comfort to people

about the current reimbursement situation, defendant Thurman stated:

> **Well obviously we've been inundated in the last two weeks with this question
> since an analyst came out with a report claiming that he had spoken with the
> people of Highmark and that there was a pending $200 decrease in
> reimbursement**. For starters that analyst has never spoken with Cardionet before
> that report came out or afterwards.  We have about seven other analysts who
> cover the company, all of whom Marty [referring to Defendant Galvan] and I are
> in constant dialogue with.  Most, if not all of them, have actually visited the
> company and sat down with Marty and me, so, **we certainly wish that that
> analyst had taken the extra effort and done the proper due diligence, which
> he did not**.  Now obviously we've been in constant dialogue with Highmark, but
> that's not unusual.  We're in regular dialogue with Highmark all the time.
> Highmark established the current reimbursement rate several years ago, and then
> the code on the reimbursement rate was published, you know, at the beginning of
> this year so, you know, four months ago.  **In speaking with the Highmark
> people, they have been unequivocal in their comments.  That they provided
> this analyst with no information whatsoever on CardioNet and never spoke
> to them about price.  So that's the Highmark position**.  With regard to what
> the current situation is, it was always expected that we would migrate from carrier
> pricing to national pricing and we thought that that time frame would be by 2010.
> We still think that's the case.  Highmark has never suggested to us that they're
> going to decrease the price, but never suggested to us that they're going to raise
> the price, but you would expect them to do that.  In the past they have always

38

Exhibit 2
Page 99

communicated with us anywhere from 45 days to three months in advance of any pricing consideration.

\* \* \*

So I'm telling everybody here, you know everything that I know. **We've never gotten any signal from Highmark that they're considering a price reduction. Our interface with them has been nothing less than extraordinary since the company was created. We're in absolute constant dialogue with the individual at Highmark who would be the decision maker, who absolutely denies that they provided any information to this analyst whatsoever.**

\* \* \*

Unidentified Questioner: So, I just want to follow up because I think its an interest point and that was the point of your press release. You said that they didn't provide any information to that analyst, but probably the more interesting question is: did you ask them point blank, "Is your reimbursement rate under review currently?"

Defendant Thurman: Oh we know it is. I just explained the whole process. You know, they are, you know, you know, we're in this process of hand off from Highmark to the CMS, so, that's procedure. Whether you consider that "under review" or not I guess is subject to interpretation. But they have told us that there is nothing eminent [sic.] in the way of change.

\* \* \*

Unidentified Questioner: Ok. So if hypothetically there, so I guess just to be clear: We don't know what CMS is going to do this July. Highmark is, as they do from time to time, they do review the status of reimbursement and right now the status of reimbursement is officially under review. We're in one of those 40 to 45 day periods..."

Defendant Thurman: No, I think that's, **no I didn't say that**."

Unidentified Questioner: Ok.

Defendant Thurman: You also started your statement by saying "hypothetical." It's a little difficult to deal with hypothetical. **There is no formal review of our pricing underway at Highmark that we are aware of, nor any, as they've said, nor any pending change.**

Unidentified Questioner: Ok, yeah, because in the past you said you usually get 40 to 45 day sort of discussion period or…

39

Exhibit 2
Page 100

Defendant Thurman: No they always have notified us at least 5 days in advance of any change. There's been no notification of that whatsoever.

Unidentified Questioner: Ok … Anything more specific you'd like to talk about in terms of [Highmark]? Exactly what we're going to see there?

Defendant Thurman: …I don't think I need to apologize, back on this reimbursement thing. I mean, no one's more frustrated that this thing has put a question over our company than we are. We are, no matter what happened here, **Cardionet, you know, it is kind of the victim of a train wreck that, you know, we didn't participate in.** The company is performing extraordinarily well. You can see the growth. We are well ahead of our plan for hiring and integrating new sales reps, the number of new physician practices that are adopting the ((M-Cot)) technology is increasing dramatically. We would love nothing more than for Highmark to come out with a definitive statement. I also will suggest. **I also will tell you that FNRA and we believe the SEC is going to investigate the circumstances behind this. You know, we lost 20% of our market cap almost overnight, you know. If the analyst was right, I guess he'll be vindicated. If it was wrong for any reason, we all ought to know what happened**.

87.   Defendant Thurman's statements made at the May 12, 2009 Bank of America Conference were materially false and misleading in at least the following respects:

(a)   Defendants' statement that Jefferies and its analyst, Mr. Kennedy, had not conducted "proper due diligence" was materially false and misleading, and made recklessly because, among other reasons, CardioNet purposefully failed to contact anyone from Jefferies concerning the sources of the information contained in the Report, and even went so far as to ban Jefferies from attending subsequent conference calls with investors. Thus, the statement impugning Jefferies' "due diligence" was made without a reasonable basis, and evidenced defendants' willful and/or reckless misconduct in making the statement.

(b)   Defendants' statements concerning the professional relationships between CardioNet and Highmark were further materially false and misleading because had the Company had the type of positive relationship with Highmark that defendants represented it had, defendants would have learned that (a) Mr. Kennedy had received information from Dr. Bloschichak, and (b) that Highmark had indicated to Jefferies that a reimbursement rate cut for

40

Exhibit 2
Page 101

the CPT code under which the MCOT$^{TM}$ device is billed was imminent. As CW1 confirmed, CardioNet executives "overstat[ed] their relationship with Highmark."

        (c)     Defendants' statements that "[w]e've never gotten any signal from Highmark that they're considering a price reduction" and that [w]e're in absolute constant dialogue with the individual at Highmark who would be the decision maker, who absolutely denies that they provided any information to this analyst whatsoever" were materially false and misleading because, among other reasons, as explained by CW1 and CW2, the person who was responsible for setting Highmark's reimbursement rate, Dr. Bloschichak, had provided Jefferies with information relative to a rate reduction in the CPT code applicable to CardioNet's product. The statements were further materially false and misleading because they gave the investing public the impression that Jefferies did not receive <u>any</u> information from Highmark regarding an impending rate cut and that the Report was, therefore, false. Finally, defendant Thurman's statements denying that Highmark was conducting a reimbursement rate review were false, as evidenced by the fact that a reimbursement rate change was announced just two months later, on July 12, 2009, when the Company itself admitted that it <u>had been aware</u> Highmark was conducting a review of the reimbursement rate for the MCOT$^{TM}$ device.

        (d)     Defendant Thurman's statement that "I also will tell you that FNRA and we believe the SEC is going to investigate the circumstances behind this" was further materially false and misleading because, among other reasons, defendant Thurman failed to disclose that <u>he was the person who was asking the SEC and FINRA to investigate Jefferies</u>. Indeed, according to the *Wall Street Journal* article, in early June, defendant Thurman sent formal letters to the SEC, Nasdaq and FINRA suggesting that the Jefferies report may have been part of a plot to

41

Exhibit 2
Page 102

enrich CardioNet short sellers betting on a share-price decline and characterizing the April 24

Report as a "blatant and inappropriate manipulation of our company's stock."

      (e)     Defendant Thurman's statement that "For starters that analyst has never

spoken with Cardionet before that report came out or afterwards" was materially false and

misleading because (i) other personnel from Jefferies had spoken with CardioNet employees

several times in advance of the April 24 Report, albeit not on the subject of the imminent

reimbursement rate cut by Highmark, (ii) personnel from Jefferies called defendant Galvan, but

he did not return their calls, and (iii) any communications after issuance of the Report were

thwarted by CardioNet, whose executives refused to speak with anyone from Jefferies and

banned Jefferies analysts from participating in CardioNet conference calls with analysts. In this

regard, CardioNet's exclusion of Jefferies from conference calls was part of the defendants'

scheme to prevent the disclosure of accurate information, prevent pointed questioning about

CardioNet's relationship with Highmark, and/or conceal the reality of the status of Highmark's

reimbursement process and decision.

**D.    The May 18, 2009 Press Release**

      88.    On May 18, 2009, CardioNet issued a press release announcing a reimbursement

rate from Highmark for its MCOT$^{TM}$ services. The press release stated in relevant part:

> CardioNet, Inc. today announced that last week Highmark Medicare Services
> posted a reimbursement rate for CPT code 93229, Mobile Cardiovascular
> Telemetry Services, of $1,123.07 at:
> www.highmarkmedicareservices.com/partb/reimbursement/talc-2009.html.
>
> Highmark Medicare Services had not posted a reimbursement rate for CPT code
> 93229 since the CPT code was published by the AMA in October of 2008. The
> reimbursement of $1,123.07 reflects the same rate that the Company announced
> in November 2008 on attaining the CPT code.

42

Exhibit 2
Page 103

89.     On this news, the price of CardioNet's stock increased by $2.50 per share, to close at $19.60 per share on May 19, 2009 – a one-day increase of 15%.

90.     While technically accurate, the May 18, 2009 press release was materially misleading because it falsely implied that (a) there had been no basis for the statements made in Jefferies' April 24 Report, (b) the posting of the reimbursement rate indicated that the $1,123.07 rate would remain in place at least through the end of 2009, and (c) Highmark was not undertaking and would not undertake any further review of the reimbursement rate for 2009. However, defendants issued the press release without ever once attempting to speak with Mr. Kennedy or Jefferies to ascertain the basis for the statements made in the April 24 Report. Instead, defendants purposefully and willfully excluded Jefferies' analysts from their analyst conference calls, and sought to discredit them in the market – even going so far as contacting and writing letters to the SEC, Nasdaq and FINRA to initiate an investigation of Jefferies.

91.     In this connection, according to the *Wall Street Journal* article, defendant Thurman wrote letters in early June 2009 to the SEC, Nasdaq and FINRA suggesting that Jefferies' April 24 Report may have been part of a scheme to enrich short sellers of CardioNet stock. Notably, this followed defendant Thurman's presentation at the May 12, 2009 Bank of America conference, during which he stated: "I also will tell you that FNRA and we believe the SEC is going to investigate the circumstances behind this." Thus, even into June 2009, CardioNet was continuing its smear campaign against Mr. Kennedy and Jefferies. Ironically, while the smear campaign was successful in one sense – as it was instrumental in getting Mr. Kennedy to resign his analyst position at Jefferies – it was unsuccessful in a far different sense, since the Company's later announcements of June 30 and July 12, 2009, would eventually show that CardioNet had no basis whatsoever to question either the "due diligence" that Mr. Kennedy

43

Exhibit 2
Page 104

had conducted or the information contained in the April 24 Report about Highmark planning to reduce drastically its reimbursement rate for the Company's MCOT™ services.

92.     The May 18, 2009 statement was further materially misleading materially because, as more Medicare claims were made based on usage of the MCOT™ system – including claims that may have been outside the strict limitations of coverage under the Highmark Medical Policy Bulletin revisions issued in January and April 2009, referred to in ¶¶ 50-52 above – such increasing and potentially abusive claims would increasingly push Highmark to review and cut the reimbursement rate applicable to the MCOT™ system, hurting the Company's future revenues and earnings.  The statement was further materially misleading because to the extent CardioNet pushed the usage of the MCOT™ system, with its higher reimbursement rate, as opposed to usage of Holter and event devices, which had lower reimbursement rates, in contradiction of Highmark's limitations on usage of the MCOT™ system, that would only temporarily make the Company's reported revenues and earnings appear better, and it would factor into Highmark's and/or CMS's decision to significantly reduce the reimbursement rates applicable to the MCOT™ system.

### THE COMPANY FINALLY DISCLOSES THE TRUTH
### ABOUT THE REIMBURSEMENT PROCESS AND RATES

93.     On June 30, 2009, after the close of the market, the Company issued a press release lowering the financial guidance defendants had previously provided, stating that the revenue guidance "is based on lower than anticipated commercial reimbursement rates."  The press release, entitled "CardioNet, Inc. Updates Full Year 2009 Guidance, Industry Dynamics and Future Strategies," stated in pertinent part:

> The Company is revising its revenue guidance for full year 2009 to reflect growth of 30%-33% compared to the full year 2008 and now expects revenue for 2009 to be in the range of $156 million to $160 million. **The revenue guidance is based on**

44.

Exhibit 2
Page 105

**lower than anticipated commercial reimbursement rates**. Volume growth continues to be significant, but is expected to be somewhat lower than the Company had anticipated. The Company believes that the long-term outlook for its business and the wireless healthcare industry remains highly attractive, and CardioNet intends to continue its previously announced investments in its sales and marketing organization, product development and clinical research programs. Other areas of spending will be curtailed and restructured to partially offset the negative price and volume dynamics. **Accordingly, the Company is now expecting adjusted earnings per diluted share for full year 2009 to be in the range of $0.30 to $0.35 excluding any impact of NOLs, other tax related items and any nonrecurring charges, with the majority of the impact affecting results in the second half of 2009**. At this time, the Company is not in a position to provide revenue or earnings guidance for 2010 and 2011. The Company may issue such guidance if greater certainty develops with respect to long-term reimbursement and physician adoption. CardioNet's balance sheet remains strong with no debt and substantial cash.

94. With this news, the prior guidance of 40% growth in revenues in 2009 compared to 2008, and 75% growth in earnings in 2009 compared to 2008, was lowered to 30%-33% revenue growth in 2009 over 2008 (to $156 to $160 million in revenues for the year) and to 52%-56% growth in earnings in 2009 over 2008 (to $0.30 to $0.35 per share). But even with this reduced revenue and earnings growth disclosures, defendant Thurman still reassured the investing public that the Company was "structured to produce long-term shareholder value [in a highly cost conscious healthcare reform market] environment."

95. On July 1, 2009, the Company held an investor call where defendants reiterated that the update to the 2009 full year guidance was a result of "the Company being negatively impacted by downward pressure on commercial reimbursement rates greater than previously planned." Participating on this call were defendants Thurman and Galvan, on behalf of the Company, and analysts from Citigroup, Leerink, Bank of America (where defendant Thurman had presented on May 12, 2009), Cowen & Co. (where defendants Thurman and Galvan had presented on March 17, 2009) and Thomas Weisel Partners. Still, Jefferies was not invited or allowed to attend CardioNet's conference calls.

45

**Exhibit 2**
**Page 106**

96.     Defendant Thurman stated that 98% of the reduction in the Company's projected

revenue for 2009 was a result of the Company being "negatively impacted by downward

pressure on commercial reimbursement rates greater than previously planned." He stated,

however, that the current pricing dynamics in the commercial area "should be, while unfortunate,

**a mere bump in the road** for those committed to the potential of wireless medicine," and that

even with the commercial payor reductions, "**[w]e remain very enthusiastic about the long-

term success of CardioNet**." When asked specifically about the basis for the guidance the

Company was providing as of that time, defendant Thurman refused to answer, stating that

"because of the changing environment and other reasons, we don't want to be more specific."

However, he did acknowledge that the new guidance was based on the assumptions that (a)

"what we are seeing currently as continuing for the remainder of the year" and (b) "**Medicare

reimbursement rates will remain stable**."

97.     Defendant Thurman further stated, in response to a question from Leerink's

analyst, "[a]s we have stated consistently in the past, we have an outstanding dialogue

undergoing with both our regional carrier [meaning Highmark] as well as with CMS." Thus,

even as late as July 1, 2009, defendants continued to make broad, positive statements about their

relationship with Highmark, and specifically assured investors that Medicare reimbursement

rates would "remain stable," which statements were materially false and misleading when made.

Indeed, during the July 1st conference call, defendant Thurman further sought to reassure the

market by citing to a study that had allegedly concluded that CardioNet should have a $1,300

reimbursement rate from Medicare (compared to the then-existing $1,123 rate).

98.     The disclosures made in the press release issued after the close of the market on

June 30 and during the conference call on July 1 led to a drastic decline in the price of CardioNet

46

Exhibit 2
Page 107

stock on July 1, 2009. The price of CardioNet stock fell $6.75 per share, from $16.32 per share

on June 30, 2009 to $9.57 per share on July 1, 2009, a one-day decline of 41% on volume of 23.4

million shares, over 24 times the average three-month daily average. However, the full truth

about CardioNet, and specifically the critical Medicare reimbursement rate for MCOT™

services, still remained concealed and misrepresented by defendants.

99.    It was not until July 12, 2009 that the full truth was revealed. On July 12, 2009,

defendants disclosed that Highmark was adjusting its reimbursement rate for MCOT™ services.

In a press releases entitled "CardioNet, Inc. Announces Highmark Medicare Services

Reimbursement Reduction Regarding CPT Code 93229," defendants revealed:

> CardioNet announced today that on Friday, July 10, 2009, it received a letter from
> Highmark Medicare Services stating effective September 1, 2009 Highmark was
> adjusting its reimbursement rate for MCOT™ services **to $754 per service**. This
> reimbursement change affects all providers covered under CPT Code 93229.
>
> Randy Thurman, Chairman, President and CEO of CardioNet, Inc., said, "CardioNet
> strongly believes that this reduction is unjustified and wil' immediately pursue with
> Highmark and CMS a methodology that appropriately values MCOT™ technology
> and related services. This review with Highmark and CMS will reinforce for
> Medicare the demonstrated benefit of Mobile Cardiac Outpatient Telemetry™ in
> detecting cardiac arrhythmias and improving the health of Medicare beneficiaries.
>
> We are strong proponents and supporters of the very real need to manage the cost of
> healthcare. We believe that early diagnosis through innovation in technology is
> fundamental to the provision of high quality health care and a cost efficient US
> healthcare system. Nearly 250,000 patients have been enrolled in MCOT™ to date
> with physicians and patients greatly benefiting from the CardioNet MCOT™
> technology and service. We have made it our mission at CardioNet to educate the
> medical community about the value of wireless medicine in the diagnosis and
> detection of disease and we will further increase our efforts to demonstrate its
> potential to substantially lower costs to both patients and payors."
>
> CardioNet has previously indicated that **while it had been aware Highmark
> Medicare Services was conducting a normal review of the reimbursement rate
> for MCOT™**, it had received no indication of any rate adjustment or the specific
> timing of a Highmark decision prior to being notified on July 9, 2009. During a July
> 9 communication, Highmark reported that CardioNet would receive a letter notifying

47

Exhibit 2
Page 108

it of a change in reimbursement including the exact amount of the change. That letter arrived July 10, 2009.

Based on the Company's ongoing discussions with Highmark and CMS and the Company's desire for a re-evaluation of reimbursement that it is pursuing, but cannot assure will be realized, **the Company believes it is prudent to withdraw previously stated 2009 guidance at this time**.

100.    Notably, the $754 reimbursement rate finally disclosed in CardioNet's July 12, 2009 press release fell precisely within the $700 to $1,000 range provided in Jefferies' April 24 Report.

101.    With this disclosure, CardioNet's stock fell another $2.96 per share, falling from its close on July 10, 2009 of $8.83 per share to $5.87 per share on July 13, 2009 – a one-day decline of 34% on volume of 11.8 million shares, over seven times the average three-month daily average.

102.    As shown above, throughout the Class Period, defendants made false and misleading statements about the potential for Highmark to reduce its reimbursement rates for the Company's MCOT$^{TM}$ device and made baseless and aggressive projections for 2009 through 2011. Indeed, while the Company admitted in the July 12, 2009 press release that it had been aware Highmark was conducting "a normal review of the reimbursement rate for MCOT$^{TM}$," during the May 12, 2009 health care conference, defendant Thurman **denied** that Highmark was conducting any such review. Further, from the outset of the Class Period through the time of the June 30 and July 1, 2009 disclosures, the Company had failed to adequately disclose to the market the likely reimbursement rate cuts by its commercial payors, who collectively paid approximately 66% of the Company's revenues on a quarter-to-quarter basis by April 2009.

103.    Moreover, as further set forth in detail above, defendants recklessly downplayed the potential for a reimbursement rate cut and conducted a systematic, intentional smear

48

Exhibit 2
Page 109

campaign against Mr. Kennedy and Jefferies stemming from Jefferies' April 24 Report by, *inter alia*: (a) materially overstating CardioNet's relationship with Highmark, CMS and other payors; (b) questioning publicly Jefferies' purported motive in issuing the Report; (c) falsely denying that Highmark was conducting a reimbursement rate review; (d) falsely denying that Jefferies analysts had received any information from Highmark about a rate cut that would impact CardioNet; (e) prodding "friendly" analysts – which had "outperform" and "buy" recommendations out for CardioNet and who worked for investment banks that had underwritten and managed the Company's IPO and secondary stock offering (and, in the case of Citigroup, had also served as lead placement agent for its $110 million private financing in March 2007) – to write reports attacking Jefferies' April 24 Report; and (f) seeking to have the SEC, Nasdaq and FINRA initiate investigations into possible market manipulation by Jefferies. Defendants' statements falsely assured the investing public that a significant reimbursement rate cut was neither imminent nor in the works, causing CardioNet's stock to trade at artificially inflated prices during the Class Period. However, eventually, CardioNet was forced to withdraw its market guidance and announce the same type of drastic reimbursement rate cut that Jefferies had said was coming in its April 24 Report, leading to a market decline of 64% from June 30, 2009 to July 13, 2009.

### ADDITIONAL FACTS RELEVANT TO SCIENTER

104.   Each of the Individual Defendants (and, by imputation, CardioNet) acted with scienter in that, as set forth herein, each knew or recklessly disregarded that CardioNet's public statements issued during the Class Period were materially false and misleading. The Individual Defendants were the senior management of the Company, and thus at all times were the ones with principal responsibility for ensuring that the Company's statements were accurate and

49

Exhibit 2
Page 110

truthful. Yet, as the Company admitted on July 12, 2009, the Company was facing a rate reimbursement review by Highmark and a significant rate reimbursement cut, facts that defendants recklessly denied throughout the Class Period.

105. As further demonstrated above, after the issuance of the April 24 Report, defendants embarked on a concerted campaign to discredit the information in the Report, as well as Mr. Kennedy's and Jefferies' "due diligence" and motives. At the same time, defendants sought to falsely reassure the investing public that the statements in the April 24 Report were not true, and affirmatively stated that the Company (and Jefferies) had no information of a rate reimbursement cut by Highmark.

106. Defendants' actions were even more egregious in light of the fact that the April 24 Report evidenced significant due diligence, and presented many indications that Highmark was going to lower the reimbursement rate. First, CMS's recent decision to price the MCOT™ professional fee at $25 was indicative of an impending technical fee reduction. This $25 professional fee compared to the $128 rate that Highmark previously paid for MCOT™'s professional component.

107. Aside from the professional fee reduction, there were other factors, including the fact that MCOT™ costs were considered indirect costs, which increased the likelihood of a lower national technical fee, and the 2009 OPPS payment rate assigned to the technical component was $369 lower than current Highmark rate, which indicated that a rate cut by Highmark was looming.

108. Defendants intentionally also set out to discredit Mr. Kennedy, Jefferies and the April 24 Report in ways other than through their own false and misleading statements. Just after the April 24 Report was issued, Leerink, an underwriter for the Company's IPO and a manager

50

Exhibit 2
Page 111

of its secondary stock offering, reiterated its "Buy" rating on CardioNet, and stated that "[t]his morning, we checked in with BEAT management who emphasized to us that they are confident no decision regarding a potential change to reimbursement is imminent based on their conversations today with Highmark senior medical personnel who are unaware of any final decisions." Two days later, on April 26, 2009, Citigroup, the lead underwriter for the Company's IPO and sole book-manager for its secondary stock offering (and lead placement agent for the March 2007 private financing), issued a report maintaining its "Buy" rating and questioning the legitimacy of Jefferies' April 24 Report and stating that CardioNet management had been in contact with Highmark and "saw no signal of pending reimbursement changes." Notably, however, according to the *Wall Street Journal* article, the Citigroup analyst author Amit Bhalla relied entirely upon representations from CardioNet's management in writing his analysis on this point, and never even tried to contact Highmark before issuing Citigroup's report on CardioNet.

109. Defendants further halted all communications with Jefferies analysts after the April 24 Report. Jefferies analysts were blocked from the Company's April 30, 2009 analyst conference call and, although Jefferies analysts were allowed to listen in on the most recent CardioNet conference calls, defendants continued to refuse to take any questions from Jefferies. CardioNet's exclusion of Jefferies from conference calls was part of the defendants' scheme to prevent the disclosure of accurate information, prevent pointed questioning about CardioNet's relationship with Highmark, and/or conceal the reality of the status of Highmark's reimbursement process and decision. Such conduct, at a minimum, constituted willful blindness on the part of defendants CardioNet, Thurman and Galvan.

51

**Exhibit 2**
**Page 112**

110. By contrast, as alleged above, defendants communicated with analysts from many other firms – including the investment banks that served as underwriters of the Company's IPO. Moreover, according to CW1, defendant Thurman and others from CardioNet were "on the road a lot" and at the May 12, 2009 Bank of America Health Care Conference spoke to many different analysts and constituencies about Jefferies and the information contained in the April 24 Report.

111. In order to further discredit the April 24 Report and Jefferies, in early June, defendant Thurman sent letters to the SEC, Nasdaq and FINRA suggesting that the Jefferies report "may have been part of a plot to enrich CardioNet short sellers bettering on a share-price decline." According to the *Wall Street Journal* article, the letters stated "this strikes me as blatant and inappropriate manipulation of our company's stock," stated that the Report was suspect "given its apparent inaccuracies," and questioned "whether it was written with the intent of driving down our stock price."

112. Defendants' scienter is further evidenced by the fact that they consistently misrepresented the nature of the information that Jefferies received from Highmark. According to CW1, despite the fact that CardioNet refused to communicate with Jefferies, CardioNet was telling others on the Street that Jefferies had never spoken with Highmark. CW1 stated that "[t]he story kept changing on Jefferies about what we did and didn't do. CardioNet initially went out and told people that we made it up, like literally made it up." CardioNet's story, however, began to change once it could no longer credibly claim that Jefferies had not spoken to Highmark in connection with the Report. CardioNet, which had first claimed that Highmark never provided Jefferies with any information, thereafter took the position that Jefferies had misrepresented themselves to the Highmark.

52 .

Exhibit 2
Page 113

## LOSS CAUSATION/ECONOMIC LOSS

113.    Defendants' fraudulent scheme and misrepresentations and omissions concerning an impending reimbursement rate cut and CardioNet's ability to meet earnings estimates caused the price of the Company's stock to be artificially inflated during the Class Period. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of CardioNet's common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of CardioNet's common stock during the Class Period, the Pension Fund, plaintiff Solomon-Shrawder and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

114.    Defendants' false and misleading statements had the intended effect and caused CardioNet's common stock to trade at artificially inflated levels throughout the Class Period. As a direct result of defendants' corrective statements on June 30 and July 12, 2009, CardioNet's common stock price plummeted, falling from $16.32 per share on June 30, 2009 to $5.87 per share on July 13, 2009 – **an overall decline of $10.45 per share, or 64%** – causing persons who purchased CardioNet during the Class Period to suffer enormous losses on their stock purchases. This 64% decline in CardioNet's common stock price was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.

115.    The timing and magnitude of CardioNet's common stock price declines negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. To the contrary, the economic loss, *i.e.*, damages, suffered by plaintiffs and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate CardioNet's common stock price and the subsequent

53

**Exhibit 2**
**Page 114**

significant declines in the value of CardioNet's common stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

116. These drops removed the inflation from CardioNet's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

117. At all relevant times, the market for CardioNet's common stock was an efficient market for the following reasons, among others:

(a) CardioNet's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b) as a regulated issuer, CardioNet filed periodic public reports with the SEC;

(c) CardioNet regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) CardioNet was followed by several securities analysts employed by major brokerage films who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports became publicly available and entered the public marketplace.

118. As a result of the foregoing, the market for CardioNet's common stock promptly digested current information regarding CardioNet from all publicly available sources and reflected such information in CardioNet's stock price. Under these circumstances, all purchasers

54

Exhibit 2
Page 115

of CardioNet's common stock during the Class Period suffered similar injury through their purchase of CardioNet's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

119.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements, and the forward-looking statements were joined with false and misleading statements of existing facts. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CardioNet who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

120.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

55

**Exhibit 2**
**Page 116**

121.    Throughout the Class Period, defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/pr the facilities of a national securities exchange:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material fact and/or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or;

(c)    Engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon Lead Plaintiff and other members of the Class in connection with their purchases of CardioNet stock.

122.    Defendants made material misrepresentations or omissions knowingly and/or in reckless disregard for the truth, with the purpose and effect of misleading the investing public with respect to CardioNet's true condition and prospects, and supporting the artificially inflated prices of CardioNet common stock.

123.    Defendants knowingly or in reckless disregard for the truth employed devices, schemes, artifices to defraud, and/or engaged in acts, practices and/or courses of business, with the purpose and effect of misleading the investing public with respect to the true condition and prospects of CardioNet, and supporting the artificially inflated prices of CardioNet common stock.

124.    Defendants carried out a plan, scheme and course of business that was intended to and did deceive the investing public, including Lead Plaintiff, plaintiff Solomon-Shrawder and other members of the Class, as alleged herein, to artificially inflate and maintain the market price

56

Exhibit 2
Page 117

of CardioNet common stock and induce plaintiffs and other members of the Class to purchase or

otherwise acquire CardioNet common stock.

125.    By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act and Rule 10b-5.

126.    As detailed herein, in ignorance of the materially false and misleading nature of

the reports and statements described above, Lead Plaintiff, plaintiff Solomon-Shrawder and the

Class relied to their detriment on the statements described above and/or on the integrity of the

market prices as reflecting the completeness and accuracy of the information disseminated in

connection with their purchases of the securities. Lead Plaintiff, plaintiff Solomon-Shrawder and

other members of the Class would not have purchased CardioNet common stock at the prices

they paid, if at all, had they known that the market prices of those securities were artificially

inflated by the fraudulent conduct alleged herein.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

127.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth

fully herein.

128.    As set forth in Count I above, defendant CardioNet committed a primary violation

of Section 10(b) of the Exchange Act and Rule 10b-5 through its knowing and/or reckless

dissemination of materially false and misleading statements, and/or through its use of devices,

schemes, artifices, practices and/or courses of conduct that operated as a fraud on the investing

public.

129.    Each of the Individual Defendants possessed, directly or indirectly, the power to

direct and/or control CardioNet's management and policies, including CardioNet's management

57

Exhibit 2
Page 118

of and policies surrounding its public statements, and was therefore a controlling person of CardioNet within the meaning of Section 20(a) of the Exchange Act.

130. Each of the Individual Defendants is liable, jointly and severally with and to the same extent as the Company under Section 10(b) of the Exchange Act and Rule10b-5 promulgated thereunder, to plaintiffs and the other members of the Class who purchased CardioNet securities.

131. By virtue of the Individual Defendants' operational and management control of CardioNet's businesses and systematic involvement in the fraudulent scheme alleged herein, each of the Individual Defendants had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected. Each of the Individual Defendants also had direct and supervisory involvement in the operations of CardioNet and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities violations alleged herein, many of which were made directly by the Individual Defendants, and exercised the same.

132. As a direct and proximate result of the Individual Defendants' conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchase of CardioNet common stock.

133. By virtue of the foregoing, the Individual Defendants are liable under Section 20(a) of the Exchange Act to plaintiffs and the other members of the Class, each of whom has been damaged as a result of the fraud alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

ı

58

ᶜ

**Exhibit 2**
**Page 119**

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiffs and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including litigation costs, counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 19, 2010                    Respectfully submitted,

                                        /s/Jeffrey W. Golan
                                        Jeffrey W. Golan
                                        M. Richard Komins
                                        Jeffrey A. Barrack
                                        Beth T. Seltzer
                                        **BARRACK, RODOS & BACINE**
                                        3300 Two Commerce Square, Suite 3300
                                        2001 Market Street
                                        Philadelphia, Pennsylvania 19103
                                        Telephone: (215) 963-0600
                                        Facsimile: (215) 963-0838

                                                and

                                        J. Gerard Stranch, IV
                                        Michael Stewart
                                        Joe P. Leniski
                                        Michael J. Wall
                                        **BRANSTETTER, STRANCH &
                                        JENNINGS, PLLC**
                                        227 Second Avenue North, Fourth Floor
                                        Nashville, Tennessee 37201-1631
                                        Telephone: (615) 254-8801
                                        Facsimile: (615) 250-3970

59

**Exhibit 2**
**Page 120**

*Attorneys for Lead Plaintiff and Co-Lead
Counsel for the Class*

John T. Long
**CAVANAGH & O'HARA LLP**
407 East Adams
P.O. Box 5043
Springfield, Illinois 62705
Telephone: (217) 544-1771
Facsimile: (217)544-9894

*Other Attorneys for Lead Plaintiff*

Deborah R. Gross
**LAW OFFICES OF BERNARD M.
GROSS, P.C.**
The Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: (215) 561-3600
Facsimile: (215) 561-3000

*Attorneys for Plaintiff Dianne Solomon-
Shrawder*

60

**Exhibit 2**
**Page 121**

Exhibit 2
Page 122

# Schedule A

Central Laborers' Pension Fund
Transactions from April 28, 2009 through July 10, 2009

| Date | Transaction Type | Number of Shares | Price |
|------|------------------|------------------|-------|
| 5/19/2009 | BUY | 2,871 | 19.8405 |
| 5/26/2009 | BUY | 1,793 | 18.7884 |
| 5/27/2009 | BUY | 587 | 18.0533 |
| 5/29/2009 | BUY | 750 | 17.7588 |
| 6/5/2009 | BUY | 3,588 | 18.0780 |
| 6/17/2009 | BUY | 1,802 | 16.8617 |
| 7/1/2009 | BUY | 5,391 | 9.6479 |
| 7/8/2009 | BUY | 1,402 | 9.0430 |

Dianne Solomon-Shrawder
Transactions from April 28, 2009 through July 10, 2009

| Date | Transaction Type | Number of Shares | Price |
|------|------------------|------------------|-------|
| 5/1/2009 | BUY | 1,000 | 18.4083 |

Exhibit 2
Page 123

# EXHIBIT 1

Exhibit 2
Page 124

# Jefferies & Company, Inc.

April 24, 2009

**Healthcare**
**Medical Devices & Diagnostics**

**United States of America**

## CardioNet (NASDAQ: BEAT)

### Initiating at Underperform: Reimbursement Cuts Should Crimp Growth Plans

**Investment Summary**
Although BEAT is the hands-down leader in mobile cardiac outpatient telemetry (MCOT), we think soon-to-be-implemented reimbursement reductions for the service will prevent the company from achieving the aggressive growth targets set by management and the Street.

**Initiating Coverage**

| Rating: | UNDERPERFORM |
|---|---|
| Price: | $22.91 |
| Price Target: | $17.00 |
| Bloomberg: | NASDAQ: BEAT |

**Market Data**

| | |
|---|---|
| 52-Week Range: | $35.89-$16.85 |
| Total Entprs. Value (MM): | $491.6 |
| Market Cap. (MM): | $549.8 |
| Insider Ownership: | 15.5% |
| Institutional Ownership: | 79.2% |
| Shares Out. (MM): | 24.0 |
| Float (MM): | 21.1 |
| Avg. Daily Vol.: | 405,724 |

**Financial Summary**

| | |
|---|---|
| Net Debt (MM): | ($58.2) |
| Net Debt/Capital: | NM |

| | | | | |
|---|---|---|---|---|
| Rev. (MM) | 73.0 | 120.5 | 166.3 | 211.3 |
| EV/Rev. | 6.7x | 4.1x | 3.0x | 2.3x |
| **EPS** | | | | |
| Mar | (0.19) | 0.02 | 0.04 | 0.24 |
| Jun | (0.07) | 0.08 | 0.10 | 0.24 |
| Sep | 0.11 | 0.11 | 0.15 | 0.22 |
| Dec | 0.12 | 0.16 | 0.26 | 0.27 |
| FY Dec | (0.02) | 0.39 | 0.55 | 0.97 |
| FY P/E | NM | 58.7x | 41.7x | 23.6x |
| Consensus | — | — | 0.70 | 1.36 |

Brian Kennedy
(212) 284-2176, bkennedy@Jefferies.com

Peter J. Bye
(212) 284-2382, pbye@Jefferies.com

Joshua Jennings, M.D.
(212) 284-2016, joshjennings@Jefferies.com

**Event**
Initiating coverage of BEAT at Underperform with a $17 PT.

**Key Points**
- **Guidance and Street forecasts assume stable reimbursement.** BEAT's guidance calls for EPS to improve from $0.69-$0.73 in 2009 to as much as $2 in 2011, an ambitious outlook that the Street mostly matches. Steady reimbursement is key to this ramp. Both BEAT and the Street expect the Medicare technical fee for MCOT (which BEAT collects) to remain on par with the current $1,123 rate paid by Pennsylvania Medicare carrier Highmark.

- **But we expect Highmark to cut the technical fee in 2009.** Our checks indicate that the technical fee is now under review at Highmark, which is contrary to the Street assumption. We believe that Highmark plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear. Though several things likely swayed Highmark to revisit the technical fee, we highlight CMS's recent decision to price the MCOT professional fee (which doctors collect) at roughly $25 versus Highmark's prior rate of $128. We think this sent a clear signal to Highmark that it's been overvaluing the service.

- **We believe CMS will establish a lower technical fee regardless of Highmark's actions.** Though the prospect of a 2009 cut by Highmark concerns us most, there's evidence CMS won't maintain the $1,123 technical rate regardless. Again, we feel the new lower professional fee reveals CMS's more skeptical stance on MCOT. Further, we note that the 2009 OPPS rate for the technical component is now $754, and that public documents make clear that the RUC, which advises CMS, views many of MCOT's technical costs as indirect costs. These variables increase the likelihood that CMS will price the technical fee below $1,123, in our opinion.

- **We're neutral elsewhere.** BEAT has a sizable lead in MCOT, and doctors like the company's system. In addition, the U.S. arrhythmia monitoring market is large, at $2B, and underpenetrated. On the flip side, we're concerned about BEAT's high accounts receivable and bad debt levels. We also think management has boxed itself in by issuing such favorable three-year guidance. Overall, since BEAT shares price in the Street's optimism more than risk, our divergent view on the technical fee leads us to initiate at Underperform.

**Valuation/Risks**
Our $17 PT averages the price-to-earnings and price-to-sales approaches shown on page 2. For risks, MCOT reimbursement could remain stable, a scenario that may drive BEAT shares above $30.

Please see important disclosure information on pages 13 - 16 of this report.

# Jefferies

Exhibit 2
Page 125

## Executive Summary

CardioNet (BEAT) is the world's leading provider of mobile cardiac outpatient telemetry, or MCOT, an innovative technology for monitoring heart rate and rhythm abnormalities known as arrhythmias. Arrhythmia monitoring represents a sizable U.S. market opportunity of approximately $2B, with more than 4MM Americans affected by arrhythmias each year. The most prevalent form of arrhythmia is atrial fibrillation, which affects roughly 2.3MM individuals in the United States. With its MCOT system, BEAT offers arguably the most accurate device for diagnosing and monitoring cardiac arrhythmias, including atrial fibrillation. And BEAT has only one real direct competitor today, LifeWatch, an Illinois-based subsidiary of Switzerland's Card Guard that has an approximate 20% share of the U.S. MCOT market.

BEAT is not shy about its growth potential. At a time when most of its med tech peers lack visibility on 2009 earnings, BEAT has issued three-year guidance. Management expects sales to increase 40% year over year in 2009, to nearly $170MM, and then by 50% in 2010 to over $250MM. To do this, the company will expand its sales force from 88 representatives at year-end 2008 to 148 exiting 2009. The projected effect on earnings is impressive — BEAT anticipates 2009 EPS of $0.69–$0.73 doubling in 2010 and reaching as high as $2 in 2011. The Street shares management's optimism, forecasting 2009–11 sales of $174MM, $247MM, and $300MM, respectively, and 2009–11 EPS of $0.70, $1.36, and $1.88. Five of the six Street analysts who cover BEAT rate its shares Outperform or Buy, with an average 12-month price target of $33. The Street likes BEAT for multiple reasons, including the company's near-monopoly of the MCOT marketplace and the likelihood that MCOT reimbursement will remain stable or even improve in the coming years as more private insurers establish payment policies for the technology.

Our bearish stance on BEAT stems from our concerns about reimbursement for MCOT, specifically Medicare reimbursement, which we believe is at risk of being cut in a matter of weeks. The Medicare reimbursement setup for MCOT is somewhat complicated. MCOT has two distinct parts: a professional component, collected by the physician for interpreting the reports generated by the MCOT service, and a technical component, collected by the MCOT provider for offering the service itself. Prior to January 1, 2009, both components were billed under CPT 93799, a nonspecific code used for unlisted cardiovascular services. The professional fee was reimbursed at rates between $30 and $300 depending on the Medicare carrier, while the technical fee was reimbursed by only one Medicare carrier, Pennsylvania's Highmark, which has paid an average rate of $1,123.07 for the past several years. On January 1, 2009, two new CPT codes went into effect: 93228, for the professional component, and 93229, for the technical component. CMS elected to price the professional component at approximately $25 for 2009 and to "contractor price" the technical component, which means that Highmark will again set the technical fee for the year.

The Street has assumed that Highmark will keep the technical fee at $1,123 for 2009, even though neither BEAT nor LifeWatch has explicitly stated that the fee won't change. We think the Street's assumption is wrong. Our checks indicate that Highmark is currently reviewing the technical fee. We believe the carrier plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear. This decline — likely made in response to CMS's move to reduce the 2009 professional fee — should mark the end of the favorable Medicare reimbursement terms MCOT has enjoyed for years thanks to Highmark's support of the technology. We think CMS will eventually establish a technical national fee at or below the soon-to-be-implemented Highmark rate and that private insurers may follow suit, reducing MCOT reimbursement to mirror lowered Medicare rates.

We believe the Street is also overestimating MCOT's growth prospects while underestimating the impact of competition from LifeWatch and others. Further, we're concerned that BEAT's high bad debt levels and growing days sales outstanding may reflect structural reimbursement challenges rather than simply collections problems. However, with such a high bar set by management guidance and Street forecasts, we think the likelihood of a reimbursement cut alone is enough to justify an Underperform rating on BEAT. Our price target is $17.

## Valuation

We arrive at a P/E-based value of $14.50 per share by applying a 15 multiple to our 2010 EPS forecast of $0.97. We calculate a sales-based value of $20 per share by applying a 2 multiple to our 2010 revenue projection of $211MM and adding in BEAT's net cash of $58MM. Our $17 price target averages these approaches. The multiples we use are sizable discounts to those used by the Street. We believe such discounts are warranted since our 2010 estimates reflect only modest reimbursement cuts and don't fully account for issues such as competition, accounting, and margin compression.

## Risks

The biggest risk to our thesis is that Medicare reimbursement for the technical component of MCOT remains stable, which is the consensus assumption and could drive BEAT shares to Street price targets of more than $30. Other risks to our thesis include BEAT overcoming reimbursement setbacks due to its solid technology and market leadership position, as well as BEAT being acquired at a premium by a larger company that could build upon the telemedicine opportunity.

---

Please see important disclosure information on pages 13 - 16 of this report.
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

**Jefferies & Company, Inc.**
Page 2 of 16

Exhibit 2
Page 126

## Key Concerns

1. **We expect Highmark to lower the technical fee for MCOT within weeks.** Because CMS opted to contractor price CPT code 93229 for 2009, responsibility for setting the technical fee still rests with Pennsylvania's Medicare carrier, Highmark Medicare Services. Though the Street has assumed Highmark's technical fee under 93229 will match the price the carrier previously offered under 93799, neither BEAT nor LifeWatch has explicitly stated that the fee won't change in 2009. In BEAT's SEC filings, the company says the following about the 2009 technical fee:

   > The 2009 national reimbursement rate for the technical component related to use of the CardioNet System (CPT code 93229) has been carrier priced, meaning, similar to today, Highmark Medicare Services will continue to be responsible for the reimbursement rate for this new code. The current technical reimbursement rate established by Highmark Medicare Services is $1,123. The company believes that the current technical reimbursement rate will positively impact its growth prospects for 2009 and beyond.

   Our checks indicate that the Street assumption is incorrect and that the technical fee is now under review at Highmark. We expect the carrier to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear. Though we suspect several things swayed Highmark to revisit the technical fee, we highlight CMS's recent decision to price the MCOT professional fee at roughly $25 as a likely major contributor. This $25 professional fee compares to the $126 rate that Highmark previously paid for MCOT's professional component and, in our opinion, sent clear signals to Highmark that it's been overvaluing the service. Our checks suggest Highmark feels pressure to conform to the way CMS appears to be valuing MCOT, and that Highmark doesn't want to maintain an incongruently high technical fee when it senses that an eventual reduction by CMS is inevitable. In Bullets 2 and 3, we expand upon our belief that CMS will establish a lower technical fee regardless of Highmark's actions in 2009, a viewpoint that adds a layer of protection to our claim that reimbursement will be cut. Still, a near-term reduction by Highmark is the biggest potential negative catalyst we envision for BEAT, as it would mark the end of the highly favorable Medicare terms MCOT has enjoyed for years thanks to Highmark and raise the possibility that private insurers reduce MCOT reimbursement to mirror lowered Medicare rates.

2. **The recent reduction in the Medicare professional fee could reduce demand for MCOT and raises our conviction that CMS will lower the technical fee regardless of what Highmark does.**

   a. **The new rate of approximately $25 compares to a prior range of $30 to $300 and may decrease physician demand for MCOT.** Prior to January 1, 2009, doctors billed for the interpretation of MCOT data for Medicare patients under CPT 93799, a nonspecific code used for unlisted cardiovascular services. Physicians would add the modifier -26 and specify "mobile cardiac outpatient telemetry" (or a close variation) on the CMS claim form. While CMS guidelines stated that the service should be paid only one time in any 30-day period regardless of the number of data transmissions involved (a policy most private insurers now follow), the use of an unlisted code made payment inconsistencies from carrier to carrier fairly common. In an October 2006 letter[1] to CMS, BEAT discusses this issue, saying "payment for physicians varies widely through the country and there is no single methodology used by carriers to determine payment." To illustrate its point, BEAT enclosed a table listing the payments made by several Medicare carriers for 93799-26 and, in one instance, 93237, which allows for multiple units to be billed per service period. The table shows payments of $30 to $150 for 93799-26 and a payment of $299 for 93237 assuming 13 days of service. The new payment of roughly $25 for a 30-day period under the recently created MCOT-specific code 93228 thus represents a step back — and in some instances a significant step back — in physician reimbursement for MCOT.

   We have three thoughts on the potential demand impact stemming from the new lower professional fee. First, the new fee is comparable to those for older-line devices, Holter and event monitors, which removes the profit incentive that once favored MCOT relative to these other technologies. Though we're not suggesting that a profit motive alone drives MCOT adoption — the technology has clear diagnostic benefits — we think the added profitability of MCOT encouraged many physicians to at least trial the technology. We're cautious that this willingness to trial MCOT may decline now that the professional reimbursement is on par with that for more routinely used Holters and event monitors. (In fact, the new code is about $2 less than reimbursement for CPT 93014 and 93272, two interpretation

---

[1] www.cms.hhs.gov/eRulemaking/downloads/CMS-1321-P%20Paper%20Comments%20204-209.pdf

**Exhibit 2**
**Page 127**

codes for event monitors.) Cardiologists and electrophysiologists are generally more experienced with Holters and event monitors and some have the technology, particularly Holters, in their offices, allowing them to bill for the technical fee too and generate more revenue. Second, our checks with physicians who've already adopted MCOT reveal frustration over the new rate given the greater number of MCOT reports relative to the other technologies, as well as the additional time needed to work through issues such as explaining to the patient that MCOT is associated with a higher co-pay. While many doctors indicate that they'll continue using MCOT even if they're generating a loss on their efforts, we're inclined to think that demand from existing users could decline as physicians become more selective in choosing patients who'll benefit from the technology. Lastly, we believe many private insurers will gravitate toward the new CMS professional fee over time, further pressuring demand from both new and existing users of MCOT.

b. **The industry reaction to the new professional fee also suggests physician demand for MCOT could decline.** We acknowledge some clear benefits to CMS making national payment decisions on MCOT-specific CPT codes, including simpler billing and the potential to influence still-reluctant private insurers to cover the service. However, we think the struggle to ensure that MCOT remains a profitable procedure involves more obstacles than many investors appreciate. A December 2008 letter[2] sent by the Cardiology Advocacy Alliance (CAA) to CMS underscores this point:

> MCOT is a vital diagnostic tool and many carriers have recognized the professional component involved by setting the professional fee at $150 or more. That fee will be cut by 80 percent, to approximately $30, under the 0.52 work RVU recommendation. CAA requests that CMS carrier price CPT code 93228 for 2009 and asks that CMS direct the AMA RUC to review the MCOT work RVUs to ensure adequate reimbursement for CPT Code 93228 for 2010 and beyond.

CMS, of course, did not heed this request. Our checks show that the industry push to reverse CMS's stance on 93228 continues through efforts such as physician letters written to the Heart Rhythm Society. Though we feel these initiatives will fail to influence CMS policy, we think they nonetheless demonstrate the concern that physicians, service providers, and industry groups have for declining MCOT reimbursement, a fear that we believe is not appropriately reflected in bullish views on BEAT.

c. **We think the new lower professional fee clearly establishes where the technical fee is headed.** We believe the decline seen in the professional fee with the transition to an MCOT-specific CPT code bodes poorly for the technical fee under the new CPT code 93229. As discussed previously, the technical fee has yet to receive a national payment decision and is still contractor priced by Highmark at $1,123. For reasons we expand upon in Bullet 3, we expect CMS to set a lower reimbursement rate for 93229, mirroring the professional fee reduction for 93228. Broadly stated, we believe CMS assigns a lower cost/benefit value to MCOT than some of the local Medicare carriers, particularly Highmark. As evidence, we again cite the reimbursement rate of $128.27 Highmark previously assigned to MCOT's professional component. Although we do not expect a decline of similar magnitude for the technical component — CMS now pays doctors one-fifth of what Highmark once paid doctors for MCOT interpretations — we think the valuation discrepancy between CMS and Highmark on the professional fee discredits the consensus belief that CMS will keep the technical fee relatively stable with Highmark's current rate.

3. **Apart from the professional fee reduction, there are other factors that suggest CMS will price MCOT's technical fee below the $1,123 rate currently provided by Highmark.**

a. **The AMA RUC (and most likely CMS) views many MCOT costs as indirect costs, not direct costs, which we believe increases the likelihood of a lower national technical fee.** One goal of the American Medical Association (AMA) is to ensure appropriate valuation for physician services using its Resource-Based Relative Value Scale (RBRVS). To facilitate this, the AMA established the AMA/Specialty Society Relative Value Scale Update Committee (RUC). The RUC makes annual recommendations regarding new and revised physician services to CMS. In the 2009 Federal Register[3] (which reflects decisions made in 2008), CMS indicates that the RUC "recommended 0.52 work RVUs for CPT code 93228 and only direct cost inputs for CPT code 93229." CMS accepted the

---

[2] http://www.regulations.gov/fdmspublic/ContentViewer?objectId=0900006480806805&disposition=attachment&contentType=pdf
[3] http://www.regulations.gov/fdmspublic/ContentViewer?objectId=09000064807b15a8&disposition=attachment&contentType=pdf

Please see important disclosure information on pages 13 - 16 of this report.       **Jefferies & Company, Inc.**
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176                              Page 4 of 16

Exhibit 2
Page 128

RUC's recommended work RVUs for CPT code 93228, as noted previously. However, with 93229, CMS opted to contractor price the code in order to "better understand the direct cost inputs for this service and to allow [CMS] to collect actual utilization data under the new code." Comments made by BEAT[4,5] and LifeWatch[6,7] in letters sent to CMS last year indicate that the RUC views many MCOT costs as indirect costs rather than direct costs. For instance, we believe the RUC views the software and hardware used in the MCOT monitoring center as indirect costs, akin to overhead, because these items are used to process multiple patients in parallel rather than on a serial basis. Although BEAT cites several technologies it believes offer precedent for the type of reimbursement it's requesting, we are cautious that the RUC has already considered and rejected this line of thinking. Further, we note that LifeWatch's December 2008 letter indicates that "neither LifeWatch nor the Remote Cardiac Services Provider Group [of which BEAT is a member] was permitted to attend the RUC meeting" in 2008, and though LifeWatch worked closely with the American College of Cardiology (ACC) to develop recommendations for MCOT, "the ACC decided not to submit recommendations to the RUC on this code because it did not believe it had the expertise with respect to this service." Both factors suggest that the MCOT providers have limited influence over the RUC's recommendation to CMS on the technical fee, which leads us to believe the RUC's future recommendation for 93229 will resemble the 2009 recommendation.

Because CMS has already followed the RUC's recommendation on the professional fee, we'd be surprised if the valuation method CMS ultimately deems appropriate for the technical fee is radically different than what the RUC proposes, which again we think will closely resemble what the RUC proposed in 2009. LifeWatch's August 2008 letter to CMS indicates that the agency already accepts the RUC's stance that many MCOT costs should be deemed indirect, not direct, as the text below shows. Since LifeWatch distinguishes between CMS and the RUC elsewhere in the letter, we believe these comments reveal that the viewpoint of CMS is already aligned with that of the RUC.

> It became apparent to LifeWatch, in recent discussions with CMS, that the CMS methodology for pricing equipment under the physician's fee schedule does not fit well with some of the other equipment used in furnishing mobile cardiac telemetry services – in particular the cardiac telemetry system. This led CMS to suggest that the mobile telemetry system, which consists of very expensive computer software and hardware, might be more appropriately treated as an indirect cost. LifeWatch strongly disagrees with this suggestion and believes it reflects a misunderstanding of the service provided by the MCT system.

Gauging when CMS will make a national payment decision on 93229 is difficult. On one hand, we believe CMS has an incentive to move the technical fee out of contractor pricing as soon as possible to prevent Highmark from making a de facto national payment decision for another year in 2010 (the theory is that CMS doesn't like to delegate such control to individual carriers). This suggests that CMS may make a technical fee decision later this year for implementation on January 1, 2010. On the other hand, the work CMS has proposed — collecting "actual utilization data under the new code" — could take years to complete. Since the RUC typically forwards its annual recommendations to CMS in May, we believe there's little chance that it has gathered enough new data to enhance the analysis conducted ahead of last year's recommendation to CMS. We think the RUC will mostly reiterate the spirit of last year's indirect-cost-heavy recommendation. Should CMS agree to this recommendation this time around (a proposed payment decision should be in the public domain around September), a national technical fee below Highmark's $1,123 rate could be established for 2010. Alternatively, should CMS insist that more utilization data be gathered, a national technical fee could be deferred for several years, in which case Highmark's near-term contractor price decision becomes crucial.

b. **We note that the 2009 OPPS payment rate assigned to the technical component is $369 lower than the current Highmark rate.** When MCOT services are provided on an inpatient or outpatient basis in a healthcare facility such as a hospital, the services are purchased by the facility, which then can bill the insurer for both the technical and professional fees. The Outpatient Prospective Payment System (OPPS) was implemented in August 2000 to handle Medicare hospital outpatient claims. OPPS is made up of categories of services known as Ambulatory Payment Classification (APC)

[4] August 2008: http://www.regulations.gov/fdmspublic/ContentViewer?objectId=09000064806e69fc&disposition=attachment&contentType=msw8
[5] December 2008: http://www.regulations.gov/fdmspublic/ContentViewer?objectId=0900006480806518b&disposition=attachment&contentType=pdf
[6] August 2008: http://www.regulations.gov/fdmspublic/ContentViewer?objectId=0900006480807267&disposition=attachment&contentType=pdf
[7] December 2008: www.regulations.gov/fdmspublic/ContentViewer?objectId=0900006480790dd&disposition=attachment&contentType=pdf

Please see important disclosure information on pages 13 - 16 of this report.        **Jefferies & Company, Inc.**
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176                                      Page 5 of 16

Exhibit 2
Page 129

**BEAT**

groups. Every CPT code is assigned to an APC group to enable hospitals to receive payment under OPPS. The new CPT code for MCOT's technical component, 93229, has been assigned to APC 0209, Level II Extended EEG, Sleep and Cardiovascular (formerly Level II Extended EEG and Sleep Studies). CMS's January Addendum B update for OPPS payments lists a $754.41 payment rate for 93229.

EXHIBIT 1: ADDENDUM B OPPS PAYMENT BY HCPCS CODE FOR 2009

| HCPCS Code | Short Descriptor | APC | Payment Rate | National Unadjusted Copayment | Minimum Unadjusted Copayment |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

Source: Centers for Medicare and Medicaid Services data

This coding allows a hospital to provide an MCOT monitor, purchase the MCOT service from a vendor, and then bill the $754 amount shown in Exhibit 1, 20% of which is typically covered by the patient ($151, shown as the minimum unadjusted copayment). Because APC 0209 combines cardiovascular studies with EEG and sleep studies, the code does not exclusively reflect the costs associated with MCOT and may not accurately telegraph where the Physician Fee Schedule amount for 93229 will fall. However, CMS often strives to harmonize these rates to prevent the same service from receiving different treatment only due to differing provider types — in this case, either a hospital or an independent diagnostic testing facility. We are thus inclined to believe the Physician Fee Schedule amount will more closely resemble the 2009 OPPS rate than the current Highmark-awarded fee of $1,123. Our checks support this general logic.

c. **Most physicians and industry experts we speak with suggest the national technical fee will initially fall in the $700 to $1,000 range.** If we aggregate the comments we've received from doctors and industry experts, we see three broad factors that suggest a technical fee decline from current rates is likely: (1) reimbursement generally decreases rather than increases or stays the same, a trend that should continue in today's cost-conscious environment, (2) the spread between Medicare reimbursement rates for event monitors and MCOT is large and should prove unsustainable over time, and (3) Highmark was the first supporter of MCOT, and first supporters tend to be generous with reimbursement. The first observation requires no comment. For the second point, we note that MCOT reimbursement is approximately five times greater than reimbursement for event monitors, which typically falls between $200 and $250 per case. Holter reimbursement is an even greater step down, at approximately $100 per case. Several people we've spoken with suggest that MCOT has managed to maintain its substantial reimbursement premium because only BEAT had been actively pursuing the opportunity before 2007, and the company's scale was much smaller than it is today. These observers believe that BEAT's aggressive growth strategy, paired with LifeWatch's emergence as an MCOT competitor, will attract reimbursement scrutiny and make cuts inevitable. Regarding observation three, we'd note that BEAT has gotten far less traction with CMS than it has with Highmark. In the company's 2006 letter to CMS, BEAT acknowledges its dependence on Highmark bluntly, even limiting its influence to a single person, Highmark medical director Dr. Andrew Bloschichak: "Our payment is based on the willingness of Dr. Bloschichak to learn about MCOT, carefully research issues and provide for payment that reflects the cost of the service." We don't expect CMS to give MCOT the open-minded consideration that Dr. Bloschichak has (due to CMS's priorities elsewhere), and we think an upcoming reimbursement reduction by Highmark will mark the end of MCOT's most favorable Medicare reimbursement terms.

4. **We believe Medicare and other insurers could place a greater number of restrictions on the use of MCOT than is done presently, which may also impact MCOT sales.** Despite shortcomings such as a non-ideal control group, BEAT's largest study of its MCOT system[8] demonstrates the device's utility in diagnosing arrhythmia. The trial randomized patients (with syncope, pre-syncope, or palpitations who had a non-diagnostic 24-hour Holter monitor) to receive either event monitoring or MCOT. The study's final analysis contained data from 266 subjects and showed MCOT's superiority to loop recordings, with a diagnosis made

---

[8] Rothman SA, Laughlin JC, Seltzer J, Walia JS, Baman RI, Sioufli SY, Sangrigoli RM, Kowey PR: The diagnosis of cardiac arrhythmias: A prospective multi-center randomized study comparing mobile cardiac outpatient telemetry versus standard loop event monitoring. J Cardiovasc Electrophysiol 2007; 18:241-247.

---

Please see important disclosure information on pages 13 - 16 of this report.

Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

**Jefferies & Company, Inc.**

Page 6 of 16

**Exhibit 2**
**Page 130**

in 88% of MCOT patients compared to 75% of loop patients (p=0.008). In patients with syncope or presyncope, a diagnosis was made in 89% of MCOT patients versus 69% of loop patients (p=0.008). In addition, MCOT proved superior in confirming the diagnosis of clinically significant arrhythmias, detecting such events in 55 of 134 MCOT patients (41%) compared with 19 of 132 patients (15%) in the loop group (p< 0.001).

From a pure technology standpoint, BEAT's MCOT system performed admirably in the trial. Yet the results are somewhat unremarkable to those familiar with cardiac monitoring, since using better technology capable of capturing asymptomatic events and extending the observation time window should obviously improve one's diagnostic yield. The more relevant question to many is can the technology actually improve outcomes? This issue is central to the December 2007 technology assessment[9] of remote cardiac monitoring devices, prepared by the Agency for Healthcare Research and Quality (AHRQ). The AHRQ authors write:

> Most of the studies in the field are focused on the question "does the technology lead to an appropriate diagnosis?" and any downstream outcomes are less likely to be reported. Some clinicians assume that a patient's quality of life will improve simply from receiving a diagnosis, regardless of whether management is changed. However, this assumption remains an assumption in the absence of quality-of-life data obtained from validated instruments. While this report did find evidence that certain remote cardiac monitoring technologies lead to changes in patient management, the available evidence was insufficient to allow conclusions about the impact of remote cardiac monitoring technologies on any patient-oriented outcomes. Future studies that focus on downstream patient-oriented outcomes would be useful for determining the true benefit of these technologies.

At present, several private insurers won't reimburse for MCOT even though the BEAT system has achieved statistically significant results in a large-scale randomized clinical trial. Some of these private payers have indicated that they don't think the study's data are sufficient, an opinion that may stem from a primary focus on outcomes rather than simply diagnosis. We believe until more outcomes data are generated, restrictions on the reimbursable uses of the service are likely to increase as coverage moves toward a Medicare national payment decision. Our checks indicate that Highmark and some private insurers are now fairly lenient in requiring documentation to support the medical necessity of MCOT compared to other less expensive forms of monitoring. We expect CMS to impose more restrictions on usage. We note that once the technical fee moves out of Highmark's control and into CMS's, the MCOT providers should have the ability to open independent diagnostic testing facilities in any state, not just Pennsylvania. We believe CMS will take pains to prevent MCOT euphoria from building on the national level. We view CMS's decision to remove the financial incentive favoring MCOT by lowering the professional fee to $25 as an early tell that the agency plans to rein in MCOT costs and limit the technology's use to only those patients who truly need it.

## Risks to Our Thesis

1. **Reimbursement for the technical component of MCOT could remain stable or improve.** If reimbursement for the technical fee remains at or near the $1,123 rate currently offered by Highmark, as the Street projects, BEAT shares could trade higher than $30 per share. We'd consider our Underperform thesis wrong if the present technical fee is not lowered by either Highmark or CMS before year-end 2010.

2. **BEAT could manage to weather reimbursement cuts.** BEAT has a clear leadership position in the MCOT marketplace. Moreover, because MCOT systems offer 24-hour alerts, physicians have some incentive to stay with a single prominent vendor whose services can be trusted during off-hours and with which doctors are familiar. BEAT is highly levered to the MCOT market, and we've assumed that MCOT reimbursement cuts will be more impactful to BEAT than LifeWatch, which is more broadly diversified in cardiac monitoring. However, if BEAT can withstand initial reimbursement declines by offsetting lower fees with increased patient volumes, the company may be able to deliver upon the growth targets set by its management and the Street, especially in the event that reductions in reimbursement lessen LifeWatch's interest in penetrating the MCOT market.

3. **BEAT could be acquired.** Several large companies have shown interest in the potential high-growth area of home healthcare, including segments involving monitoring services. Since 2006, Philips has spent roughly $6B acquiring companies providing home healthcare services, such as Respironics, Raytel, Health Watch Holdings, and Lifeline Systems. Philips intends to expand its Home Healthcare Solutions unit by at least 10% annually over

---

[9] http://www.cms.hhs.gov/determinationprocess/downloads/id51TA.pdf

Please see important disclosure information on pages 13 - 16 of this report.   **Jefferies & Company, Inc.**
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176                          Page 7 of 16

Exhibit 2
Page 131

the next five years, according to the division's head. Meanwhile, medical-imaging equipment giant General Electric (GE, $11.88, NC) recently announced a partnership with Intel (INTC, $15.53, Underperform) to jointly spend $250MM over a five-year period to develop home healthcare products. Lastly, medical device maker Medtronic (MDT, $29.72, NC) has frequently expressed interest in the field of telemedicine and recently pledged to accelerate its European launches of remote patient monitoring systems. Any of these companies or similar-scale peers could look to acquire BEAT to quickly establish a footprint in cardiac monitoring.

## Background

Conshohocken, Pennsylvania-based BEAT develops and markets technology to diagnose and monitor cardiac arrhythmias. Its lead product is the MCOT system, a continuous arrhythmia monitoring system that wirelessly transmits electrocardiogram (ECG) data to BEAT's 24-hour service center. The FDA approved the first and second generations of BEAT's MCOT devices in February 2002, and approximately 200,000 patients have used the service since its introduction. BEAT also offers industry standard technology such as Holter, event and pacemaker monitors, which it accessed through its March 2007 acquisition of PDSHeart.

Arrhythmia represents a $2B market opportunity. An arrhythmia is an abnormal heart rate or rhythm caused by a disturbance in the electrical signals transmitted to the heart. More than 4MM people in the U.S. suffer from arrhythmias, which come in two basic forms: tachycardia, or a heartbeat that's too fast (more than 100 beats per minute), and bradycardia, or a heartbeat that's too slow (less than 60 beats per minute). Multiple environmental factors can contribute to arrhythmias such as stress, smoking, drug use, and excessive consumption of caffeine or alcohol. Arrhythmias can also be a symptom of diabetes or cardiovascular disease and, if untreated, may lead to a stroke or another serious complication, including death. According to data from the American Heart Association (AHA), arrhythmias cause more than 780,000 hospitalizations each year and contribute to roughly 480,000 annual deaths.

The most common form of arrhythmia is atrial fibrillation. Atrial fibrillation is characterized by an irregular beating of the muscles of the heart's upper chambers (atria) that is out of sync with the heart's lower chambers (ventricles). This condition results in a rapid heart rate that causes poor blood flow as well as symptoms such as heart palpitations and shortness of breath. In addition, atrial fibrillation increases the risk of blood clot formation and a subsequent stroke. Atrial fibrillation affects roughly 2.3MM individuals in the United States. One in four people over the age of 40 is at risk for atrial fibrillation, and the prevalence of atrial fibrillation increases with age — 3%–5% of the population is affected by the condition after age 65, which rises to 9% after age 80. AHA data indicate that 15%–20% of the estimated 700,000 strokes that occur annually in the U.S. can be attributed to atrial fibrillation.

Ventricular tachycardia is an arrhythmia that originates in the ventricles rather than the atria. The condition is associated with a pulse rate of more than 100 beats per minute, with at least three irregular heartbeats in a row. Ventricular tachycardia can interfere with the heart's ability to pump blood and cause symptoms such as palpitations, syncope (fainting), and dyspnea (troubled breathing). It can also be fatal, especially when it progresses to ventricular fibrillation, which is a rapid and highly uncoordinated ventricular rhythm that requires immediate CPR and defibrillation to correct. Ventricular tachycardia is less common than atrial fibrillation and more difficult to diagnose, which may increase the need for longer-interval, more accurate cardiac monitoring.

As indicated above, arrhythmias of various types are often linked to syncope. Syncope is the temporary loss of consciousness due to an abrupt decline in blood flow to the brain that may result from either tachycardia or bradycardia. The prevalence of syncope has been estimated at as much as 19% in the general population over 45 years of age[10]. It accounts for 1% to 3% of emergency department visits and up to 6% of hospital admissions each year in the United States. While recovery from syncope is typically rapid and spontaneous, diagnosing its root cause often presents challenges. In nearly 50% of cases, syncope cannot be explained after a patient history, physical exam, and conventional testing such as Holter monitoring.

Given the severity of certain outcomes associated with arrhythmias, the ability to either identify or rule out an arrhythmia is important. Arrhythmias can be diagnosed in a physician's office or remotely. Doctors typically begin by taking a patient's history and conducting a physical exam. They will then administer a resting ECG, a test that quantifies the electrical impulses in the heart. Should that prove inconclusive and the suspected arrhythmia is not deemed life-threatening, the physician will then prescribe an externally worn ambulatory cardiac monitoring device to allow for at-home ECG monitoring.

---

[10] Chen LY, Shen WK, Mahoney DW, Jacobsen SJ, Rodeheffer RJ. Prevalence of syncope in a population aged more than 45 years. Am J Med 2006 Dec;119(12):1088.e1-7.

Please see important disclosure information on pages 13 - 16 of this report.
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

Jefferies & Company, Inc.
Page 8 of 16

Exhibit 2
Page 132

**BEAT**

---

**EXHIBIT 2: CARDIONET HOLTER AND EVENT MONITORS**


**Digital Holter Monitor**


**Non-Looping Event Monitor**


**Looping Event Monitor**

Source: CardioNet images from http://www.pdsheart.com/products.html

External cardiac monitoring devices can record either intermittently or continuously and can be divided into five basic categories: Holter monitors, non-looping event monitors, looping event monitors, auto-trigger event monitors, and MCOT. The first ambulatory cardiac monitoring system was developed in the 1940s by biophysicist Norman Jeff Holter[11] and, at 75 pounds, was ambulatory only in the loosest sense of the word. Today's Holter monitors are roughly the size of a deck of cards and can be worn on a belt. They attach to the patient via electronic leads that are lightly adhered to multiple spots on the chest. Holters can record ECG waveforms continuously for 72 hours or longer, although most are used for 48 hours or less. Holters are best for patients whose suspected arrhythmias are thought to occur several times over the course of a day. However, the device allows for only a relatively short monitoring period, making it inappropriate for patients with intermittent symptoms. In addition, studies show that Holters have diagnostic yields of less than 15% for some conditions[12]. Last, any arrhythmia detected by the device is not discovered until after the monitoring period has concluded, when the physician is first able to review the recorded data. While older analog Holters require the patient to physically return the device in order for the physician to review the data, newer models such as the digital Holter shown above allow the patient's results to be immediately uploaded via the Internet.

Event monitors are typically worn for 15 to 30 days and are used to diagnose patients with infrequent arrhythmias that won't likely be captured by a limited-duration Holter device. The most basic variety of event monitor is a non-looping chest plate or wristwatch device, which doesn't have electronic leads and instead is manually pressed against the chest to record heart activity. This type of device is often called a post-symptom event monitor because the patient activates it in response to symptoms. Recording specifications vary by model, but most non-looping devices can store between one and six events and have approximately six minutes of total recording memory. The chest plate shown above, for instance, records 30 seconds of ECG data at a time and can store up to four events before the patient must transmit the recorded information via telephone and erase the memory. These monitors allow for physicians to be notified in the event of a life-threatening arrhythmia. In addition, since they don't require electrodes to be connected to the chest, they avoid the skin irritation that some patients experience with adhesive attachments.

The most widely used type of event monitor is a looping event monitor, also called a loop recorder. This device continuously records several minutes of ECG activity in loop, with new data overwriting the old. When a patient experiences symptoms, he or she activates the device's recording function, and the monitor stores the information registered (typically) 30 seconds before and two minutes after the point of activation. These registrations get stored in memory, and after several are captured, the patient must transmit the data via telephone. The device's memory can then be cleared and the process started again. The expanded recording capacity of a loop recorder can make catching an arrhythmia easier compared to a non-looping device. Also, the loop recorder uses electronic leads, so patients never miss recording an event because they can't find an appropriate place to lift their shirt and press a monitor to their chest. However, like the non-looping monitor, the loop recorder requires patient activation to record and thus necessitates some degree of operator skill. Moreover, both non-looping devices and loop recorders are activated only after a patient experiences symptoms, so by design they miss any asymptomatic arrhythmias the patient may have.

[11] Holter NJ, Generelli JA. Remote recording of physiologic data by radio. Rocky Mtn Med J. 1949;46:747-751.
[12] Bass EB, Curtiss EI, Arena VC, Hanusa BH, Cecchetti A, Karpf M, Kapoor WN: The duration of Holter monitoring in patients with syncope. Is 24 hours enough? Arch Intern Med 1990;150:1072-1078.

---

Please see important disclosure information on pages 13 - 16 of this report.
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

**Jefferies & Company, Inc.**
Page 9 of 16

**Exhibit 2**
**Page 133**

Clinical data suggest that only 15% to 20% of clinically significant cardiac events are symptomatic, creating a need for a monitor that can capture asymptomatic arrhythmias.

Auto-trigger (auto-detect) event monitors incorporate algorithm technology that enables them to catch the events patients can't — conditions such as atrial fibrillation, tachycardia, and bradycardia, which are often both asymptomatic and infrequent. Auto-trigger monitors also capture the symptomatic events that loop recorders and non-looping devices catch. Given the broad range of events it is capable of detecting over an extended interval, the device is associated with a significantly higher diagnostic yield than standard event monitors and Holters, as a notable study conducted by Dr. James Reiffel demonstrates[13]. All event monitors have relatively limited storage, and auto-trigger devices are no exception, though newer models show vast improvements over earlier technology. Also, like the other event monitors, auto-trigger devices require the patient to transmit the recorded data via telephone or run the risk of exhausting the device's storage capacity and failing to capture subsequent arrhythmias.

Continuous monitoring for symptomatic and asymptomatic arrhythmias was enhanced by the advent of telemetry, which incorporates real-time data transmission that doesn't require patient assistance to send. An early form of telemetry came from Cardiac Telecom, which in November 1998 received FDA approval for its HEARTLink II system. The HEARTLink II system is capable of wirelessly transmitting ECG data to a remote monitoring center on a continuous basis. However, the system requires constant communication with the base station the patient places in his or her home to successfully transmit data and thus lacks true mobile capabilities. Only two systems we are aware of can transmit data wherever there's cellular service and meet our definition of an MCOT device: BEAT's system and the ACT platform from LifeWatch. LifeWatch, which we estimate holds a 20% share of the MCOT market, launched its latest system, the ACT III Platinum, in late 2008.

BEAT's MCOT system has an approximate 80% share of the MCOT market. The first and second generations of BEAT's MCOT devices were granted FDA approval in February 2002. The company has since enhanced the system several times and received additional 510(k) clearances from the FDA. The wearable component of the system has three main parts — three chest leads that attach to a small, medallion-shaped sensor that communicates wirelessly with a PDA-sized monitor. The sensor detects the patient's heartbeats and transmits them to the monitor. The monitor analyzes each heartbeat, detects arrhythmias, and automatically sends each event to BEAT's monitoring center, via either the monitor's built-in cellular modem or by using the patient's home telephone connection. Monitoring technicians employed by BEAT review these events and report the results to the patient's doctor. The BEAT system, which is prescribed for up to 30 days and used until an arrhythmia diagnosis or exclusion can be made, is currently indicated for:

- Patients who have demonstrated a need for cardiac monitoring and are at low risk of developing primary ventricular fibrillation or sustained ventricular tachycardia

- Patients with dizziness or lightheadedness

- Patients with palpitations

- Patients with syncope of unknown etiology

- Patients who require monitoring for non life-threatening arrhythmias, such as atrial fibrillation, other supraventricular arrhythmias, evaluation of various bradyarrhythmias, and intermittent bundle branch block. This includes postoperative monitoring for these rhythms

- Patients recovering from coronary artery bypass graft surgery who require monitoring for arrhythmias

- Patients requiring monitoring for arrhythmias inducing co-morbid conditions such as hyperthyroidism or chronic lung disease

- Patients with obstructive or central sleep apnea to evaluate possible nocturnal arrhythmias

- Patients requiring arrhythmia evaluation for the etiology of stroke or transient cerebral ischemia, possibly secondary to atrial fibrillation

- Patients who require monitoring of the effect of drugs to control ventricular rate in various atrial arrhythmias (e.g., atrial fibrillation)

---

[13] Reiffel JA, Schwarzberg R, Murry M: Comparison of auto-triggered memory loop recorders versus standard loop recorders versus 24 hour Holter monitors for arrhythmia detection. Am J Cardiol 2005;95:1055-1059.

---

Please see important disclosure information on pages 13 - 16 of this report.

Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

Jefferies & Company, Inc.

Page 10 of 16

Exhibit 2
Page 134

Also, data from the device may be used by another device to analyze, measure, or report the QT interval. The device is not intended to sound any alarms for QT interval changes. BEAT's MCOT system is contraindicated for patients with potentially life-threatening arrhythmias who require inpatient monitoring and those the attending physician thinks should be hospitalized.

As of February 2009, BEAT had 25 U.S. patents and eight foreign patents relating to the functionality of individual MCOT components, operation of the total monitoring system, communication methodologies, system data control, ECG detection and analysis algorithms, and monitoring methods. The company aims to expand its patent estate to cover various other aspects of the technology and has roughly 44 patent applications on file in the U.S. and elsewhere.

BEAT was founded in the 1990s by James Sweeney, a pioneer of the home infusion industry who also founded Caremark, now part of CVS (CVS, $29.57, Buy). BEAT raised approximately $250MM in capital during Sweeney's time with the company. In November 2007, Sweeney was replaced by Arie Cohen, who'd previously held several senior positions with Viasys, which was acquired by Cardinal Health (CAH, $33.79, NC) in June 2007. Under Cohen's leadership, BEAT completed an initial public offering in March 2008 and a secondary offering in August of that year. Cohen left BEAT in late January 2009 to pursue other interests, which led to the appointment of Randy Thurman, then BEAT's executive chairman, as interim president and CEO. Thurman, who was formerly chairman and CEO of Viasys, has since been named Cohen's permanent replacement as president and CEO. Three other senior executives at BEAT previously worked at either Viasys or CAH: Martin Galvan, BEAT's CFO; Matthew Margolies, BEAT's senior vice president of sales; and John Imperato, BEAT's senior vice president of business operations.

Please see important disclosure information on pages 13 - 16 of this report.    Jefferies & Company, Inc.
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176    Page 11 of 16

Exhibit 2
Page 135

BEAT

**CardioMet: Estimated Quarterly Profit and Loss Statement ($MM)**

| | Year Ending December 2008 | | | | | Year Ending December 2009 | | | | | Year Ending December 2010 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Year | Q1E | Q2E | Q3E | Q4E | Year | Q1E | Q2E | Q3E | Q4E | Year |
| Cost of Goods Sold | 9.5 | 9.8 | 10.0 | 10.5 | 39.9 | 11.2 | 12.3 | 13.9 | 16.2 | 53.6 | 16.8 | 16.9 | 17.3 | 18.7 | 69.7 |
| Research and Development | 1.1 | 0.9 | 0.9 | 1.0 | 4.0 | 1.1 | 1.1 | 1.2 | 1.2 | 4.6 | 1.3 | 1.3 | 1.4 | 1.4 | 5.4 |
| General and Administrative | 9.1 | 10.0 | 10.8 | 11.0 | 40.9 | 12.6 | 12.9 | 12.9 | 12.9 | 51.2 | 13.8 | 14.1 | 14.9 | 15.3 | 58.1 |
| Sales and Marketing | 5.1 | 5.4 | 5.2 | 5.4 | 21.1 | 8.7 | 9.0 | 9.0 | 9.2 | 35.9 | 9.7 | 9.7 | 10.5 | 10.8 | 40.7 |
| Interest/Other Expense (Income) | (0.1) | (0.5) | (0.3) | (0.3) | (1.0) | (0.3) | (0.3) | (0.3) | (0.3) | (1.2) | (0.4) | (0.4) | (0.4) | (0.4) | (1.4) |
| Taxes | 0.3 | 1.4 | 1.9 | 3.1 | 6.7 | 0.7 | 1.6 | 2.5 | 4.1 | 8.9 | 3.8 | 3.7 | 3.4 | 4.2 | 15.1 |
| Basic Shares (MM) | 18.3 | 23.1 | 23.2 | 23.4 | 22.0 | 23.2 | 23.0 | 22.8 | 22.6 | 22.9 | 22.4 | 22.2 | 22.0 | 21.8 | 22.1 |
| Diluted Shares (MM) | 18.3 | 24.2 | 24.0 | 24.0 | 22.7 | 24.2 | 24.2 | 24.3 | 24.3 | 24.3 | 24.3 | 24.4 | 24.4 | 24.5 | 24.4 |
| **Margin Analysis** | | | | | | | | | | | | | | | |
| Gross Profit | 62.6% | 66.5% | 67.9% | 69.4% | 66.9% | 68.0% | 68.5% | 67.5% | 67.3% | 67.8% | 67.0% | 67.0% | 67.0% | 67.0% | 67.0% |
| Research and Development | 4.5% | 3.2% | 3.0% | 2.9% | 3.3% | 3.2% | 2.9% | 2.7% | 2.5% | 2.8% | 2.6% | 2.5% | 2.6% | 2.5% | 2.5% |
| General and Administrative | 35.6% | 34.1% | 34.5% | 32.0% | 33.9% | 36.0% | 33.0% | 30.0% | 26.0% | 30.8% | 27.0% | 27.5% | 28.5% | 27.0% | 27.5% |
| Sales and Marketing | 20.1% | 10.7% | 16.7% | 15.6% | 17.5% | 25.0% | 23.0% | 21.0% | 18.5% | 21.6% | 19.0% | 19.0% | 20.0% | 19.0% | 19.2% |
| Operating Income | 2.4% | 10.7% | 13.7% | 18.9% | 12.1% | 3.8% | 9.6% | 13.8% | 20.3% | 12.6% | 18.4% | 18.0% | 15.9% | 18.5% | 17.7% |
| Pretax Income | 2.9% | 11.6% | 14.8% | 19.8% | 12.9% | 4.7% | 10.4% | 14.5% | 20.9% | 13.4% | 19.1% | 18.7% | 16.6% | 19.1% | 18.4% |
| Pro Forma Net Income | 1.7% | 6.8% | 8.6% | 10.8% | 7.3% | 2.8% | 6.2% | 8.7% | 12.5% | 8.0% | 11.6% | 11.4% | 10.1% | 11.7% | 11.2% |
| Tax Rate | 40.0% | 41.8% | 41.8% | 45.2% | 43.2% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 39.0% | 39.0% | 39.0% | 39.0% | 39.0% |
| **Growth Analysis** | | | | | | | | | | | | | | | |
| Total Revenue | 129% | 68% | 52% | 44% | 65% | 37% | 33% | 37% | 44% | 38% | 46% | 31% | 22% | 15% | 27% |
| Gross Profit | 118% | 70% | 58% | 57% | 70% | 49% | 37% | 37% | 39% | 40% | 44% | 28% | 21% | 14% | 26% |
| Research and Development | 15% | (9%) | 16% | 2% | 6% | (2%) | 21% | 23% | 28% | 16% | 19% | 13% | 17% | 15% | 16% |
| General and Administrative | 74% | 41% | 50% | 37% | 49% | 39% | 28% | 20% | 17% | 25% | 10% | 9% | 16% | 15% | 13% |
| Sales and Marketing | 54% | 24% | 32% | 24% | 32% | 71% | 66% | 73% | 71% | 70% | 11% | 8% | 16% | 16% | 13% |
| Operating Income | NM | NM | 180% | 239% | 5,917% | 114% | 19% | 38% | 54% | 44% | 607% | 146% | 40% | 18% | 13% |
| Pretax Income | NM | NM | 155% | 225% | NM | 122% | 18% | 35% | 52% | 43% | 498% | 136% | 39% | 5% | 78% |
| Pro Forma Net Income | NM | NM | 49% | 78% | NM | 122% | 22% | 39% | 67% | 51% | 508% | 140% | 42% | 7% | 75% |
| Pro Forma EPS | NM | NM | 4% | 26% | NM | 66% | 22% | 34% | 67% | 41% | 510% | 139% | 44% | 4% | 76% |

*Source: Company reports and Jefferies & Company, Inc. estimates*

Please see important disclosure information on pages 13 - 16 of this report.
Brian Kennedy , bkennedy@jefferies.com, (212) 284-2176

Jefferies & Company, Inc.
Page 12 of 16

Exhibit 2
Page 136

BEAT

## Company Description
Conshohocken, Pennsylvania-based CardioNet develops and markets technology to diagnose and monitor cardiac arrhythmias. Its lead product is the mobile cardiac outpatient telemetry system.

## ANALYST CERTIFICATIONS
I, Brian Kennedy, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Peter Bye, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

I, Joshua Jennings, certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies). I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

## Important Disclosures

As is the case with all Jefferies employees, the analyst(s) responsible for the coverage of the financial instruments discussed in this report receive compensation based in part on the overall performance of the firm, including investment banking income. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Aside from certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgement.

Jefferies makes a market in CardioNet.

Within the past twelve months, Jefferies and/or its affiliates received non-investment banking, securities related compensation for client services it provided to Intel Corporation.

Jefferies makes a market in Intel Corporation.

## Meanings of Jefferies & Company, Inc, Ratings
Buy - Describes stocks that we expect to provide a total return (price appreciation plus yield) of 15% or more within a 12-month period.

Hold - Describes stocks that we expect to provide a total return (price appreciation plus yield) of plus 15% or minus 10% within a 12-month period.

Underperform - Describes stocks that we expect to provide a total negative return (price appreciation plus yield) of 10% or more within a 12-month period.

Our focus on mid-capitalization and growth companies implies that many of the companies we cover are typically more volatile than the overall stock market, which can be amplified for companies with an average stock price consistently below $10. For companies in this category only, the expected total return (price appreciation plus yield) for Buy rated stocks is 20% or more within a 12-month period. For Hold rated stocks with an average stock price consistently below $10, the expected total return (price appreciation plus yield) is plus or minus 20% within a 12-month period. For Underperform rated stocks with an average stock price consistently below $10, the expected total return (price appreciation plus yield) is minus 20% within a 12-month period.

NR - The investment rating and price target have been temporarily suspended. Such suspensions are in compliance with applicable regulations and/or Jefferies & Company, Inc. policies.

CS - Coverage Suspended. Jefferies & Company, Inc. has suspended coverage of this company.

NC - Not covered. Jefferies & Company, Inc. does not cover this company.

Restricted - Describes issuers where, in conjunction with Jefferies engagement in certain transactions, company policy or applicable securities regulations prohibit certain types of communications, including investment recommendations.

---

Please see important disclosure information on pages 13 - 16 of this report.
Brian Kennedy , bkennedy@Jefferies.com. (212) 284-2176

**Jefferies & Company, Inc.**

Exhibit 2
Page 137

**BEAT**

Monitor - Describes stocks whose company fundamentals and financials are being monitored, and for which no financial projections or opinions on the investment merits of the company are provided.

## Valuation Methodology

Jefferies' methodology for assigning ratings may include the following: market capitalization, maturity, growth/value, volatility and expected total return over the next 12 months. The price targets are based on several methodologies, which may include, but are not restricted to, analyses of market risk, growth rate, revenue stream, discounted cash flow (DCF), EBITDA, EPS, cash flow (CF), free cash flow (FCF), EV/EBITDA, P/E, PE/growth, P/CF, P/FCF, premium (discount)/average group EV/EBITDA, premium (discount)/average group P/E, sum of the parts, net asset value, dividend returns, and return on equity (ROE) over the next 12 months.

## Risk which may impede the achievement of our Price Target

This report was prepared for general circulation and does not provide investment recommendations specific to individual investors. As such, the financial instruments discussed in this report may not be suitable for all investors and investors must make their own investment decisions based upon their specific investment objectives and financial situation utilizing their own financial advisors as they deem necessary. Past performance of the financial instruments recommended in this report should not be taken as an indication or guarantee of future results. The price, value of, and income from, any of the financial instruments mentioned in this report can rise as well as fall and may be affected by changes in economic, financial and political factors. If a financial instrument is denominated in a currency other than the investor's home currency, a change in exchange rates may adversely affect the price of, value of, or income derived from the financial instrument described in this report. In addition, investors in securities such as ADRs, whose values are affected by the currency of the underlying security, effectively assume currency risk.



Please see important disclosure information on pages 13 - 16 of this report.
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

**Jefferies & Company, Inc.**
Page 14 of 16

Exhibit 2
Page 138

**BEAT**





## Distribution of Ratings

| Rating | Count | Percent | IB Serv./Past 12 Mos. Count | Percent |
|---|---|---|---|---|
| BUY [BUY/ SB] | 423 | 52.40 | 47 | 11.11 |
| HOLD [HOLD] | 307 | 38.00 | 21 | 6.84 |
| SELL [SU/ UNPF] | 77 | 9.50 | 6 | 7.79 |

## OTHER DISCLOSURES

This material has been prepared by Jefferies & Company, Inc. a U.S.-registered broker-dealer, employing appropriate expertise, and in the belief that it is fair and not misleading. The information upon which this material is based was obtained from sources believed to be reliable, but has not been independently verified, therefore, we do not guarantee its accuracy. Additional and supporting information is available upon request. This is not an offer or solicitation of an offer to buy or sell any security or investment. Any opinion or estimates constitute our best judgment as of this date,

Please see important disclosure information on pages 13 - 16 of this report.

**Jefferies & Company, Inc.**

Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

Page 15 of 16

Exhibit 2
Page 139

**BEAT**

and are subject to change without notice. Jefferies & Company, Inc. and Jefferies International Limited and their affiliates and their respective directors, officers and employees may buy or sell securities mentioned herein as agent or principal for their own account. Upon request Jefferies & Company, Inc. may provide specialized research products or services to certain customers focusing on the prospects for individual covered stocks as compared to other covered stocks over varying time horizons or under differing market conditions. While the views expressed in these situations may not always be directionally consistent with the long-term views expressed in the analyst's published research, the analyst has a reasonable basis and any inconsistencies can be reasonably explained.

## Additional information for UK and Canadian investors

This material has been issued by Jefferies & Company, Inc. and in the United Kingdom ("UK") is approved and distributed by Jefferies International Limited which is authorized and regulated by the Financial Services Authority ("FSA").

In the UK, this material is intended for use only by persons who have professional experience in matters relating to investments falling within Articles 19(5) and 49(2)(a) to (d) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended), or by persons to whom it can be otherwise lawfully distributed. For Canadian investors, this material is intended for use only by professional or institutional investors. None of the investments or investment services mentioned or described herein is available to other persons or to anyone in Canada who is not a "Designated Institution" as defined by the Securities Act (Ontario). For investors in the Republic of Singapore, this material is provided by Jefferies & Company, Inc. through Jefferies Singapore Limited ("JSL") pursuant to Regulation 32C of the Financial Advisers Regulations. The material contained in this document is intended solely for accredited, expert or institutional investors, as defined under the Securities and Futures Act (Cap. 289 of Singapore). If there are any matters arising from, or in connection with this material, please contact JSL in Singapore at 80 Raffles Place #15-20, UOB Plaza 2, Singapore 048624, telephone: +65 6551 3950.

The information set forth herein was obtained from sources believed to be reliable, but has not been independently verified by JIL, JSL or JEFCO. Therefore, except for any obligation under the rules of the FSA we do not guarantee its accuracy. Additional and supporting information is available upon request. This is not an offer or solicitation of an offer to buy or sell any security or derivative instrument, or to make any investment. Any opinion or estimate constitutes the preparer's best judgment as of the date of preparation, and is subject to change without notice. JIL, JSL, JEFCO, their associates or affiliates, and their respective officers, directors, and employees may have long or short positions in, or may buy or sell any of the securities, derivative instruments or other investments mentioned or described herein, either as agent or as principal for their own account.

This material does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this report is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of the investments referred to herein and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

Jefferies & Company, Inc. research reports are disseminated and available primarily electronically, and, in some cases, in printed form. Electronic research is simultaneously available to all clients. This report or any portion hereof may not be reprinted, sold or redistributed without the written consent of Jefferies & Company, Inc. Jefferies International Limited has adopted a conflicts management policy in connection with the preparation and publication of research, the details of which are available upon request in writing to: The Compliance Officer, Jefferies International Limited, Vintners Place, 68 Upper Thames Street, London EC4V 3BJ; telephone +44 (0)20 7029 8000; facsimile +44 (0)20 7029 8010.

## © 2009 Jefferies & Company, Inc,

Please see important disclosure information on pages 13 - 16 of this report.
Brian Kennedy , bkennedy@Jefferies.com, (212) 284-2176

**Jefferies & Company, Inc.**
Page 16 of 16

Exhibit 2
Page 140

# EXHIBIT 2

**Exhibit 2**
**Page 141**



1 of 1 DOCUMENT

Copyright 2009 Factiva ®, from Dow Jones
All Rights Reserved

# Dow Jones Factiva

(Copyright (c) 2009, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL

The Wall Street Journal

November 20, 2009 Friday

**SECTION:** Pg. C1

**LENGTH:** 1164 words

**HEADLINE:** A Tough 'Sell' for Jefferies Analyst

**BYLINE:** By David Armstrong

**BODY:**

Jefferies & Co. analyst Brian Kennedy made the best call of his fledgling career when he slapped a "sell" rating on shares of CardioNet Inc. earlier this year.

Then he quit his job.

In an April 24 report, Mr. Kennedy accurately predicted a dire cut in the price Medicare pays for CardioNet's remote heart-monitoring system. The call would have protected anyone heeding his advice from potentially big losses in the stock, which is down 78% since the report.

But for Mr. Kennedy, the call brought internal pressure and unexpected criticism. He found himself the subject of a complaint to the Securities and Exchange Commission brought by CardioNet and faced an in-house inquiry by Jefferies lawyers while his research was being pummeled by competitors.

Mr. Kennedy's case is an example of the difficulty that analysts can face when their opinions on stocks are negative. In 2003, under federal and state pressure, securities firms agreed to rules for insulating analysts from colleagues who make big fees keeping corporate clients happy. Despite these efforts, "sell" recommendations remain rare and unpopular.

"There is no real desire for that kind of report on Wall Street," says Mr. Kennedy, who is 36 years old and joined Jefferies in 2007 from Wachovia Securities. "I thought I was doing research with credibility, and when that became controversial, I thought, 'How do I win at this game?' "

Exhibit 2
Page 142

Page 2

A Tough 'Sell' for Jefferies Analyst The Wall Street Journal November 20, 2009 Friday

Jefferies says "sell" ratings represent 8% of its analysts' recommendations. "Buys" make up 53% and holds are 39%. That mirrors the overall picture on Wall Street where, as of Nov. 1, only 7% of analyst reports in North America were "sell" ratings, and 48.2% were "buys," according to Thomson Financial.

Mr. Kennedy said there were some analysts with the firm that were supportive of his call and encouraged him. Among his defenders was Jefferies's head of research. In addition, the internal review by Jefferies's legal department cleared him of wrongdoing.

Nevertheless, Mr. Kennedy said other senior Jefferies analysts chided him for "rocking the boat." He said that he felt exposed and defenseless against mounting outside attacks because a Jefferies committee responsible for vetting analysts' reports blocked him from releasing more detailed information on how he made his call. Another person familiar with the committee confirmed its action. Jefferies spokesman Tom Tarrant declined to comment on Mr. Kennedy or the aftermath of his report.

"It was very stressful for him because he knew he had done the work that typically hadn't been done on this name, yet he was persecuted for it unjustly," says Joshua Jennings, a Jefferies analyst who worked with Mr. Kennedy on a team covering health-care companies, in reference to the CardioNet rating.

Mr. Kennedy says his "sell" rating came after weeks of research into CardioNet. The Conshohocken, Pa., company went public in 2008 on the strength of its wireless system that sends data on a patient's heartbeat to a monitoring center for doctors. After talking to reimbursement experts, insurers and physicians, Mr. Kennedy became convinced that CardioNet was in for a drastic price cut from Medicare, the government health insurer.

On the day his report was issued, April 24, CardioNet's stock was drubbed, dropping 13% to $19.94 in heavy trading. At the time, the mean rating on the stock from other analysts was a "buy," according to Thomson Financial. Several of the most bullish analysts worked for underwriters of the company's initial public offering. Jefferies is a dealer in CardioNet stock, but hasn't done investment-banking work for the company.

In early April, Citigroup Inc., one of the underwriters, added CardioNet to its "Top Picks Live," a list of companies that represent its highest-conviction ideas. That report cited "in-tact reimbursement for 2009" as part of the rationale for CardioNet.

Within hours of Mr. Kennedy's report, another underwriter, Leerink Swann LLC, reiterated its "buy" rating on CardioNet, quoting the company as "confident no decision regarding a potential change to reimbursement is imminent." Leerink declined to comment.

On April 26, Citi issued "Not Worthy of the BEAT-down" -- a report playing on CardioNet's BEAT ticker symbol -- maintaining its "buy" rating and questioning the legitimacy of the Jefferies report.

Citi analyst Amit Bhalla said CardioNet management had been in contact with Highmark Medicare Services, a contractor hired by Medicare to set reimbursement rates for CardioNet's monitoring system, and saw "no signal of pending reimbursement changes."

Mr. Kennedy says he talked to Highmark and that it supplied important information in helping him make his call. Mr. Bhalla says he never tried to contact Highmark, which declined to comment for this article; Mr. Bhalla also said Citi's investment-banking work for CardioNet had no influence on his views.

On April 28, CardioNet issued a news release saying that neither Highmark nor Medicare had provided any information to Jefferies about a rate cut. CardioNet based its information on an email from Highmark's legal counsel, says Randy Thurman, CardioNet's chief executive.

At a Bank of America health-care conference on May 12, Mr. Thurman accused Jefferies of failing to do "proper

Exhibit 2
Page 143

Page 3

A Tough 'Sell' for Jefferies Analyst The Wall Street Journal November 20, 2009 Friday

due diligence" and again asserted that the analyst didn't receive any information from Highmark. He said CardioNet was the "victim of a train wreck."

But by then, Mr. Kennedy says his days were occupied with defending his call to customers, colleagues and internal lawyers. "It was a hostile environment where people view you as troublemaker," he said.

In letters in early June to the SEC, the Nasdaq Stock Market and the Financial Industry Regulatory Authority, Mr. Thurman suggested the Jefferies report may have been part of a plot to enrich CardioNet short sellers betting on a share-price decline. The agencies declined to comment. Mr. Kennedy says the allegation is false.

"[T]his strikes me as blatant and inappropriate manipulation of our company's stock," Mr. Thurman wrote in the letters. He said the Jefferies report was suspect "given its apparent inaccuracy" and questioned "whether it was written with the intent of driving down our stock price."

On June 30, CardioNet announced some private insurers were cutting reimbursement rates, and lowered revenue expectations. Then, on July 12, it said Medicare was cutting payment for the monitoring system to $754 per patient from $1,123. CardioNet shares plummeted, and the stock now trades at $5.15. The 33% rate cut was identical to what Mr. Kennedy forecast as a possibility in April.

Mr. Thurman, in a recent interview, said the rate cut means CardioNet "will not be able to sustain operations as a stand-alone company."

He says CardioNet is fighting to get the reimbursement decision overturned.

Mr. Kennedy quit his job in July. He says he is now considering working for an independent research shop that doesn't do any investment-banking work.



Exhibit 2
Page 144

Page 4

A Tough 'Sell' for Jefferies Analyst The Wall Street Journal November 20, 2009 Friday

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** November 24, 2009

**Exhibit 2**
**Page 145**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DIANNE SOLOMON-SHRAWDER, Individually and on Behalf of All Others Similarly Situated, | CIVIL ACTION No. 2:09-cv-3894-SD |
| Plaintiff, | |
| v. | CLASS ACTION |
| CARDIONET INC., RANDY THURMAN and MARTIN P. GALVAN, | **FILED ELECTRONICALLY** |
| Defendants. | |

## CERTIFICATE OF SERVICE

I certify that on January 15, 2010 I electronically filed the foregoing Amended Motion of

Lead Plaintiff Central Laborers' Pension Welfare and Annuity Funds for Approval of Its

Selection of Counsel as Co-Lead Counsel for the Class with the Clerk of the Court using the

ECF system, and also served the forgoing by e-mail upon the following counsel:

Deborah R. Gross
**LAW OFFICES OF BERNARD M.**
 **GROSS, P.C.**
debbie@bernardmgross.com

Marc J. Sonnenfeld
**MORGAN LEWIS & BOCKIUS LLP**
msonnenfeld@morganlewis.com

Dated: January 15, 2010

___/s/ Jeffrey W. Golan_____
Jeffrey W. Golan

**Exhibit 2**
**Page 146**